REDACTED

# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

———————————————————————

|  |  |  |
|---|---|---|
| In Re:  AUTOMOTIVE PARTS ANTITRUST LITIGATION | ) ) ) ) | 12-md-02311 Honorable Marianne O. Battani |

———————————————————————

In re:  FUEL INJECTION SYSTEMS

———————————————————————

THIS RELATES TO:

ALL DEALERSHIP ACTIONS

———————————————————————

)
)
)  12-md-02311
)  Honorable Marianne O. Battani
)
)  2:13-cv-02202-MOB-MKM
)
)  CONSOLIDATED AMENDED
)   CLASS ACTION COMPLAINT
)
)  JURY TRIAL DEMANDED
)
)  [FILED UNDER SEAL-HIGHLY
)  CONFIDENTIAL]

## DEALERSHIP CONSOLIDATED CLASS COMPLAINT

Martens Cars of Washington, Inc. ("Plaintiff Martens"), Landers Auto Group No. 1, Inc.,

d/b/a Landers Toyota ("Plaintiff Landers"), Hammett Motor Company, Inc. ("Plaintiff Hammett"),

Superstore Automotive, Inc. ("Plaintiff Superstore"), Lee Pontiac-Oldsmobile-GMC Truck, Inc.

("Plaintiff Lee"), V.I.P. Motor Cars Ltd. ("Plaintiff V.I.P."), Desert European Motorcars, Ltd.

("Plaintiff Desert"), Dale Martens Nissan Subaru, Inc. ("Plaintiff Dale Martens"), Green Team of

Clay Center Inc. ("Plaintiff Green Team"), McGrath Automotive Group, Inc. ("Plaintiff

McGrath"), Table Rock Automotive, Inc., d/b/a Todd Archer Hyundai ("Plaintiff Table Rock"),

Archer-Perdue, Inc., d/b/a/ Archer-Perdue Suzuki ("Plaintiff Archer-Perdue"), Bonneville and Son,

Inc. ("Plaintiff Bonneville"), Holzhauer Auto and Truck Sales, Inc. ("Plaintiff Holzhauer"), Pitre,

Inc., d/b/a/ Pitre Buick GMC ("Plaintiff Pitre"), Patsy Lou Chevrolet, Inc. ("Plaintiff Patsy Lou"),

John Greene Chrysler Dodge Jeep, LLC ("Plaintiff John Greene"), SLT Group II, Inc., d/b/a Planet

Nissan Subaru of Flagstaff ("Plaintiff Planet Nissan"), Herb Hallman Chevrolet, Inc., d/b/a/

Champion Chevrolet ("Plaintiff Champion"), Charles Daher's Commonwealth Motors, Inc., d/b/a

REDACTED

Commonwealth Chevrolet, Commonwealth Kia, Commonwealth Honda ("Plaintiff Commonwealth Motors"), Commonwealth Volkswagen, Inc., d/b/a Commonwealth Volkswagen ("Plaintiff Commonwealth Volkswagen"), Commonwealth Nissan, Inc., d/b/a Commonwealth Nissan ("Plaintiff Commonwealth Nissan"), Ramey Motors, Inc. ("Plaintiff Ramey"), Thornhill Superstore, Inc.,  d/b/a Thornhill GM Superstore ("Plaintiff Thornhill"), Dave Heather Corporation, d/b/a Lakeland Toyota Honda Mazda Subaru ("Plaintiff Lakeland"), Central Salt Lake Valley GMC Enterprises, LLC, d/b/a Salt Lake Valley Buick GMC ("Plaintiff Salt Lake Valley"), Capitol Chevrolet Cadillac, Inc. ("Plaintiff Capitol Chevrolet"), Capitol Dealerships, Inc., d/b/a Capitol Toyota ("Plaintiff Capitol Toyota"), Beck Motors, Inc. ("Plaintiff Beck"), Stranger Investments d/b/a Stephen Wade Toyota ("Plaintiff Wade"), John O'Neil Johnson Toyota, LLC ("Plaintiff Johnson"), Hartley Buick GMC Truck, Inc. ("Plaintiff Hartley"), Lee Oldsmobile-Cadillac, Inc. d/b/a Lee Honda ("Plaintiff Lee Honda"), Lee Auto Malls-Topsham, Inc. d/b/a Lee Toyota of Topsham ("Plaintiff Topsham"), Landers of Hazelwood, LLC d/b/a Landers Toyota of Hazelwood ("Plaintiff Hazelwood"), Cannon Chevrolet – Oldsmobile – Cadillac – Nissan, Inc. ("Plaintiff Cannon"), Cannon Nissan of Jackson, LLC ("Plaintiff Cannon Nissan"), Hudson Charleston Acquisition, LLC d/b/a Hudson Nissan ("Plaintiff Hudson Nissan"), Shearer Automotive Enterprises III, Inc. ("Plaintiff Shearer"), Apex Motor Corporation ("Plaintiff Apex"), Hudson Gastonia Acquisition, LLC ("Plaintiff Gastonia Nissan"); HC Acquisition, LLC d/b/a Toyota of Bristol ("Plaintiff Bristol Toyota"), Hodges Imported Cars, Inc. d/b/a Hodges Subaru ("Plaintiff Hodges"); Reno Dodge Sales, Inc. d/b/a Don Weir's Reno Dodge ("Plaintiff Don Weir"); Scotland Car Yard Enterprises d/b/a San Rafael Mitsubishi ("Plaintiff San Rafael"); Empire Nissan of Santa Rosa, LLC ("Plaintiff Empire Nissan"); Panama City Automotive Group, Inc. d/b/a John Lee Nissan ("Plaintiff John Lee"); and Westfield Dodge City, Inc. ("Plaintiff

REDACTED

Westfield") (collectively "Plaintiffs"), file this Class Action Complaint on behalf of themselves and all others similarly situated (the "Classes" as defined below).

Plaintiffs bring this class action for damages, injunctive relief, and other relief pursuant to federal antitrust laws and state unjust enrichment, antitrust, unfair competition, and consumer protection laws, demand a trial by jury, and allege as follows:

## NATURE OF ACTION

1.     This lawsuit is brought as a proposed class action against Defendants Aisan Industry Co., Ltd., Franklin Precision Industry, Inc., Aisan Corporation of America, Hyundam Industrial Co., Ltd., (collectively, "Aisan Defendants" or "Aisan"), Hitachi Automotive Systems, Ltd., Hitachi Automotive Systems Americas, Inc. (collectively, "Hitachi")[1], DENSO Corporation, DENSO International America, Inc., and DENSO Internation Korea Corporation ("DIKR") (collectively, "DENSO Defendants" or "DENSO"), Keihin Corporation, Keihin North America, Inc. (collectively, "Keihin Defendants" or "Keihin"), Maruyasu Industries Co., Ltd. ("Maruyasu"), Mikuni Corporation, Mikuni American Corporation (collectively, "Mikuni Defendants" or "Mikuni"), Mitsuba Corporation, American Mitsuba Corporation (collectively, "Mitsuba Defendants" or "Mitsuba"), Mitsubishi Electric Corporation, Mitsubishi Electric US Holdings, Inc., and Mitsubishi Electric Automotive America, Inc. (collectively, "Mitsubishi Defendants" or "Mitsubishi"), Robert Bosch GmbH, Bosch Electrical Drives Co., Ltd. and Robert Bosch LLC (collectively, "Bosch Defendants" or "Bosch"), (all as defined below, and collectively "Defendants") (collectively, "Defendants") and unnamed co-conspirators, manufacturers and/or suppliers of Fuel Injection Systems (defined below) for engaging in a long-

---

[1] For the purposes of this Complaint, the terms "Hitachi Defendants" or "Defendants" also includes the former Hitachi Automotive Systems Group of Hitachi, Ltd., as it existed prior to July 1, 2009, the former Hitachi Unisia Automotive, Ltd. and the former Tokico Ltd.

REDACTED

running conspiracy to unlawfully fix, artificially raise, maintain and/or stabilize prices, rig bids

for, and allocate the market and customers in the United States for Fuel Injection Systems.

2.      Plaintiffs seek to represent all automobile dealers, during the period from and

including January 1, 2000 through the present (the "Class Period"), purchased vehicles[2] which

included one or more Fuel Injection System(s) as a component part, or purchased one or more

Fuel Injection Systems(s) as a replacement part, which were manufactured or sold by

Defendants, any current or former subsidiary of Defendants or any co-conspirator of Defendants.

3.      "Fuel Injection Systems" admit fuel or a fuel/air mixture into engine cylinders and

may include injectors, high pressure pumps, rail assemblies, feed lines, electronic throttle bodies,

airflow meters, engine control units, fuel pumps, fuel pump modules, manifold absolute pressure

sensors ("MAP Sensors"), pressure regulators, pulsation dampers, purge control valves and other

components sold as a unitary system.  Fuel Injection Systems can also be sold as part of a

broader system, such as an engine management system.  Fuel Injection Systems are part of the

powertrain segment of the automotive market.

4.      Defendants manufacture, market, and sell Fuel Injection Systems throughout and

into the United States.  Defendants and other co-conspirators (as yet unknown) agreed,

combined, and conspired to fix, raise, maintain, and/or stabilize prices, rig bids and allocate

market shares for Fuel Injection Systems.

5.      The U.S. Department of Justice's ("DOJ") Antitrust Division is currently

conducting a broad criminal investigation into illegal price fixing and bid rigging in the

automotive parts industry.  As part of its criminal investigation, the DOJ is seeking information

about unlawful anticompetitive conduct in the market for a number of different but related

---

[2] "Vehicles" as used here, means any new vehicles purchased by automobile dealers throughout the United States, including but not limited to sedans, trucks and sport utility vehicles.

REDACTED

automotive parts, and the Federal Bureau of Investigation ("FBI") has participated in raids, pursuant to search warrants, carried out in the offices of a number of major competitors in the automotive parts industry. The automotive parts investigation is the largest criminal investigation the Antitrust Division has ever pursued, both in terms of its scope and the potential volume of commerce affected by the alleged illegal conduct. The ongoing cartel investigation of price-fixing and bid-rigging in the automotive parts industry has yielded $2.4 billion in criminal fines, already surpassing the total amount in criminal fines obtained by the DOJ's Antitrust Division for all of last fiscal year. The European Commission Competition Authority ("EC") has also conducted dawn raids at the European offices of several automotive parts manufacturers.

6.      Defendant Aisan Industry Co., Ltd. agreed to plead guilty to a one count criminal Information and to pay a $6.86 million fine for its unlawful participation in a combination and conspiracy to suppress and eliminate competition in the automotive parts industry by agreeing to rig bids for, and to fix, stabilize, and maintain the prices of, electronic throttle bodies, fuel pump modules (including fuel pumps), and charcoal canisters sold to Nissan Motor Co., Ltd. and certain of its subsidiaries in the United States and elsewhere, from at least as early as October 2003 until at least February 2010. The combination and conspiracy engaged in by Defendant Aisan Industry Co., Ltd. and its co-conspirators was in unreasonable restraint of interstate and foreign trade and commerce in violation of the Sherman Antitrust Act, 15 U.S.C. § 1.

7.      Defendant DENSO Corporation agreed to plead guilty to a two-count criminal Information and to pay a $78 million fine for participating in a combination and conspiracy to suppress and eliminate competition in the automotive parts industry by agreeing to rig bids for, and to fix, stabilize, and maintain the prices of, certain electronic control units ("ECUs") and heater control panels ("HCPs") sold to an automobile manufacturer in the United States and

REDACTED

elsewhere from at least as early as January 2000 until at least February 2010.  The combination and conspiracy engaged in by Defendant DENSO Corporation and its co-conspirators was in unreasonable restraint of interstate and foreign trade and commerce in violation of the Sherman Antitrust Act, 15 U.S.C. § 1.

8.      In addition to the fact that Defendant DENSO Corporation pleaded guilty and agreed on its own behalf and on behalf of its subsidiaries to cooperating in the government's investigation, several of its high-ranking executives have pleaded guilty to criminal price-fixing in the automotive parts industry.

9.      On March 26, 2012, the DOJ announced that Norihiro Imai, an executive of Defendant DENSO Corporation, agreed to serve one year and one day in a U.S. prison, pay a $20,000 criminal fine, and plead guilty to a one-count criminal Information charging him with engaging in a conspiracy to rig bids for, and to fix, stabilize and maintain the prices of HCPs sold to customers in the United States and elsewhere.

10.     On April 26, 2012, the DOJ announced that Makoto Hattori, an executive of Defendant DENSO Corporation, agreed to serve fourteen months in a U.S. prison, pay a $20,000 criminal fine, and plead guilty to a one-count criminal Information charging him with engaging in a conspiracy to rig bids for, and to fix, stabilize, and maintain the prices of HCPs sold to a customer in the United States and elsewhere.

11.     On May 21, 2013, the DOJ announced that Yuji Suzuki, an executive of Defendant DENSO Corporation, agreed to serve sixteen months in a U.S. prison, pay a $20,000 criminal fine, and plead guilty to a two-count criminal Information for his role in a conspiracy to rig bids for, and to fix, stabilize, and maintain the prices of ECUs and HCPs sold in the United States and elsewhere.  Also on May 21, 2013, the DOJ announced that Hiroshi Watanabe an

REDACTED

executive of Defendant DENSO Corporation, agreed to serve fifteen months in a U.S. prison, pay a $20,000 criminal fine, and plead guilty to a one-count criminal Information for his role in a conspiracy to rig bids for, and to fix, stabilize, and maintain the prices of HCPs sold in the United States and elsewhere.

12.     On February 20, 2014, the DOJ announced that Kazuaki Fujitani, a former executive of Defendant DENSO Corporation, agreed to serve one year and one day in a U.S. prison and plead guilty to a one-count criminal Information charging him with obstruction of justice for deleting numerous e-mails and electronic documents upon learning the FBI was executing a search warrant on Defendant DENSO International America, Inc. in connection with the DOJ's investigation into a conspiracy to fix the prices of HCPs installed in automobiles sold in the United States and elsewhere.

13.     On June 30, 2014, the DOJ announced that Satoru Horisaki, a former executive of Defendant DENSO Corporation, agreed to serve one year and one day in a U.S. prison, pay a $20,000 criminal fine, and plead guilty to a one-count criminal Information charging him with participating in a conspiracy to agree upon bids and prices for, and allocate the supply of, automotive instrument panel clusters sold to Honda of America Manufacturing Co. Inc., in the United States and elsewhere.

14.     On September 26, 2013, the DOJ announced that Hitachi Automotive Systems, Ltd. agreed to plead guilty and pay a $195 million criminal fine for its unlawful conduct in participating in a combination and conspiracy to suppress and eliminate competition in the automotive parts industry by agreeing to allocate the supply of, rig bids for, and fix, stabilize, and maintain the prices of, certain automotive products sold to automobile manufacturers, including, Nissan Motor Company, Ltd., Honda Motor Company, Ltd., General Motors

REDACTED

Company, Ford Motor Company, Toyota Motor Corporation, Chrysler Group LLC, and Fuji Heavy Industries Ltd., and certain of their subsidiaries, affiliates and suppliers, in the United States and elsewhere, from at least as early as January 2000 until at least February 2010.  For purposes of the plea agreement between Defendant Hitachi Automotive Systems, Ltd. and the United States, "automotive parts" were defined to include, among other products, air flow meters, fuel injection systems, and electronic throttle bodies.  The combination and conspiracy engaged in by Defendant Hitachi Automotive Systems, Ltd. and its co-conspirators was in unreasonable restraint of interstate and foreign trade and commerce in violation of the Sherman Antitrust Act, 15 U.S.C. § 1.

15.     On June 30, 2014, the DOJ announced that a federal grand jury returned a one-count Indictment against Takashi Toyokuni, Ken Funasaki, Kazunobu Tsunekawa and Tomiya Itakura of Hitachi Automotive Systems Ltd. for agreeing to allocate the supply of, rig bids for, and fix, stabilize and maintain the prices of, certain automotive parts sold to various automobile manufacturers such as Ford Motor Company, General Motors LLC, Nissan Motor Co. Ltd., Toyota Motor Corporation, and Honda Motor Company, Ltd., and others, and certain of their subsidiaries, in the United States and elsewhere.  For purposes of the Indictment, "automotive parts" included starter motors, alternators, air flow meters, valve timing control devices, fuel injection systems, electronic throttle bodies, ignition coils, inverters and motor generators.

16.     Defendant Mitsuba Corporation agreed to plead guilty and to pay a criminal fine of $135 million for participating in a combination and conspiracy to suppress and eliminate competition in the automotive parts industry by agreeing to rig bids for, and to fix, stabilize, and maintain the prices of, certain automotive parts sold to automobile manufacturers, including Honda Motor Company, Ltd., Fuji Heavy Industries Ltd., Nissan Motor Company, Ltd., Toyota

8

REDACTED

Motor Corporation, Chrysler Group LLC, and certain of their subsidiaries, affiliates and suppliers in the United States and elsewhere, from at least as early as January 2000 through at least February 2010. "Automotive parts," for purposes of the plea agreement, included, among other parts, electric throttle motors and fuel pumps. The combination and conspiracy engaged in by Defendant Mitsuba Corporation and its co-conspirators was in unreasonable restraint of interstate and foreign trade and commerce in violation of the Sherman Antitrust Act, 15 U.S.C. § 1.

17.     On December 1, 2014, the DOJ announced that a former executive of Defendant Mitsuba, Kazumi Umahashi, agreed to serve thirteen months in a U.S. prison, pay a $20,000 criminal fine, and plead guilty to a one-count criminal Information charging him with conspiring to fix the prices of products installed in cars sold in the United States and elsewhere. According to the Information, Kazumi Umahashi participated in a combination and conspiracy to suppress and eliminate competition in the automotive parts industry by agreeing to rig bids for, and to fix, stabilize, and maintain the prices of, certain automotive parts, including windshield wiper systems, and starter motors sold to Honda Motor Company Ltd. and certain of its subsidiaries, affiliates, suppliers, and others in the United States and elsewhere.

18.     Defendant Mitsubishi Electric Corporation agreed to plead guilty and to pay a criminal fine of $190 million for participating in a combination and conspiracy to suppress and eliminate competition in the automotive parts industry by agreeing to rig bids for, and to fix, stabilize, and maintain the price of, certain automotive parts sold to automobile manufacturers, including Ford Motor Company, General Motors LLC, Chrysler Group LLC, Fuji Heavy Industries Ltd., Nissan Motor Company, Ltd., Honda Motor Company, Ltd., Toyota Motor Corporation, and certain of their subsidiaries, in the United States and elsewhere, from at least as

REDACTED

early as January 2000 until at least February 2010. "Automotive parts," for purposes of the plea agreement, included, among other parts, fuel injections, fuel pumps, MAP sensors, purge control valves, and throttle bodies. The combination and conspiracy engaged in by Defendant Mitsubishi Electric Corporation and its co-conspirators was in unreasonable restraint of interstate and foreign trade and commerce in violation of the Sherman Antitrust Act, 15 U.S.C. § 1.

19.     On June 30, 2014, the DOJ announced that a federal grand jury returned a three-count Indictment against Atsushi Ueda, Minoru Kurisaki, and Hideyuki Saito, current and former executives of Mitsubishi Electric Corporation, for their participation in a conspiracy to fix the prices of certain automotive parts, including starter motors, alternators, and ignition coils. Count One charged Atsushi Ueda, Minoru Kurisaki, and Hideyuki Saito with participating in a conspiracy to suppress and eliminate competition in the automotive parts industry by agreeing to allocate the supply of, rig bids for, and fix, stabilize, and maintain the prices of, various automotive parts sold to Ford Motor Company., General Motors LLC, Chrysler Group LLC, Fuji Heavy Industries Ltd., Nissan Motor Company Ltd., Honda Motor Company Ltd., and certain of their subsidiaries, in the United States and elsewhere. Count Two charged Minoru Kurisaki and Hideyuki Saito with knowingly conspiring to obstruct justice by destroying documents and corruptly persuading, and attempting to persuade others, to destroy documents related to an official proceeding, grand jury investigation, and U.S. agency investigation. Count Three charged Hideyuki Saito with knowingly and corruptly persuading, or attempting to persuade, other employees of Mitsubishi Electric Corporation to destroy or conceal paper documents and delete electronic data that may contain evidence of antitrust crimes in the United States and elsewhere with the intent to impair the objects' availability and integrity for use in an official proceeding.

REDACTED

20.     Defendants and their co-conspirators participated in a combination and conspiracy to suppress and eliminate competition in the automotive parts industry by agreeing to rig bids for, and to fix, stabilize, and maintain the prices of, Fuel Injection Systems sold to automobile manufacturers and others in the United States.  The combination and conspiracy engaged in by Defendants and their co-conspirators was in unreasonable restraint of interstate and foreign trade and commerce in violation of the Sherman Antitrust Act, 15 U.S.C. § 1, and state antitrust, unfair competition, consumer protection and unjust enrichment laws.

21.     As a direct result of the anti-competitive and unlawful conduct alleged herein, Plaintiffs and the Classes (as defined below) paid artificially inflated prices for Fuel Injection Systems during the Class Period and have thereby suffered antitrust injury to their business or property.

## JURISDICTION AND VENUE

22.     Plaintiffs bring this action under Section 16 of the Clayton Act (15 U.S.C. § 26) to secure equitable and injunctive relief against Defendants for violating Section 1 of the Sherman Act (15 U.S.C. § 1).   Plaintiffs also assert claims for actual and exemplary damages pursuant to state antitrust, unfair competition, and consumer protection laws, and the state common law of unjust enrichment, and seek to obtain restitution, recover damages and secure other relief against Defendants for violations of those state laws.  Plaintiffs and the Classes also seek attorneys' fees, costs, and other expenses under federal and state law.

23.     This Court has jurisdiction over the subject matter of this action pursuant to Section 16 of the Clayton Act (15 U.S.C. § 26), Section 1 of the Sherman Act (15 U.S.C. § 1), and 28 U.S.C. §§ 1331 and 1337.  This Court has subject matter jurisdiction of the state law claims pursuant to 28 U.S.C. §§ 1332(d) and 1367, in that: (i) this is a class action in which the matter or controversy exceeds the sum of $5,000,000, exclusive of interests and costs, and in

REDACTED

which some members of the proposed Classes are citizens of a state different from Defendants; and (ii) Plaintiffs' state law claims form part of the same case or controversy as their federal claims under Article III of the United States Constitution.

24.     Venue is proper in this District pursuant to Section 12 of the Clayton Act (15 U.S.C. § 22) and 28 U.S.C. §§ 1391 (b), (c), and (d) because a substantial part of the events giving rise to Plaintiffs' claims occurred in this District, a substantial portion of the affected interstate trade and commerce discussed below has been carried out in this District, and Defendants reside, are licensed to do business in, are doing business in, had agents in, or are found or transact business in this District.

25.     This Court has *in personam* jurisdiction over Defendants because Defendants, either directly or through the ownership and/or control of their subsidiaries, *inter alia*: (a) transacted business in the United States, including in this District; (b) directly or indirectly sold or marketed substantial quantities of Fuel Injection Systems throughout the United States, including in this District; (c) had substantial aggregate contacts with the United States as a whole, including in this District; (d) targeted customers in the United States, including in this District; or (e) were engaged in an illegal price-fixing conspiracy that was directed at, and had a direct, substantial, reasonably foreseeable and intended effect of causing injury to the business or property of persons and entities residing in, located in, or doing business throughout the United States, including in this District.  Defendants also conduct business throughout the United States, including in this District, and have purposefully availed themselves of the laws of the United States.

REDACTED

26.     Defendants engaged in conduct both inside and outside of the United States that caused direct, substantial and reasonably foreseeable and intended anticompetitive effects upon interstate commerce within the United States.

27.     The activities of Defendants and their co-conspirators were within the flow of, were intended to, and did have a substantial effect on interstate commerce of the United States. Defendants' products are sold in the flow of interstate commerce.

28.     Fuel Injection Systems manufactured abroad by Defendants and sold for use in automobiles in the United States are goods brought into the United States for sale and therefore constitute import commerce.  To the extent any Fuel Injection Systems are purchased in the United States and such Fuel Injection Systems do not constitute import commerce, Defendants' unlawful activities with respect thereto, as more fully alleged herein during the Class Period, had, and continue to have, a direct, substantial and reasonably foreseeable effect on United States commerce.  The anticompetitive conduct, and its effect on United States commerce described herein, proximately caused antitrust injury to Plaintiffs and members of the Classes in the United States.

29.     By reason of the unlawful activities hereinafter alleged, Defendants substantially affected commerce throughout the United States, causing injury to Plaintiffs and members of the Classes.  Defendants, directly and through their agents, engaged in activities affecting all states, to fix, raise, maintain, and/or stabilize prices, rig bids and allocate the market and customers in the United States for Fuel Injection Systems, which conspiracy unreasonably restrained trade and adversely affected the market for Fuel Injection Systems.

30.     Defendants' conspiracy and wrongdoing described herein adversely affected automobile dealers in the United States.

REDACTED

# PARTIES

**Plaintiffs**

31.     Plaintiff Hammett is a Mississippi corporation with its principal place of business in Durant, Mississippi.  Plaintiff Hammett is an authorized Ford dealer who bought Ford-brand vehicles containing Fuel Injection Systems manufactured by one or more of the Defendants or their co-conspirators, as well as Fuel Injection Systems manufactured by one or more of the Defendants or their co-conspirators, during the Class Period.

32.     During the Class Period, Plaintiff Hammett purchased vehicles containing Fuel Injection Systems manufactured by Defendants or their co-conspirators.  Plaintiff Hammett also purchased Fuel Injection Systems, manufactured by Defendants or their co-conspirators, for its repair and service business, during the Class Period.  Plaintiff Hammett purchased and received both the afore-mentioned vehicles and Fuel Injection Systems in Mississippi.  Plaintiff Hammett has also displayed, sold, serviced, and advertised its vehicles in Mississippi during the Class Period.

33.     Plaintiff Landers is an Arkansas corporation with its principal place of business in Little Rock, Arkansas.  Plaintiff Landers is an authorized Toyota dealer who bought Toyota-brand vehicles containing Fuel Injection Systems manufactured by one or more of the Defendants or their co-conspirators, as well as Fuel Injection Systems manufactured by one or more of the Defendants or their co-conspirators, during the Class Period.

34.     During the Class Period, Plaintiff Landers purchased vehicles containing Fuel Injection Systems manufactured by one or more Defendants or their co-conspirators.  Plaintiff Landers also purchased Fuel Injection Systems, manufactured by one or more Defendants or their co-conspirators, for its repair and service business, during the Class Period. Plaintiff Landers purchased and received both the afore-mentioned vehicles and Fuel Injection Systems in

14

REDACTED

Arkansas. Plaintiff Landers has also displayed, sold, serviced, and advertised its vehicles in Arkansas during the Class Period.

35.     Plaintiff Martens is a Maryland corporation that had its principal place of business in the District of Columbia during the Class Period. During the Class Period, Plaintiff Martens was an authorized Volvo and Volkswagen dealer who sold Volvo- and Volkswagen-brand vehicles containing Fuel Injection Systems manufactured by one or more of the Defendants or their co-conspirators, as well as Fuel Injection Systems manufactured by one or more of the Defendants or their co-conspirators.

36.     During the Class Period, Plaintiff Martens purchased vehicles containing Fuel Injection Systems manufactured by one or more of the Defendants or their co-conspirators. Plaintiff Martens also purchased Fuel Injection Systems, manufactured by one or more of the Defendants or their co-conspirators, for its repair and service business, during the Class Period. Plaintiff Martens purchased and received both the afore-mentioned vehicles and Fuel Injection Systems in the District of Columbia. Plaintiff Martens has also displayed, sold, and advertised its vehicles in the District of Columbia during the Class Period.

37.     Plaintiff Superstore is a Minnesota company, with its principal place of business in White Bear Lake, Minnesota. Plaintiff Superstore is an authorized Buick/GMC dealer, doing business under the name White Bear Lake Superstore. Plaintiff Superstore bought Buick- and GMC-brand vehicles containing Fuel Injection Systems manufactured by one or more of the Defendants or their co-conspirators, as well as Fuel Injection Systems manufactured by one or more of the Defendants or their co-conspirators during the Class Period.

38.     During the Class Period, Plaintiff Superstore purchased vehicles containing Fuel Injection Systems manufactured by one or more Defendants or their co-conspirators. Plaintiff

REDACTED

Superstore also purchased Fuel Injection Systems, manufactured by one or more Defendants or their co-conspirators, for its repair and service business, during the Class Period. Plaintiff Superstore purchased and received both the afore-mentioned vehicles and Fuel Injection Systems in Minnesota. Plaintiff Superstore has also displayed, sold, serviced, and advertised its vehicles in Minnesota during the Class Period.

39.     Plaintiff Lee is a Florida corporation, with its principal place of business in Fort Walton Beach, Florida. Plaintiff Lee is presently an authorized GMC dealer. During the Class Period, Plaintiff Lee was also an authorized Pontiac, Oldsmobile and Jeep dealer. Plaintiff Lee buys GMC-brand vehicles containing Fuel Injection Systems manufactured by one or more of the Defendants or their co-conspirators, as well as Fuel Injection Systems manufactured by one or more of the Defendants or their co-conspirators. During the Class Period, Plaintiff Lee bought Pontiac-, Oldsmobile-, and Jeep-brand vehicles containing Fuel Injection Systems manufactured by one or more of the Defendants or their co-conspirators, as well as Fuel Injection Systems manufactured by one or more of the Defendants or their co-conspirators.

40.     During the Class Period, Plaintiff Lee purchased vehicles containing Fuel Injection Systems manufactured by one or more Defendants or their co-conspirators. Plaintiff Lee also purchased Fuel Injection Systems, manufactured by one or more Defendants or their co-conspirators, for its repair and service business, during the Class Period. Plaintiff Lee purchased and received both the afore-mentioned vehicles and Fuel Injection Systems in Florida. Plaintiff Lee has also displayed, sold, serviced, and advertised its vehicles in Florida during the Class Period.

41.     Plaintiff V.I.P. is a California company with its principal place of business in Palm Springs, California. Plaintiff VIP is an authorized Mercedes, BMW, Infiniti, and Hyundai

16

REDACTED

dealer who bought Mercedes-, BMW-, Infiniti-, and Hyundai-brand vehicles containing Fuel Injection Systems manufactured by one or more of the Defendants or their co-conspirators, as well as Fuel Injection Systems manufactured by one or more of the Defendants or their co-conspirators during the Class Period.

42.     During the Class Period, Plaintiff V.I.P. purchased vehicles containing Fuel Injection Systems manufactured by one or more Defendants or their co-conspirators.  Plaintiff V.I.P. also purchased Fuel Injection Systems, for its repair and service business, during the Class Period.  Plaintiff V.I.P. purchased and received both the afore-mentioned vehicles and Fuel Injection Systems in California.  Plaintiff V.I.P. has also displayed, sold, serviced, and advertised its vehicles in California during the Class Period.

43.     Plaintiff Desert is a California company, with its principal place of business in Rancho Mirage, California.  Plaintiff Desert is an authorized Rolls Royce, Bentley, Aston Martin, Maserati, Porsche, Jaguar, Land Rover, Audi, Lotus, and Spyker dealer who bought Rolls Royce-, Bentley-, Aston Martin-, Maserati-, Porsche-, Jaguar-, Land Rover-, Audi-, Lotus-, and Spyker-brand vehicles containing Fuel Injection Systems manufactured by one or more of the Defendants or their co-conspirators, as well as Fuel Injection Systems manufactured by one or more of the Defendants or their co-conspirators during the Class Period.

44.     During the Class Period, Plaintiff Desert purchased vehicles containing Fuel Injection Systems manufactured by one or more Defendants or their co-conspirators.  Plaintiff Desert also purchased Fuel Injection Systems, manufactured by one or more Defendants or their co-conspirators, for its repair and service business, during the Class Period.  Plaintiff Desert purchased and received both the afore-mentioned vehicles and Fuel Injection Systems in

17

REDACTED

California.  Plaintiff Desert has also displayed, sold, serviced, and advertised its vehicles in California during the Class Period.

45.     Plaintiff Dale Martens was a Kansas corporation, with its principal place of business in Lawrence, Kansas during the Class Period.  Plaintiff Dale Martens was an authorized Nissan and Subaru dealer during the Class Period, who, during the Class Period, bought Nissan- and Subaru-brand vehicles containing Fuel Injection Systems manufactured by one or more of the Defendants or their co-conspirators, as well as Fuel Injection Systems manufactured by one or more of the Defendants or their co-conspirators.

46.     During the Class Period, Plaintiff Dale Martens purchased vehicles containing Fuel Injection Systems manufactured by one or more Defendants or their co-conspirators. Plaintiff Dale Martens also purchased Fuel Injection Systems, manufactured by one or more Defendants or their co-conspirators, for its repair and service business, during the Class Period. Plaintiff Dale Martens purchased and received both the afore-mentioned vehicles and Fuel Injection Systems in Kansas.  Plaintiff Dale Martens has also displayed, sold, serviced, and advertised its vehicles in Kansas during the Class Period.

47.     Plaintiff Green Team is a Kansas corporation, with its principal place of business in Clay Center, Kansas.  Plaintiff Green Team is an authorized Chrysler, Jeep, Dodge, and Ram dealer, who bought Chrysler-, Jeep-, Dodge-, and Ram-brand vehicles containing Fuel Injection Systems manufactured by one or more of the Defendants or their co-conspirators, as well as Fuel Injection Systems manufactured by one or more of the Defendants or their co-conspirators, during the Class Period.

48.     During the Class Period, Plaintiff Green Team purchased vehicles containing Fuel Injection Systems manufactured by one or more Defendants or their co-conspirators.  Plaintiff

REDACTED

Green Team also purchased Fuel Injection Systems, manufactured by one or more Defendants or their co-conspirators, for its repair and service business, during the Class Period.  Plaintiff Green Team purchased and received both the afore-mentioned vehicles and Fuel Injection Systems in Kansas.  Plaintiff Green Team has also displayed, sold, serviced, and advertised its vehicles in Kansas during the Class Period.

49.     Plaintiff McGrath is a Delaware corporation, with its principal place of business in Cedar Rapids, Iowa.  Plaintiff McGrath is an authorized Buick, GMC, Chevrolet, Chrysler, Dodge, Jeep, Ram, Kia, and Cadillac dealer, who bought Buick-, GMC-, Chevrolet-, Chrysler-, Dodge-, Jeep-, Ram-, Kia-, and Cadillac-brand cars containing Fuel Injection Systems manufactured by one or more of the Defendants or their co-conspirators, as well as Fuel Injection Systems manufactured by one or more of the Defendants or their co-conspirators during the Class Period.

50.     During the Class Period, Plaintiff McGrath purchased vehicles containing Fuel Injection Systems manufactured by one or more Defendants or their co-conspirators.  Plaintiff McGrath also purchased Fuel Injection Systems, manufactured by one or more Defendants or their co-conspirators, for its repair and service business, during the Class Period.  Plaintiff McGrath purchased and received both the afore-mentioned vehicles and Fuel Injection Systems in Iowa.  Plaintiff McGrath has also displayed, sold, serviced, and advertised its vehicles in Iowa during the Class Period.

51.     Plaintiff Table Rock is a Nebraska corporation, with its principal place of business in Bellevue, Nebraska.  Plaintiff Table Rock is an authorized Hyundai dealer, who bought Hyundai-brand cars containing Fuel Injection Systems manufactured by one or more of

REDACTED

the Defendants or their co-conspirators, as well as Fuel Injection Systems manufactured by one or more of the Defendants or their co-conspirators, during the Class Period.

52.     During the Class Period, Plaintiff Table Rock purchased vehicles containing Fuel Injection Systems manufactured one or more Defendants or their co-conspirators.  Plaintiff Table Rock also purchased Fuel Injection Systems, manufactured by one or more Defendants or their co-conspirators, for its repair and service business, during the Class Period.  Plaintiff Table Rock purchased and received both the afore-mentioned vehicles and Fuel Injection Systems in Nebraska.  Plaintiff Table Rock has also displayed, sold, serviced, and advertised its vehicles in Nebraska during the Class Period.

53.     Plaintiff Archer-Perdue is a Nebraska corporation, with its principal place of business in Omaha, Nebraska.  Plaintiff Archer-Perdue is an authorized Suzuki dealer, who, during the Class Period, has bought Suzuki-brand cars containing Fuel Injection Systems manufactured by one or more of the Defendants or their co-conspirators, as well as Fuel Injection Systems manufactured by one or more of the Defendants or their co-conspirators.

54.     During the Class Period, Plaintiff Archer-Perdue purchased vehicles containing Fuel Injection Systems manufactured by one or more Defendants or their co-conspirators. Plaintiff Archer-Perdue also purchased Fuel Injection Systems, manufactured by one or more Defendants or their co-conspirators, for its repair and service business, during the Class Period. Plaintiff Archer-Perdue purchased and received both the afore-mentioned vehicles and Fuel Injection Systems in Nebraska.  Plaintiff Archer-Perdue has also displayed, sold, serviced, and advertised its vehicles in Nebraska during the Class Period.

55.     Plaintiff Bonneville is a New Hampshire corporation, with its principal place of business in Manchester, New Hampshire.  Plaintiff Bonneville is an authorized Dodge, Chrysler,

20

REDACTED

Jeep, and Ram dealer, who bought Chrysler-, Dodge-, Jeep-, and Ram-brand vehicles containing Fuel Injection Systems manufactured by one or more of the Defendants or their co-conspirators, as well as Fuel Injection Systems manufactured by one or more of the Defendants or their co-conspirators during the Class Period.

56.     During the Class Period, Plaintiff Bonneville purchased vehicles containing Fuel Injection Systems manufactured by one or more Defendants or their co-conspirators.  Plaintiff Bonneville also purchased Fuel Injection Systems, manufactured by one or more Defendants or their co-conspirators, for its repair and service business, during the Class Period.  Plaintiff Bonneville purchased and received both the afore-mentioned vehicles and Fuel Injection Systems in New Hampshire.  Plaintiff Bonneville has also displayed, sold, serviced, and advertised its vehicles in New Hampshire during the Class Period.

57.     Plaintiff Holzhauer is a Delaware corporation, with its principal place of business in Nashville, Illinois.  Plaintiff Holzhauer is an authorized Dodge, Chrysler, and Jeep dealer, who bought Dodge-, Chrysler-, and Jeep-brand vehicles containing Fuel Injection Systems manufactured by one or more of the Defendants or their co-conspirators, as well as Fuel Injection Systems manufactured by one or more of the Defendants or their co-conspirators during the Class Period.

58.     During the Class Period, Plaintiff Holzhauer purchased vehicles containing Fuel Injection Systems manufactured by one or more Defendants or their co-conspirators.  Plaintiff Holzhauer also purchased Fuel Injection Systems, manufactured by one or more Defendants or their co-conspirators, for its repair and service business, during the Class Period.  Plaintiff Holzhauer purchased and received both the afore-mentioned vehicles and Fuel Injection Systems

REDACTED

in Illinois.  Plaintiff Holzhauer has also displayed, sold, serviced, and advertised its vehicles in Illinois during the Class Period.

59.     Plaintiff Pitre is a New Mexico corporation, with its principal place of business in Albuquerque, New Mexico.  Plaintiff Pitre is an authorized Buick and GMC dealer, who bought Buick- and GMC-brand vehicles containing Fuel Injection Systems manufactured by one or more of the Defendants or their co-conspirators, as well as Fuel Injection Systems manufactured by one or more of the Defendants or their co-conspirators, during the Class Period.

60.     During the Class Period, Plaintiff Pitre purchased vehicles containing Fuel Injection Systems manufactured by one or more Defendants or their co-conspirators.  Plaintiff Pitre also purchased Fuel Injection Systems, manufactured by one or more Defendants or their co-conspirators, for its repair and service business, during the Class Period.  Plaintiff Pitre purchased and received both the afore-mentioned vehicles and Fuel Injection Systems in New Mexico.  Plaintiff Pitre has also displayed, sold, serviced, and advertised its vehicles in New Mexico during the Class Period.

61.     Plaintiff Patsy Lou is a Michigan corporation, with its principal place of business in Flint, Michigan.  Plaintiff Patsy Lou is an authorized Chevrolet dealer, who bought Chevrolet-brand vehicles containing Fuel Injection Systems manufactured by one or more of the Defendants or their co-conspirators, as well as Fuel Injection Systems manufactured by one or more of the Defendants or their co-conspirators, during the Class Period.

62.     During the Class Period, Plaintiff Patsy Lou purchased vehicles containing Fuel Injection Systems manufactured by one or more Defendants or their co-conspirators.  Plaintiff Patsy Lou also purchased Fuel Injection Systems, manufactured by one or more Defendants or their co-conspirators, for its repair and service business, during the Class Period.  Plaintiff Patsy

REDACTED

Lou purchased and received both the afore-mentioned vehicles and Fuel Injection Systems in Michigan.  Plaintiff Patsy Lou has also displayed, sold, serviced, and advertised its vehicles in Michigan during the Class Period.

63.    Plaintiff John Greene is a North Carolina corporation, with its principal place of business in Morganton, North Carolina.  Plaintiff John Greene is an authorized Chrysler, Dodge, Jeep, and Ram dealer, who bought Chrysler-, Dodge-, Jeep-, and Ram-brand vehicles containing Fuel Injection Systems manufactured by one or more of the Defendants or their co-conspirators, as well as Fuel Injection Systems manufactured by one or more of the Defendants or their co-conspirators during the Class Period.

64.    During the Class Period, Plaintiff John Greene purchased vehicles containing Fuel Injection Systems manufactured by one or more Defendants or their co-conspirators.  Plaintiff John Greene also purchased Fuel Injection Systems, manufactured by one or more Defendants or their co-conspirators, for its repair and service business, during the Class Period.  Plaintiff John Greene purchased and received both the afore-mentioned vehicles and Fuel Injection Systems in North Carolina.  Plaintiff John Greene has also displayed, sold, serviced, and advertised its vehicles in North Carolina during the Class Period.

65.    Plaintiff Planet Nissan is an Arizona corporation, with its principal place of business in Flagstaff, Arizona.  Plaintiff Planet Nissan is an authorized Nissan and Subaru dealer, who bought Nissan- and Subaru-brand vehicles containing Fuel Injection Systems manufactured by one or more of the Defendants or their co-conspirators, as well as Fuel Injection Systems manufactured by one or more of the Defendants or their co-conspirators during the Class Period.

66.    During the Class Period, Plaintiff Planet Nissan purchased vehicles containing Fuel Injection Systems manufactured by one or more Defendants or their co-conspirators.

REDACTED

Plaintiff Planet Nissan also purchased Fuel Injection Systems, manufactured by one or more Defendants or their co-conspirators, for its repair and service business, during the Class Period. Plaintiff Planet Nissan purchased and received both the afore-mentioned vehicles and Fuel Injection Systems in Arizona.  Plaintiff Planet Nissan has also displayed, sold, serviced, and advertised its vehicles in Arizona during the Class Period.

67.    Plaintiff Champion is a Nevada corporation, with its principal place of business in Reno, Nevada.  Plaintiff Champion is an authorized Chevrolet dealer, who bought Chevrolet-brand vehicles containing Fuel Injection Systems manufactured by one or more of the Defendants or their co-conspirators, as well as Fuel Injection Systems manufactured by one or more of the Defendants or their co-conspirators during the Class Period.

68.    During the Class Period, Plaintiff Champion purchased vehicles containing Fuel Injection Systems manufactured by one or more Defendants or their co-conspirators.  Plaintiff Champion also purchased Fuel Injection Systems, manufactured by one or more Defendants or their co-conspirators, for its repair and service business, during the Class Period.  Plaintiff Champion purchased and received both the afore-mentioned vehicles and Fuel Injection Systems in Nevada.  Plaintiff Champion has also displayed, sold, serviced, and advertised its vehicles in Nevada during the Class Period.

69.    Plaintiff Commonwealth Motors is a Delaware corporation, with its principal place of business in Lawrence, Massachusetts.  Plaintiff Commonwealth Motors is an authorized Chevrolet, Honda, and Kia dealer, who bought Chevrolet-, Honda-, and Kia-brand vehicles containing Fuel Injection Systems manufactured by one or more of the Defendants or their co-conspirators, as well as Fuel Injection Systems manufactured by one or more of the Defendants or their co-conspirators during the Class Period.

REDACTED

70.     During the Class Period, Plaintiff Commonwealth Motors purchased vehicles containing Fuel Injection Systems manufactured by one or more Defendants or their co-conspirators.  Plaintiff Commonwealth Motors also purchased Fuel Injection Systems, manufactured by one or more Defendants or their co-conspirators, for its repair and service business, during the Class Period.  Plaintiff Commonwealth Motors purchased and received both the afore-mentioned vehicles and Fuel Injection Systems in Massachusetts.  Plaintiff Commonwealth Motors has also displayed, sold, serviced, and advertised its vehicles in Massachusetts during the Class Period.

71.     Plaintiff Commonwealth Volkswagen is a Massachusetts corporation with its principal place of business in Lawrence, Massachusetts.  Plaintiff Commonwealth Volkswagen is an authorized Volkswagen dealer, who bought Volkswagen-brand vehicles containing Fuel Injection Systems manufactured by one or more of the Defendants or their co-conspirators, as well as Fuel Injection Systems manufactured by one or more of the Defendants or their co-conspirators during the Class Period.

72.     During the Class Period, Plaintiff Commonwealth Volkswagen purchased vehicles containing Fuel Injection Systems manufactured by one or more Defendants or their co-conspirators.  Plaintiff Commonwealth Volkswagen also purchased Fuel Injection Systems, manufactured by one or more Defendants or their co-conspirators, for its repair and service business, during the Class Period.  Plaintiff Commonwealth Volkswagen purchased and received both the afore-mentioned vehicles and Fuel Injection Systems in Massachusetts.  Plaintiff Commonwealth Volkswagen has also displayed, sold, serviced and advertised its vehicles in Massachusetts during the Class Period.

REDACTED

73.    Plaintiff Commonwealth Nissan is a Massachusetts corporation with its principal place of business in the Lawrence, Massachusetts.  Plaintiff Commonwealth Nissan is an authorized Nissan dealer, who bought Nissan-brand vehicles containing Fuel Injection Systems manufactured by one or more of the Defendants or their co-conspirators, as well as Fuel Injection Systems manufactured by one or more of the Defendants or their co-conspirators during the Class Period.

74.    During the Class Period, Plaintiff Commonwealth Nissan purchased vehicles containing Fuel Injection Systems manufactured by one or more Defendants or their co-conspirators.  Plaintiff Commonwealth Nissan also purchased Fuel Injection Systems, manufactured by one or more Defendants or their co-conspirators, for its repair and service business, during the Class Period.  Plaintiff Commonwealth Nissan purchased and received both the afore-mentioned vehicles and Fuel Injection Systems in Massachusetts.  Plaintiff Commonwealth Nissan has also displayed, sold, serviced, and advertised its vehicles in Massachusetts during the Class Period.

75.    Plaintiff Ramey is a West Virginia company with its principal place of business in Princeton, West Virginia.  Plaintiff Ramey is an authorized Toyota, Chrysler, Dodge, Jeep, and Ram dealer, who bought Toyota-, Chrysler-, Dodge-, Jeep-, and Ram-brand vehicles containing Fuel Injection Systems manufactured by one or more of the Defendants or their co-conspirators, as well as Fuel Injection Systems manufactured by one or more of the Defendants or their co-conspirators during the Class Period.

76.    During the Class Period, Plaintiff Ramey purchased vehicles containing Fuel Injection Systems manufactured by one or more Defendants or their co-conspirators.  Plaintiff Ramey also purchased Fuel Injection Systems, manufactured by one or more Defendants or their

REDACTED

co-conspirators, for its repair and service business, during the Class Period.  Plaintiff Ramey purchased and received both the afore-mentioned vehicles and Fuel Injection Systems in West Virginia.  Plaintiff Ramey has also displayed, sold, serviced, and advertised its vehicles in West Virginia during the Class Period.

77.     Plaintiff Thornhill is a West Virginia corporation, with its principal place of business in Chapmanville, West Virginia.  Plaintiff Thornhill is an authorized Chevrolet, Buick, and GMC dealer, who bought Chevrolet-, Buick-, and GMC-brand vehicles containing Fuel Injection Systems manufactured by one or more of the Defendants or their co-conspirators, as well as Fuel Injection Systems manufactured by one or more of the Defendants or their co-conspirators during the Class Period.

78.     During the Class Period, Plaintiff Thornhill purchased vehicles containing Fuel Injection Systems manufactured by one or more Defendants or their co-conspirators.  Plaintiff Thornhill also purchased Fuel Injection Systems, manufactured by one or more Defendants or their co-conspirators, for its repair and service business, during the Class Period.  Plaintiff Thornhill purchased and received both the afore-mentioned vehicles and Fuel Injection Systems in West Virginia.  Plaintiff Thornhill has also displayed, sold, serviced, and advertised its vehicles in West Virginia during the Class Period.

79.     Plaintiff Lakeland is a Wisconsin corporation with its principal place of business in Sheboygan, Wisconsin.  Plaintiff Lakeland is an authorized Toyota, Honda, Mazda, and Subaru dealer who bought Toyota- Honda-, Mazda-, and Subaru-brand vehicles containing Fuel Injection Systems manufactured by one or more of the Defendants or their co-conspirators, as well as Fuel Injection Systems manufactured by one or more of the Defendants or their co-conspirators during the Class Period.

REDACTED

80.     During the Class Period, Plaintiff Lakeland purchased vehicles containing Fuel Injection Systems manufactured by one or more Defendants or their co-conspirators.  Plaintiff Lakeland also purchased Fuel Injection Systems, manufactured by one or more Defendants or their co-conspirators, for its repair and service business, during the Class Period.  Plaintiff Lakeland purchased and received both the afore-mentioned vehicles and Fuel Injection Systems in Wisconsin.  Plaintiff Lakeland has also displayed, sold, serviced, and advertised its vehicles in Wisconsin during the Class Period.

81.     Plaintiff Salt Lake Valley is a Utah company, with its principal place of business in Salt Lake City, Utah.  Plaintiff Salt Lake Valley is an authorized Buick and GMC dealer, who bought Buick- and GMC-brand vehicles containing Fuel Injection Systems manufactured by one or more of the Defendants or their co-conspirators, as well as Fuel Injection Systems manufactured by one or more of the Defendants or their co-conspirators during the Class Period.

82.     During the Class Period, Plaintiff Salt Lake Valley purchased vehicles containing Fuel Injection Systems manufactured by one or more Defendants or their co-conspirators.  Plaintiff Salt Lake Valley also purchased Fuel Injection Systems, manufactured by one or more Defendants or their co-conspirators, for its repair and service business, during the Class Period.  Plaintiff Salt Lake Valley purchased and received both the afore-mentioned vehicles and Fuel Injection Systems in Utah.  Plaintiff Salt Lake Valley has also displayed, sold, serviced, and advertised its vehicles in Utah during the Class Period.

83.     Plaintiff Capitol Chevrolet is an Oregon corporation, with its principal place of business in Salem, Oregon.  Plaintiff Capitol Chevrolet is an authorized Chevrolet, Cadillac, and Subaru dealer, who bought Chevrolet-, Cadillac-, and Subaru-brand vehicles containing Fuel Injection Systems manufactured by one or more of the Defendants or their co-conspirators, as

REDACTED

well as Fuel Injection Systems manufactured by one or more of the Defendants or their co-conspirators during the Class Period.

84.     During the Class Period, Plaintiff Capitol Chevrolet purchased vehicles containing Fuel Injection Systems manufactured by one or more Defendants or their co-conspirators. Plaintiff Capitol Chevrolet also purchased Fuel Injection Systems, manufactured by one or more Defendants or their co-conspirators, for its repair and service business, during the Class Period. Plaintiff Capitol Chevrolet purchased and received both the afore-mentioned vehicles and Fuel Injection Systems in Oregon. Plaintiff Capitol Chevrolet has also displayed, sold, serviced, and advertised its vehicles in Oregon during the Class Period.

85.     Plaintiff Capitol Toyota is an Oregon corporation with its principal place of business in Salem, Oregon. Plaintiff Capitol Toyota is an authorized Toyota dealer, who bought Toyota-brand vehicles containing Fuel Injection Systems manufactured by one or more of the Defendants or their co-conspirators, as well as Fuel Injection Systems manufactured by one or more of the Defendants or their co-conspirators during the Class Period.

86.     During the Class Period, Plaintiff Capitol Toyota purchased vehicles containing Fuel Injection Systems manufactured by one or more Defendants or their co-conspirators. Plaintiff Capitol Toyota also purchased Fuel Injection Systems, manufactured by one or more Defendants or their co-conspirators, for its repair and service business, during the Class Period. Plaintiff Capitol Toyota purchased and received both the afore-mentioned vehicles and Fuel Injection Systems in Oregon. Plaintiff Capitol Toyota has also displayed, sold, serviced, and advertised its vehicles in Oregon during the Class Period.

87.     Plaintiff Beck is a South Dakota corporation, with its principal place of business in Pierre, South Dakota. Plaintiff Beck is an authorized Chevrolet and Cadillac dealer, who

REDACTED

bought Chevrolet- and Cadillac-brand vehicles containing Fuel Injection Systems manufactured by one or more of the Defendants or their co-conspirators, as well as Fuel Injection Systems manufactured by one or more of the Defendants or their co-conspirators during the Class Period.

88.    During the Class Period, Plaintiff Beck purchased vehicles containing Fuel Injection Systems manufactured by one or more Defendants or their co-conspirators.  Plaintiff Beck also purchased Fuel Injection Systems, manufactured by one or more Defendants or their co-conspirators, for its repair and service business, during the Class Period.  Plaintiff Beck purchased and received both the afore-mentioned vehicles and Fuel Injection Systems in South Dakota.  Plaintiff Beck has also displayed, sold, serviced, and advertised its vehicles in South Dakota during the Class Period.

89.    Plaintiff Wade is a Utah corporation, with its principal place of business in St. George, Utah.  Plaintiff Wade is an authorized Toyota dealer, who bought Toyota-brand cars containing Fuel Injection Systems manufactured by the Defendants or their co-conspirators, as well as Fuel Injection Systems manufactured by the Defendants or their co-conspirators during the Class Period.

90.    During the Class Period, Plaintiff Wade purchased vehicles containing Fuel Injection Systems manufactured by one or more Defendants or their co-conspirators.  Plaintiff Wade also purchased Fuel Injection Systems, manufactured by one or more Defendants or their co-conspirators, for its repair and service business, during the Class Period.  Plaintiff Wade purchased and received both the afore-mentioned vehicles and Fuel Injection Systems in Utah. Plaintiff Wade has also displayed, sold, serviced, and advertised its vehicles in Utah during the Class Period.

REDACTED

91.     Plaintiff Johnson is a Mississippi limited liability company, with its principal place of business in Meridian, Mississippi.  Plaintiff Johnson is an authorized Toyota dealer, who bought Toyota-brand cars containing Fuel Injection Systems manufactured by the Defendants or their co-conspirators, as well as Fuel Injection Systems manufactured by the Defendants or their co-conspirators during the Class Period.

92.     During the Class Period, Plaintiff Johnson purchased vehicles containing Fuel Injection Systems manufactured by one or more Defendants or their co-conspirators.  Plaintiff Johnson also purchased Fuel Injection Systems manufactured by one or more Defendants or their co-conspirators, for its repair and service business, during the Class Period.  Plaintiff Johnson purchased and received both the afore-mentioned vehicles and Fuel Injection Systems in Mississippi.  Plaintiff Johnson has also displayed, sold, serviced, and advertised its vehicles in Mississippi during the Class Period.

93.     Plaintiff Hartley is a New York corporation, with its principal place of business in Jamestown, New York.  During the Class Period, Plaintiff Hartley has been an authorized Honda, Buick, Pontiac, and GM dealer, who bought Honda-, Buick-, Pontiac-, and GM-brand cars containing Fuel Injection Systems manufactured by the Defendants or their co-conspirators, as well as Fuel Injection Systems manufactured by the Defendants or their co-conspirators.

94.     During the Class Period, Plaintiff Hartley purchased vehicles containing Fuel Injection Systems manufactured by one or more Defendants or their co-conspirators.  Plaintiff Hartley also purchased Fuel Injection Systems manufactured by one or more Defendants or their co-conspirators, for its repair and service business, during the Class Period.  Plaintiff Hartley purchased and received both the afore-mentioned vehicles and Fuel Injection Systems in New

REDACTED

York.  Plaintiff Hartley has also displayed, sold, serviced, and advertised its vehicles in New York during the Class Period.

95.     Plaintiff Lee Honda is a Maine corporation, with its principal place of business in Auburn, Maine.  Plaintiff Lee Honda is an authorized Honda dealer, who bought Honda-brand cars containing Fuel Injection Systems manufactured by the Defendants or their co-conspirators, as well as Fuel Injection Systems manufactured by the Defendants or their co-conspirators during the Class Period.

96.     During the Class Period, Plaintiff Lee Honda purchased vehicles containing Fuel Injection Systems manufactured by one or more Defendants or their co-conspirators.  Plaintiff Lee Honda also purchased Fuel Injection Systems manufactured by one or more Defendants or their co-conspirators, for its repair and service business, during the Class Period.  Plaintiff Lee Honda purchased and received both the afore-mentioned vehicles and Fuel Injection Systems in Maine.  Plaintiff Lee Honda has also displayed, sold, serviced, and advertised its vehicles in Maine during the Class Period.

97.     Plaintiff Topsham is a Maine corporation, with its principal place of business in Topsham, Maine.  Plaintiff Topsham is an authorized Toyota dealer, who bought Toyota-brand cars containing Fuel Injection Systems manufactured by the Defendants or their co-conspirators, as well as Fuel Injection Systems manufactured by the Defendants or their co-conspirators during the Class Period.

98.     During the Class Period, Plaintiff Topsham purchased vehicles containing Fuel Injection Systems manufactured by one or more Defendants or their co-conspirators.  Plaintiff Topsham also purchased Fuel Injection Systems manufactured by one or more Defendants or their co-conspirators, for its repair and service business, during the Class Period.  Plaintiff

32

REDACTED

Topsham purchased and received both the afore-mentioned vehicles and Fuel Injection Systems in Maine.  Plaintiff Topsham has also displayed, sold, serviced, and advertised its vehicles in Maine during the Class Period.

99.     Plaintiff Hazelwood is an Arkansas corporation, with its principal place of business in Hazelwood, Missouri.  Plaintiff Hazelwood is an authorized Toyota dealer, who bought Toyota-brand cars containing Fuel Injection Systems manufactured by the Defendants or their co-conspirators, as well as Fuel Injection Systems manufactured by the Defendants or their co-conspirators during the Class Period.

100.     During the Class Period, Plaintiff Hazelwood purchased vehicles containing Fuel Injection Systems manufactured by one or more Defendants or their co-conspirators.   Plaintiff Hazelwood also purchased Fuel Injection Systems manufactured by one or more Defendants or their co-conspirators, for its repair and service business, during the Class Period.  Plaintiff Hazelwood purchased and received both the afore-mentioned vehicles and Fuel Injection Systems in Missouri.  Plaintiff Hazelwood has also displayed, sold, serviced, and advertised its vehicles in Missouri during the Class Period.

101.     Plaintiff Cannon is a Mississippi corporation, with its principal place of business in Greenwood, Mississippi.  Plaintiff Cannon is an authorized Chevrolet and Cadillac dealer, who bought Chevrolet- and Cadillac-brand cars containing Fuel Injection Systems manufactured by the Defendants or their co-conspirators, as well as Fuel Injection Systems manufactured by the Defendants or their co-conspirators during the Class Period.

102.     During the Class Period, Plaintiff Cannon purchased vehicles containing Fuel Injection Systems manufactured by one or more Defendants or their co-conspirators.  Plaintiff Cannon also purchased Fuel Injection Systems manufactured by one or more Defendants or their

REDACTED

co-conspirators, for its repair and service business, during the Class Period.  Plaintiff Cannon purchased and received both the afore-mentioned vehicles and Fuel Injection Systems in Mississippi.  Plaintiff Cannon has also displayed, sold, serviced, and advertised its vehicles in Mississippi during the Class Period.

103.    Plaintiff Cannon Nissan is a Mississippi limited liability company with its principal place of business in Jackson, Mississippi.  Plaintiff Cannon is an authorized Nissan dealer, who bought Nissan-brand cars containing Fuel Injection Systems manufactured by the Defendants or their co-conspirators, as well as Fuel Injection Systems manufactured by the Defendants or their co-conspirators during the Class Period.

104.    During the Class Period, Plaintiff Cannon Nissan purchased vehicles containing Fuel Injection Systems manufactured by one or more Defendants or their co-conspirators. Plaintiff Cannon Nissan also purchased Fuel Injection Systems, manufactured by one or more Defendants or their co-conspirators, for its repair and service business, during the Class Period. Plaintiff Cannon purchased and received both the afore-mentioned vehicles and Fuel Injection Systems in Mississippi.  Plaintiff Cannon has also displayed, sold, serviced, and advertised its vehicles in Mississippi during the Class Period.

105.    Plaintiff Hudson Nissan is a South Carolina limited liability company with its principal place of business in North Charleston, South Carolina.  Plaintiff Hudson Nissan is an authorized Nissan dealer, who bought Nissan-brand cars containing Fuel Injection Systems manufactured by the Defendants or their co-conspirators, as well as Fuel Injection Systems manufactured by the Defendants or their co-conspirators during the Class Period.

106.    During the Class Period, Plaintiff Hudson Nissan purchased vehicles containing Fuel Injection Systems manufactured by one or more Defendants or their co-conspirators.

REDACTED

Plaintiff Hudson Nissan also purchased Fuel Injection Systems, manufactured by one or more Defendants or their co-conspirators, for its repair and service business, during the Class Period. Plaintiff Hudson Nissan purchased and received both the afore-mentioned vehicles and Fuel Injection Systems in South Carolina. Plaintiff Hudson Nissan has also displayed, sold, serviced, and advertised its vehicles in South Carolina during the Class Period.

107.    Plaintiff Shearer is a Vermont corporation with its principal place of business in Rutland, Vermont. Plaintiff Shearer is an authorized Honda dealer, who bought Honda-brand vehicles containing Fuel Injection Systems manufactured by one or more of the Defendants or their co-conspirators, as well as Fuel Injection Systems manufactured by one or more of the Defendants or their co-conspirators during the Class Period.

108.    During the Class Period, Plaintiff Shearer purchased vehicles containing Fuel Injection Systems manufactured by one or more Defendants or their co-conspirators. Plaintiff Shearer also purchased Fuel Injection Systems manufactured by one or more Defendants or their co-conspirators, for its repair and service business, during the Class Period. Plaintiff Shearer purchased and received both the afore-mentioned vehicles and Fuel Injection Systems in Vermont. Plaintiff Shearer has also displayed, sold, serviced and advertised its vehicles in Vermont during the Class Period.

109.    Plaintiff Apex is a Vermont corporation with its principal place of business in South Burlington, Vermont. Plaintiff Apex is an authorized Acura dealer, who bought Acura-brand vehicles containing Fuel Injection Systems manufactured by one or more of the Defendants or their co-conspirators, as well as Fuel Injection Systems manufactured by one or more of the Defendants or their co-conspirators during the Class Period.

REDACTED

110.     During the Class Period, Plaintiff Apex purchased vehicles containing Fuel Injection Systems manufactured by one or more Defendants or their co-conspirators.  Plaintiff Apex also purchased Fuel Injection Systems, manufactured by one or more Defendants or their co-conspirators, for its repair and service business, during the Class Period.  Plaintiff Apex purchased and received both the afore-mentioned vehicles and Fuel Injection Systems in Vermont.  Plaintiff Apex has also displayed, sold, serviced and advertised its vehicles in Vermont during the Class Period.

111.     Plaintiff Gastonia Nissan is a North Carolina limited liability company with its principal place of business in Gastonia, North Carolina.  Plaintiff Gastonia Nissan is an authorized Nissan dealer that purchased Nissan-brand cars containing Fuel Injection Systems manufactured by the Defendants or their co-conspirators, as well as Fuel Injection Systems manufactured by the Defendants or their co-conspirators during the Class Period.

112.     During the Class Period Plaintiff Gastonia Nissan purchased vehicles containing Fuel Injection Systems manufactured by one or more Defendants or their co-conspirators.  Plaintiff Gastonia Nissan also purchased Fuel Injection Systems, manufactured by one or more Defendants or their co-conspirators, for its repair and service business, during the Class Period.  Plaintiff Gastonia Nissan purchased and received both the afore-mentioned vehicles and Fuel Injection Systems in North Carolina.  Plaintiff Gastonia Nissan has also displayed, sold, serviced, and advertised its vehicles in North Carolina during the Class Period.

113.     Plaintiff Bristol Toyota is a Tennessee limited liability company with its principal place of business in Bristol, Tennessee.  Plaintiff Bristol Toyota is an authorized Toyota dealer that purchased Toyota-brand cars containing Fuel Injection Systems manufactured by the

REDACTED

Defendants or their co-conspirators, as well as Fuel Injection Systems manufactured by the Defendants or their co-conspirators during the Class Period.

114.     During the Class Period Plaintiff Bristol Toyota purchased vehicles containing Fuel Injection Systems manufactured by one or more Defendants or their co-conspirators. Plaintiff Bristol Toyota also purchased Fuel Injection Systems, manufactured by one or more Defendants or their co-conspirators, for its repair and service business, during the Class Period. Plaintiff Bristol Toyota purchased and received both the afore-mentioned vehicles and Fuel Injection Systems in Tennessee.  Plaintiff Bristol Toyota has also displayed, sold, serviced, and advertised its vehicles in Tennessee during the Class Period.

115.     Plaintiff Hodges is a Michigan corporation with its principal place of business in Ferndale, Michigan. Plaintiff Hodges is an authorized Subaru dealer that purchased Subaru-brand cars containing Fuel Injection Systems manufactured by the Defendants or their co-conspirators, as well as Fuel Injection Systems manufactured by the Defendants or their co-conspirators during the Class Period.

116.     During the Class Period Plaintiff Hodges purchased vehicles containing Fuel Injection Systems manufactured by one or more Defendants or their co-conspirators.  Plaintiff Hodges also purchased Fuel Injection Systems, manufactured by one or more Defendants or their co-conspirators, for its repair and service business, during the Class Period.  Plaintiff Hodges purchased and received both the afore-mentioned vehicles and Fuel Injection Systems in Michigan.  Plaintiff Hodges has also displayed, sold, serviced, and advertised its vehicles in Michigan during the Class Period.

117.     Plaintiff Don Weir is a Nevada corporation with its principal place of business in Reno, Nevada.  Plaintiff Weir is an authorized Chrysler, Dodge and Jeep dealer that purchased

REDACTED

Chrysler-, Dodge- and Jeep-brand cars containing Fuel Injection Systems manufactured by the Defendants or their co-conspirators, as well as Fuel Injection Systems manufactured by the Defendants or their co-conspirators during the Class Period.

118.     During the Class Period Plaintiff Weir purchased vehicles containing Fuel Injection Systems manufactured by one or more Defendants or their co-conspirators.  Plaintiff Weir also purchased Fuel Injection Systems, manufactured by one or more Defendants or their co-conspirators. Weir purchased and received both the afore-mentioned vehicles and Fuel Injection Systems in Nevada.  Plaintiff Weir has also displayed, sold, serviced, and advertised its vehicles in Nevada during the Class Period.

119.     Plaintiff San Rafael is a California corporation with its principal place of business in San Rafael, California.  Plaintiff San Rafael is an authorized Mitsubishi dealer that purchased Mitsubishi-brand cars containing Fuel Injection Systems manufactured by the Defendants or their co-conspirators, as well as Fuel Injection Systems manufactured by the Defendants or their co-conspirators during the Class Period.

120.     During the Class Period Plaintiff San Rafael purchased vehicles containing Fuel Injection Systems manufactured by the Defendants or their co-conspirators.  Plaintiff San Rafael also purchased Fuel Injection Systems, manufactured by the Defendants or their co-conspirators. Plaintiff San Rafael purchased and received both the afore-mentioned vehicles and Fuel Injection Systems in California.  Plaintiff San Rafael has also displayed, sold, serviced, and advertised its vehicles in California during the Class Period.

121.     Plaintiff Empire Nissan is a California limited liability company with its principal place of business in Santa Rosa, California.  Plaintiff Empire Nissan is an authorized Nissan dealer that purchased Nissan-brand cars containing Fuel Injection Systems manufactured

REDACTED

by the Defendants or their co-conspirators, as well as Fuel Injection Systems manufactured by
the Defendants or their co-conspirators during the Class Period.

122. During the Class Period Plaintiff Empire Nissan purchased vehicles containing
Fuel Injection Systems manufactured by the Defendants or their co-conspirators. Plaintiff
Empire Nissan also purchased Fuel Injection Systems, manufactured by the Defendants or
their co-conspirators. Plaintiff Empire Nissan purchased and received both the afore-
mentioned vehicles and Fuel Injection Systems in California. Plaintiff Empire Nissan has also
displayed, sold, serviced, and advertised its vehicles in California during the Class Period.

123. Plaintiff John Lee is a Florida corporation with its principal place of business
in Panama City, Florida. Plaintiff John Lee is an authorized Nissan dealer that purchased
Nissan-brand cars containing Fuel Injection Systems manufactured by the Defendants or their
co-conspirators, as well as Fuel Injection Systems manufactured by the Defendants or their co-
conspirators during the Class Period.

124. During the Class Period Plaintiff John Lee purchased vehicles containing Fuel
Injection Systems manufactured by the Defendants or their co-conspirators. Plaintiff John Lee
also purchased Fuel Injection Systems, manufactured by the Defendants or their co-conspirators.
Plaintiff John Lee purchased and received both the afore-mentioned vehicles and Fuel Injection
Systems in Florida. Plaintiff John Lee has also displayed, sold, serviced, and advertised its
vehicles in Florida during the Class Period.

125. Plaintiff Westfield is a New York company with its principal place of business
in Westfield, New York. Plaintiff Westfield is an authorized Chrysler dealer, who sells
Chrysler-, Dodge- and Jeep-brand vehicles containing Fuel Injection Systems manufactured by

REDACTED

one or more of the Defendants or their co-conspirators, as well as Fuel Injection Systems manufactured by one or more of the Defendants or their co-conspirators.

126.     During the Class Period Plaintiff Westfield purchased vehicles containing Fuel Injection Systems manufactured one or more Defendants or their co-conspirators.  Plaintiff Westfield also purchased Fuel Injection Systems, manufactured by one or more Defendants or their co-conspirators, for its repair and service business, during the Class Period.  Plaintiff Westfield purchased and received both the afore-mentioned vehicles and Fuel Injection Systems in New York.  Plaintiff Westfield has also displayed, sold, serviced and advertised its vehicles in New York during the Class Period.

**Defendants**

127.     Defendant Aisan Industry Co., Ltd. is a Japanese corporation with its principal place of business in Obu, Japan.   Aisan Industry Co., Ltd. – directly and/or through its subsidiaries, which it wholly owned and/or controlled – manufactured, marketed and/or sold Fuel Injection Systems that were purchased throughout the United States, including in this District, during the Class Period including by firms that sold such Fuel Injection Systems to Plaintiffs and class members.

128.     Defendant Franklin Precision Industry, Inc. is a Kentucky corporation with its principal place of business in Franklin, Kentucky.   Franklin Precision Industry, Inc. is a subsidiary of and wholly owned and/or controlled by its parent, Aisan Industry Co., Ltd. Franklin Precision Industry, Inc. manufactured, marketed and/or sold Fuel Injection Systems that were purchased throughout the United States, including in this District, during the Class Period including by firms that sold such Fuel Injection Systems to Plaintiffs and class members.  At all

REDACTED

times during the Class Period, its activities in the United States were under the control and direction of its Japanese parent, Aisan Industry which controlled its policies, sales, and finances.

129.    Defendant Aisan Corporation of America is an Illinois corporation with its principal place of business in Franklin, Tennessee.  Aisan Corporation of America is a subsidiary of and wholly owned and/or controlled by its parent, Aisan Industry Co., Ltd.  Aisan Corporation of America manufactured, marketed and/or sold Fuel Injection Systems that were purchased throughout the United States, including in this District, during the Class Period including by firms that sold such Fuel Injection Systems to Plaintiffs and class members.  At all times during the Class Period, its activities in the United States were under the control and direction of its Japanese parent, Aisan Industry which controlled its policies, sales, and finances.

130.    Defendant Hyundam Industrial Co., Ltd. is a Korean corporation with its principal place of business in Asan-si, South Korea.  It is a subsidiary of and wholly owned and/or controlled by its parent, Aisan Industry Co., Ltd.  Defendant Hyundam Industrial Co., Ltd. manufactured, marketed and/or sold Fuel Injection Systems that were purchased throughout the United States, including in this District, during the Class Period including in this District, during the Class Period including by firms that sold such Fuel Injection Systems to Plaintiffs and class members.  At all times during the Class Period, its activities in the United States were under the control and direction of its Japanese parent, Aisan Industry which controlled its policies, sales, and finances.

131.    Defendant Hitachi Automotive Systems, Ltd. is a Japanese corporation with its principal place of business in Tokyo, Japan.  Hitachi Automotive Systems, Ltd. – directly and/or through its subsidiaries, which it wholly owned and/or controlled – manufactured, marketed and/or sold Fuel Injection Systems that were purchased throughout the United States, including

REDACTED

in this District, during the Class Period, including by firms that sold such Fuel Injection Systems
to Plaintiffs and Class Members.

132.    Defendant Hitachi Automotive Systems Americas, Inc. is a Delaware corporation
with its principal place of business in Harrodsburg, Kentucky.  It is a subsidiary of and wholly
owned and/or controlled by its parent, Hitachi Automotive Systems, Ltd.  Hitachi Automotive
Systems Americas, Inc. manufactured, marketed and/or sold Fuel Injection Systems that were
purchased throughout the United States, including in this District, during the Class Period,
including by firms that sold such Fuel Injection Systems to Plaintiffs and Class Members.  At all
times during the Class Period its activities were under the control and direction of Hitachi
Automotive Systems, Ltd., which controlled its policies, sales and finances.

133.    Defendant DENSO Corporation is a Japanese corporation with its principal place
of business in Kariya, Aichi Prefecture, Japan.  DENSO Corporation – directly and/or through its
subsidiaries, which it wholly owned and/or controlled – manufactured, marketed and/or sold Fuel
Injection Systems that were purchased throughout the United States, including in this district,
during the Class Period, including by firms that sold such Fuel Injection Systems to Plaintiffs
and Class Members.

134.    Defendant DENSO International America, Inc. is a Delaware corporation with its
principal place of business in Southfield, Michigan.  It is a subsidiary of and wholly owned
and/or controlled by its parent, DENSO Corporation.  DENSO International America, Inc. –
directly and/or through its subsidiaries, which it wholly owned and/or controlled – manufactured,
marketed, and/or sold Fuel Injection Systems that were purchased throughout the United States,
including in this District, during the Class Period, including by firms that sold such Fuel
Injection Systems to Plaintiffs and Class Members.  At all times during the Class Period, its

42

REDACTED

activities in the United States were under the control and direction of its Japanese parent, Denso Corp. which controlled its policies, sales, and finances.

135.    Defendant DENSO International Korea Corporation is a Korean corporation with its principal place of business in Uiwang-si, South Korea. It is a subsidiary of and wholly owned and/or controlled by its parent, DENSO Corporation.  Defendant DENSO International Korea Corporation manufactured, marketed and/or sold Fuel Injection Systems that were purchased throughout the United States, including in this District, during the Class Period, including by firms that sold such Fuel Injection Systems to Plaintiffs and Class Members.  At all times during the Class Period, its activities in the United States were under the control and direction of its Japanese parent, Denso Corp. which controlled its policies, sales, and finances.

136.    Defendant Keihin Corporation is a Japanese corporation with its principal place of business in Tokyo, Japan.  Keihin Corporation – directly and/or through its subsidiaries, which it wholly owned and/or controlled – manufactured, marketed and/or sold Fuel Injection Systems that were purchased throughout the United States, including in this District, during the Class Period, including by firms that sold such Fuel Injection Systems to Plaintiffs and Class Members.

137.    Defendant Keihin North America, Inc. is an Indiana corporation with its principal place of business in Anderson, Indiana.  Keihin North America, Inc. – directly and/or through its subsidiaries, which it wholly owned and/or controlled – manufactured, marketed and/or sold Fuel Injection Systems that were purchased throughout the United States, including in this District, during the Class Period, including by firms that sold such Fuel Injection Systems to Plaintiffs and Class Members.  At all times during the Class Period, its activities in the United States were under the control and direction of its Japanese parent, Keihin Corporation which controlled its policies, sales, and finances.

REDACTED

138.     Maruyasu Industries Co., Ltd. is a Japanese corporation with its principal place of business in Nagoya-shi, Japan.  Maruyasu Industries Co., Ltd. – directly and/or through its subsidiaries, which it wholly owned and/or controlled – manufactured, marketed and/or sold Fuel Injection Systems that were purchased throughout the United States, including in this District, during the Class Period, including by firms that sold such Fuel Injection Systems to Plaintiffs and Class Members.

139.     Defendant Mikuni Corporation is a Japanese corporation with its principal place of business in Tokyo, Japan. Defendant Mikuni Corporation – directly and/or through its subsidiaries, which it wholly owned and/or controlled – manufactured, marketed and/or sold Fuel Injection Systems that were purchased throughout the United States, including in this District, during the Class Period, including by firms that sold such Fuel Injection Systems to Plaintiffs and Class Members.

140.     Defendant Mikuni American Corporation is a California corporation with its principal place of business in Northridge, California.  It is a subsidiary of and wholly owned and/or controlled by its parent, Mikuni Corporation.  Defendant Mikuni American Corporation – directly and/or through its subsidiaries, which it wholly owned and/or controlled – manufactured, marketed and/or sold Fuel Injection Systems that were purchased throughout the United States, including in this District, during the Class Period, including by firms that sold such Fuel Injection Systems to Plaintiffs and Class Members.  At all times during the Class Period, its activities in the United States were under the control and direction of its Japanese parent, Mikuni Corporation which controlled its policies, sales, and finances.

141.     Defendant Mitsubishi Electric Corporation is a Japanese corporation with its principal place of business in Tokyo, Japan. Defendant Mitsubishi Electric Corporation – directly

REDACTED

and/or through its subsidiaries, which it wholly owned and/or controlled – manufactured, marketed and/or sold Fuel Injection Systems that were purchased throughout the United States, including in this District, during the Class Period, including by firms that sold such Fuel Injection Systems to Plaintiffs and Class Members.

142.    Defendant Mitsubishi Electric US Holdings, Inc. is a Delaware corporation with its principal place of business in Cypress, California.  It is a subsidiary of and wholly owned and/or controlled by its parent, Mitsubishi Electric Corporation. Defendant Mitsubishi Electric US Holdings, Inc. – directly and/or through its subsidiaries, which it wholly owned and/or controlled – manufactured, marketed and/or sold Fuel Injection Systems that were purchased throughout the United States, including in this District, during the Class Period, including by firms that sold such Fuel Injection Systems to Plaintiffs and Class Members.  At all times during the Class Period, its activities in the United States were under the control and direction of its Japanese parent, which controlled its policies, sales, and finances.

143.    Defendant Mitsubishi Electric Automotive America, Inc. is a Delaware corporation with its principal place of business in Mason, Ohio.  It is a subsidiary of and wholly owned and/or controlled by its parent, Mitsubishi Electric US Holdings.  Defendant Mitsubishi Electric Automotive America, Inc. manufactured, marketed and/or sold Fuel Injection Systems that were purchased throughout the United States, including in this District, during the Class Period, including by firms that sold such Fuel Injection Systems to Plaintiffs and Class Members. At all times during the Class Period, its activities in the United States were under the control and direction of its United States or Japanese parents, which controlled its policies, sales, and finances.

REDACTED

144. Defendant Mitsuba Corporation is a Japanese corporation with its principal place of business in Gunma, Japan. Mitsuba Corporation – directly and/or through its subsidiaries, which it wholly owned and/or controlled – manufactured, marketed and/or sold Fuel Injector Systems that were purchased throughout the United States, including in this District, during the Class Period, including by firms that sold such Fuel Injection Systems to Plaintiffs and Class Members.

145. Defendant American Mitsuba Corporation is an Illinois corporation with its principal place of business in Novi, Michigan. It is a subsidiary of and wholly owned and/or controlled by its parent, Mitsuba Corporation. American Mitsuba Corporation manufactured, marketed and/or sold Fuel Injection Systems that were purchased throughout the United States, including in this District, during the Class Period, including by firms that sold such Fuel Injection Systems to Plaintiffs and Class Members. At all times during the Class Period, its activities in the United States were under the control and direction of its Japanese parent, which controlled its policies, sales, and finances.

146. Defendant Robert Bosch GmbH is a German company with its headquarters in Stuttgart, Germany. Robert Bosch GmbH – directly and/or through its subsidiaries, which it wholly owned and/or controlled – manufactured, marketed and/or sold Fuel Injection Systems that were purchased throughout the United States, including in this District, during the Class Period, including by firms that sold such Fuel Injection Systems to Plaintiffs and Class Members.

147. Defendant Bosch Electrical Drives Co., Ltd. is a Korean company with its principal place of business in Sejong, South Korea. It is a subsidiary of and wholly owned by Robert Bosch GmbH. Bosch Electrical Drives Co., Ltd. – directly and/or through its affiliates, which it wholly controlled – manufactured, marketed and/or sold Fuel Injection Systems that

46

REDACTED

were purchased throughout the United States, including in this District, during the Class Period including by firms that sold such Fuel Injection Systems to Plaintiffs and Class Members.  At all times during the Class Period, its activities in the United States were under the control and direction of its German parent, which controlled its policies, sales, and finances.

148.    Defendant Robert Bosch LLC is a Delaware company with its principal place of business in Farmington Hills, Michigan. It is an affiliate of and wholly controlled by Bosch Electrical Drives Co., Ltd.  Robert Bosch LLC – directly and/or through its subsidiaries, which it wholly owned and/or controlled – manufactured, marketed and/or sold Fuel Injection Systems that were purchased throughout the United States, including in this District, during the Class Period, including by firms that sold such Fuel Injection Systems to Plaintiffs and Class Members. At all times during the Class Period, its activities in the United States were under the control and direction of its Korean parent, which controlled its policies, sales, and finances.

### AGENTS AND CO-CONSPIRATORS

149.    Each Defendant acted as the principal of or agent for each other Defendant with respect to the acts, violations, and common course of conduct alleged herein.

150.    Various persons, partnerships, sole proprietors, firms, corporations, and individuals not named as defendants in this lawsuit and individuals, the identities of which are presently unknown, have participated as co-conspirators with Defendants in the offenses alleged in this Complaint and have performed acts and made statements in furtherance of the conspiracy or in furtherance of the anti-competitive conduct.

151.    Whenever in this Complaint reference is made to any act, deed, or transaction of any corporation or limited liability entity, the allegation means that the corporation or limited liability entity engaged in the act, deed, or transaction by or through its officers, directors, agents,

REDACTED

employees, or representatives while they were actively engaged in the management, direction, control, or transaction of the corporation's or limited liability entity's business or affairs.

## FACTUAL ALLEGATIONS

### A.      The Fuel Injection Systems Industry

152.    Fuel Injection Systems admit fuel or a fuel/air mixture into engine cylinders and may include injectors, high pressure pumps, rail assemblies, feed lines, electric throttle bodies, airflow meters, engine control units, fuel pumps, MAP sensors, pressure regulators, pulsation dampers, purge control valves and other components sold as a unitary system.  Fuel Injection Systems can also be sold as part of a broader system, such as an engine management system. Fuel Injection Systems are part of the powertrain segment of the automotive market.

153.    The Fuel Injection System is responsible for injection timing, atomization, and injection quality of the fuel supplied to the engine.

154.    In 2012, the Fuel Injection Systems market was estimated as a $47 billion dollar global market.  According to a May 2013 report by Industry Analysts, Inc., "Global Automotive Electric Fuel Pumps Industry," DENSO is one of four dominant players in the industry. DENSO, self-labeled as a "worldwide market leader" in the fuel injection products, declared that its "compact, high-durability, high-pressure fuel pump has become a de facto standard in the industry."

155.    In 2010, Toyota named DENSO as its top North American Supplier of fuel injectors and fuel pump assemblies.

156.    Several illustrations of Fuel Injectors are set forth below.

## ELECTRONIC FUEL INJECTION SYSTEM COMPONENTS

REDACTED



## HITACHI MANUFACTURED FUEL INJECTORS



Gasoline Direct Injection Injector



Gasoline Fuel Injector

REDACTED

## FUEL INJECTOR SYSTEM DIAGRAMS



Source: Fuel Injection Systems Market By Technology (Port Fuel, GDI, Direct Diesel), Engine Type (Gasoline, Diesel), Geography, Vehicle Type & Component: Global Trends & Forecast To 2018

REDACTED



Inside a fuel injector

157.    Fuel Injection Systems are installed by original equipment manufacturers ("OEMs") in new cars as part of the automotive manufacturing process.  They are also installed by OEMs in cars to replace worn out, defective or damaged Fuel Injection Systems.

158.    For new cars, the OEMs – mostly large automotive manufacturers such as Ford Motor Company, Toyota Motor Corporation, GM, etc. – purchase Fuel Injection Systems directly from Defendants.  Fuel Injection Systems may also be purchased by component

REDACTED

manufacturers who then supply such systems to OEMs.  These component manufacturers are also called "Tier 1 Manufacturers" in the industry.  Tier 1 Manufacturers supply Fuel Injection Systems directly to an OEM.

159.    Replacement Fuel Injection Systems sold by OEMs to dealerships are the same as the Fuel Injection Systems installed in vehicles and are made by the same manufacturer who made the Fuel Injection Systems originally installed—that is the purpose of an OEM part, made by the OEM supplier. Such replacement parts are not the same as aftermarket parts, which are made by different manufacturers than those who manufactured the original parts. The prices of replacement Fuel Injection Systems were inflated by Defendants' collusion.

160.    When purchasing Fuel Injection Systems, OEMs issue Requests for Quotation ("RFQs") to automotive parts suppliers on a model-by-model basis for model specific parts. Automotive parts suppliers submit quotations, or bids, to OEMs in response to RFQs, and the OEMs usually award the business to the selected automotive parts supplier for the lifespan of the model, which is usually four to six years.  Typically, the bidding process for a particular model begins approximately three years prior to the start of production of a new model.  OEMs procure parts for U.S.-manufactured vehicles in the United States and elsewhere.

161.    Defendants and their co-conspirators supplied Fuel Injection Systems to OEMs for installation in vehicles manufactured and sold in the United States and elsewhere.  The Defendants and their co-conspirators manufactured Fuel Injection Systems (a) in the United States and elsewhere for installation in vehicles manufactured and sold in the United States, (b) in Japan and elsewhere for export to the United States and installation in vehicles manufactured and sold in the United States, and (c) in Japan and elsewhere for installation in vehicles manufactured in Japan and elsewhere for export to and sale in the United States.

52

REDACTED

162.    Plaintiffs and members of the proposed Classes purchased Fuel Injection Systems indirectly from the Defendants or their co-conspirators.  By way of example, an automobile dealer indirectly purchases one or more Fuel Injection Systems from the Defendants or their co-conspirators as part of purchasing a new vehicle.   An automobile dealer also indirectly purchases for replacement one or more Fuel Injection Systems from the Defendants or their co-conspirators when repairing a damaged vehicle or where one or more of the vehicle's Fuel Injection Systems are defective.

**B.**    **The Structure and Characteristics of the Fuel Injection Systems Market Render the Conspiracy More Plausible**

163.    The structure and other characteristics of the Fuel Injection Systems market in the United States are conducive to a price-fixing agreement and have made collusion particularly attractive in this market.  Specifically, the Fuel Injection Systems market has (1) high barriers to entry and (2) inelasticity of demand.

**1.    The Fuel Injection Systems Market Has High Barriers to Entry**

164.    A collusive arrangement that raises product prices above competitive levels would, under basic economic principles, attract new entrants seeking to benefit from the supra-competitive pricing.  Where, however, there are significant barriers to entry, new entrants are less likely.  Thus, barriers to entry help to facilitate the formation and maintenance of a cartel.

165.    There are substantial barriers that preclude, reduce, or make more difficult entry into the Fuel Injection Systems market.  A new entrant into the business would face costly and lengthy start-up costs, including multi-million dollar costs associated with manufacturing plants and equipment, energy, transportation, distribution infrastructure, and long-standing customer relationships.

REDACTED

166.     Defendants, for instance, own multiple patents related to the manufacture of Fuel Injection Systems.  These patents place a significant and costly burden on potential new entrants, who must avoid infringing on the patents when entering the market with a new product.

167.     Within the Air Flow Meter industry, there is a significant amount of technology and engineering expertise required to build systems that fully comply with environmental and public health requirements and other regulatory standards including fuel economy requirements.

**2.     There is Inelasticity of Demand for Fuel Injection Systems**

168.     "Elasticity" is a term used to describe the sensitivity of supply and demand to changes in one or the other.  For example, demand is said to be "inelastic" if an increase in the price of a product results in only a small decline in the quantity sold of that product, if any.  In other words, customers have nowhere to turn for alternative, cheaper products of similar quality and so continue to purchase despite a price increase.

169.     For a cartel to profit from raising prices above competitive levels, demand must be relatively inelastic at competitive prices.  Otherwise, increased prices would result in declining sales, revenues, and profits as customers purchased substitute products or declined to buy altogether.  Inelastic demand is a market characteristic that facilitates collusion, allowing producers to raise their prices without triggering customer substitution and lost sales revenue.

170.     Demand for Fuel Injection Systems is highly inelastic because there are no close substitutes for these products.  Additionally, customers must purchase Fuel Injection Systems as an essential part of a vehicle, regardless of whether prices are kept at supra-competitive levels.  Customers wanting to purchase a car simply have no choice but to purchase Fuel Injection Systems

REDACTED

### C.     __Government Investigations__

171.     A globally coordinated antitrust investigation is taking place in the United States, Europe, and Japan aimed at suppliers of automotive parts.  A Japan Fair Trade Commission ("JFTC") official told a leading legal publication that automotive parts supplier investigations by the JFTC, DOJ, and EC would continue to widen because the automotive industry as a whole comprises many sub-industries.  He characterized the investigations being conducted by the U.S., European, and Japanese antitrust authorities as "large and broad," and he declined to deny that this "would be history's largest case."

172.     The DOJ Antitrust Division's broad criminal investigation into illegal price-fixing and bid-rigging in the automotive parts industry is the largest criminal investigation the Antitrust Division has ever pursued.  The ongoing cartel investigation of price-fixing and bid-rigging in the automobile parts industry has yielded $3.4 billion in criminal fines, already surpassing the total amount in criminal fines obtained by the DOJ's Antitrust Division for all of last fiscal year.

173.     On January 30, 2012, the DOJ announced that Defendant DENSO Corporation had agreed to pay a $78 million fine and plead guilty to a two-count criminal Information charging it with: (1) participating in a combination and conspiracy to suppress and eliminate competition in the automotive parts industry by agreeing to rig bids for, and to fix, stabilize, and maintain the prices of, electronic control units ("ECUs") sold to an automobile manufacturer in the United States and elsewhere from at least as early as January 2000 and until at least February 2010 in violation of the Sherman Antitrust Act, 15 U.S.C. § 1; and (2) participating in a combination and conspiracy to suppress and eliminate competition in the automotive parts industry by agreeing to rig bids for, and to fix, stabilize, and maintain the prices of, heater control panels ("HCPs") sold to an automobile manufacturer in the United States and elsewhere

REDACTED

from at least as early as January 2000 and continuing until at least February 2010 in violation of the Sherman Act, 15 U.S.C. § 1.

174.    According to the criminal Information filed against it, Defendant DENSO Corporation and its co-conspirators carried out the ECU conspiracy by:

(a)    participating in meetings, conversations, and communications in the United States and Japan to discuss the bids and price quotations to be submitted to an automobile manufacturer in the United States and elsewhere;

(b)    agreeing, during those meetings, conversations, and communications, on bids and price quotations to be submitted to an automobile manufacturer in the United States and elsewhere;

(c)    agreeing, during those meetings, conversations, and communications, to allocate the supply of ECUs sold to an automobile manufacturer in the United States and elsewhere on a model-by-model basis;

(d)    agreeing, during those meetings, conversations, and communications, to coordinate price adjustments requested by an automobile manufacturer in the United States and elsewhere;

(e)    submitting bids, price quotations, and price adjustments to an automobile manufacturer in the United States and elsewhere in accordance with the agreements reached;

(f)    selling ECUs to an automobile manufacturer in the United States and elsewhere at collusive and noncompetitive prices;

(g)    accepting payment for ECUs sold to an automobile manufacturer in the United States and elsewhere at collusive and non-competitive prices;

REDACTED

> (h)     engaging in meetings, conversations, and communications in the United States and elsewhere for the purpose of monitoring and enforcing adherence to the agreed-upon bid-rigging and price-fixing scheme; and

> (i)     employing measures to keep their conduct secret, including but not limited to using code names and meeting at private residences or remote locations.

175.    According to the criminal Information filed against it, Defendant DENSO Corporation and its co-conspirators carried out the HCP conspiracy by:

> (a)     participating in meetings, conversations, and communications in the United States and Japan to discuss the bids and price quotations to be submitted to an automobile manufacturer in the United States and elsewhere;

> (b)     agreeing, during those meetings, conversations, and communications, on bids and price quotations to be submitted to an automobile manufacturer in the United States and elsewhere;

> (c)     agreeing, during those meetings, conversations, and communications, to allocate the supply of HCPs sold to an automobile manufacturer in the United States and elsewhere on a model-by-model basis;

> (d)     agreeing, during those meetings, conversations, and communications, to coordinate price adjustments requested by an automobile manufacturer in the United States and elsewhere;

> (e)     submitting bids, price quotations, and price adjustments to an automobile manufacturer in the United States and elsewhere in accordance with the agreements reached;

> (f)     selling HCPs to an automobile manufacturer in the United States and elsewhere at collusive and noncompetitive prices;

REDACTED

    (g)    accepting payment for HCPs sold to an automobile manufacturer in the United States and elsewhere at collusive and noncompetitive prices;

    (h)    engaging in meetings, conversations, and communications in the United States and elsewhere for the purpose of monitoring and enforcing adherence to the agreed-upon bid-rigging and price-fixing scheme; and

176.    employing measures to keep their conduct secret, including but not limited to using code names and meeting at private residences or remote locations.

177.    On September 26, 2013, the DOJ announced that Hitachi Automotive Systems, Ltd. agreed to plead guilty and pay a $195 million criminal fine and to plead guilty to a one-count criminal information charging it with participating in a combination and conspiracy to suppress and eliminate competition in the automotive parts industry by agreeing to allocate the supply of, rig bids for, and fix, stabilize, and maintain the prices of automotive parts, including Fuel Injection Systems, sold to automobile manufactures in the United States and elsewhere from at least as early as January 2000 and continuing until at least February 2010 in violation of the Sherman Act, 15 U.S.C. § 1.

178.    According to the Information filed, Defendant Hitachi Automotive Systems, Ltd. and its co-conspirators carried out the Fuel Injection Systems conspiracy by:

    (a)    participating in meetings, conversations, and communications in the United States and elsewhere to discuss the bids and price quotations to be submitted to automobile manufacturers in the United States and elsewhere;

    (b)    agreeing, during those meetings, conversations, and communications, on bids and price quotations to be submitted to automobile manufacturers in the United States and elsewhere;

REDACTED

   (c)  agreeing, during those meetings, conversations, and communications, to allocate the supply automotive parts, including Fuel Injection Systems, sold to automobile manufactures in the United States and elsewhere;

   (d)  agreeing, during those meetings, conversations, and communications, to coordinate price adjustments requested by automobile manufacturers in the United States and elsewhere;

   (e)  submitting bids, price quotations, and price adjustments to automobile manufacturers in the United States and elsewhere in accordance with the agreements reached;

   (f)  selling automotive parts, including Fuel Injection Systems, to automobile manufacturers in the United States and elsewhere at collusive and noncompetitive prices;

   (g)  accepting payment for automotive parts, including Fuel Injection Systems, sold to automobile manufacturers in the United State and elsewhere at collusive and noncompetitive prices;

   (h)  engaging in meetings, conversations, and communications in the United States and elsewhere for the purpose of monitoring and enforcing adherence to the agreed-upon bid-rigging and price-fixing scheme; and

   (i)  employing measures to keep their conduct secret, including, but not limited to, using code names and meeting at remote locations.

  179.  On September 26, 2013, the DOJ announced that Defendant Mitsuba Corporation agreed to pay a $135 million criminal fine and plead guilty to a two-count criminal Information charging it with: (i) participating in a combination and conspiracy to suppress and eliminate competition in automotive parts industry by agreeing to rig bids for, and to fix, stabilize, and maintain the prices of, certain automotive parts sold to automobile manufacturers, including

REDACTED

Honda Motor Company Ltd., Fuji Heavy Industries Ltd., Nissan Motor Company Ltd., Toyota Motor Corporation, Chrysler Group, LLC, and certain of their subsidiaries in the United States and elsewhere, from at least as early as January 2000 through at least February 2010, in violation of the Sherman Antitrust Act, 15 U.S.C. § 1; and (ii) altering, destroying, mutilating, concealing, covering up, falsifying and making false entries in documents and tangible objects with the intent to impede, obstruct, and influence the investigation of the conduct charged in the other count, and in relation to and contemplation of such investigation, in violation of 18 U.S.C. § 1519. For purposes of Mitsuba's plea agreement, "automotive parts" are defined to include, among other automotive parts, electric throttle motors and fuel pumps.

180.    According to the Information filed, Defendant Mitsuba Corporation and its co-conspirators carried out the automotive parts combination and conspiracy by, among other things, the following:

(a)    participating in meetings, conversations, and communications in the United States and elsewhere to discuss the bids and price quotations to be submitted to automobile manufacturers in the United States and elsewhere;

(b)    agreeing, during those meetings, conversations, and communications, on bids and price quotations to be submitted to automobile manufacturers in the United States and elsewhere;

(c)    agreeing, during those meetings, conversations, and communications, to allocate the supply of certain automotive parts sold to automobile manufacturers in the United States and elsewhere;

REDACTED

(d)      agreeing, during those meetings, conversations, and communications, to coordinate price adjustments requested by automobile manufacturers in the United States and elsewhere;

(e)      submitting bids, price quotations, and price adjustments to automobile manufacturers in the United States and elsewhere in accordance with the agreements reached;

(f)      selling certain automotive parts to automobile manufacturers in the United States and elsewhere at collusive and noncompetitive prices;

(g)      accepting payment for certain automotive parts sold to automobile manufacturers in the United States and elsewhere at collusive and noncompetitive prices;

(h)      engaging in meetings, conversations, and communications in the United States and elsewhere for the purpose of monitoring and enforcing adherence to the agreed-upon bid-rigging and price-fixing scheme;

(i)      employing measures to keep their conduct secret, including, but not limited to, using code names and meeting at remote locations.

181.   With respect to the obstruction of justice count, the Mitsuba Information charged as follows:

> In or about February 2010, Executive A, acting on Defendant's behalf, knowingly altered, destroyed, mutilated, concealed, covered up, falsified and made false entries in records, documents and tangible objects with the intent to impede, obstruct, and influence the investigation and proper administration of a matter within the jurisdiction of a department and agency of the United States, to wit, an investigation by the FBI and the United States Department of Justice of possible violations of U.S. antitrust law, in relation to and contemplation of such matter and case, and furthermore did order and command other employees of the Defendant to do so, in violation of 18 U.S.C. § 1519.
>
> After becoming aware of the FBI search of Defendant's co-conspirator's U.S. offices, Executive A informed certain of his subordinates employed at the U.S. subsidiary of Defendant about

REDACTED

the FBI search, and instructed such subordinates, as well as other employees of Defendant, to locate, conceal and destroy documents and electronic files that were likely to contain evidence of antitrust crimes in the United States and elsewhere.

Executive A concealed and destroyed documents and electronic files in his possession, custody and control in the Eastern District of Michigan that were likely to contain evidence of antitrust crimes in the United States and elsewhere. Certain of Executive A's subordinates and other employees of Defendant took acts in the Eastern District of Michigan and elsewhere to endeavor to conceal and destroy such documents and electronic files in the possession, custody and control of Defendant, and did conceal and destroy such documents and electronic files.

182.    On September 26, 2013, the DOJ announced that Defendant Mitsubishi Electric Corporation agreed to pay a $190 million criminal fine and plead guilty to a one-count criminal Information charging it with participating in a combination and conspiracy to suppress and eliminate competition in the automotive parts industry by agreeing to rig bids for, and to fix, stabilize, and maintain the prices of, certain automotive parts sold to automobile manufacturers, including Ford Motor Company, General Motors LLC, Chrysler Group LLC, Fuji Heavy Industries Ltd., Nissan Motor Company, Ltd, Honda Motor Company, Ltd., and certain of their subsidiaries in the United States and elsewhere, from at least as early as January 2000 through at least February 2010, in violation of the Sherman Antitrust Act, 15 U.S.C. § 1.  For purposes of Mitsubishi Electric Corporation's plea agreement, "automotive parts" are defined to include, among other parts, fuel injections, fuel pumps, MAP sensors, purge control valves, and throttle bodies.

183.    According to the Information filed, Defendant Mitsubishi Electric Corporation and its co-conspirators carried out the automotive parts combination and conspiracy by, among other things, the following:

REDACTED

(a)    participating in meetings, conversations, and communications in the United States and elsewhere to discuss the bids and price quotations to be submitted to automobile manufacturers in the United States and elsewhere;

(b)    agreeing, during those meetings, conversations, and communications, on bids and price quotations to be submitted to automobile manufacturers in the United States and elsewhere;

(c)    agreeing, during those meetings, conversations, and communications, to allocate the supply of certain automotive parts sold to automobile manufacturers in the United States and elsewhere;

(d)    agreeing, during those meetings, conversations, and communications, to coordinate price adjustments requested by automobile manufacturers in the United States and elsewhere;

(e)    submitting bids, price quotations, and price adjustments to automobile manufacturers in the United States and elsewhere in accordance with the agreements reached;

(f)    selling certain automotive parts to automobile manufacturers in the United States and elsewhere at collusive and noncompetitive prices;

(g)    accepting payment for certain automotive parts sold to automobile manufacturers in the United States and elsewhere at collusive and noncompetitive prices;

(h)    engaging in meetings, conversations, and communications in the United States and elsewhere for the purpose of monitoring and enforcing adherence to the agreed-upon bid-rigging and price-fixing scheme;

REDACTED

> (i)      employing measures to keep their conduct secret, including, but not limited to, using code names and meeting at remote locations.

184.    On February 3, 2014, the DOJ announced that Defendant Aisan Industry Co., Ltd. agreed to pay a $6.86 million criminal fine and plead guilty to a one-count criminal Information charging it with participating in a conspiracy to suppress and eliminate competition by agreeing to rig bids for, and to fix, stabilize, and maintain the prices of electronic throttle bodies sold to Nissan Motor Co., Ltd. and certain of its subsidiaries in the United States and elsewhere, from at least as early as October 2003 until at least February 2010 in violation of the Sherman Antitrust Act, 15 U.S.C. § 1.  According to the Information filed, Defendant Aisan Industry Co., Ltd. and its co-conspirators carried out the electronic throttle bodies conspiracy by:

> (a)      participating in meetings, conversations, and communications to discuss the bids and price quotations to be submitted to Nissan in the United States and elsewhere;

> (b)      agreeing, during those meetings, conversations, and communications, on bids and price quotations to be submitted to Nissan in the United States and elsewhere;

> (c)      agreeing, during those meetings, conversations, and communications, to allocate RFQs for the supply of electronic throttle bodies sold to Nissan in the United States and elsewhere;

> (d)      agreeing, during those meetings, conversations, and communications, to coordinate price adjustments requested by Nissan in the United States and elsewhere;

REDACTED

(e)      submitting bids, price quotations, and price adjustments to Nissan in the United States and elsewhere in accordance with the agreements reached;

(f)      selling electronic throttle bodies to Nissan in the United States and elsewhere at collusive and noncompetitive prices;

(g)      accepting payment for electronic throttle bodies sold to Nissan in the United States and elsewhere at collusive and noncompetitive prices; and

185.    engaging in meetings, conversations, and communications for the purpose of monitoring and enforcing adherence to the agreed-upon bid-rigging and price-fixing scheme.

**D.      Likely Existence of a Cooperating Defendant**

186.    The Antitrust Criminal Penalty Enhancement and Reform Act ("ACPERA") provides leniency benefits for a participant in a price-fixing conspiracy that voluntarily discloses its conduct to the Department of Justice.  In most recent cases in which guilty pleas for price-fixing conduct have been obtained, there has been a cooperating party that has been accepted into the DOJ's ACPERA program as an "amnesty applicant."  One of the leniency benefits for a conspirator that is accepted into the ACPERA program is that it is not charged with a criminal offense and is not required to plead guilty to criminal charges.

187.    In light of the guilty plea in this case, in related automotive parts antitrust cases and the DOJ's ongoing investigation into the industry, it is reasonable for this Court to infer that there is an ACPERA "amnesty applicant" in this case.

**E.      Guilty Pleas in Related Markets in the Automotive Industry**

188.    On January 30, 2012, the DOJ announced that Yazaki Corporation ("Yazaki") had agreed to pay a $470 million fine and plead guilty to a three-count criminal information charging Yazaki with: (1) participating in a combination and conspiracy with its co-conspirators to suppress and eliminate competition in the automotive parts industry by agreeing to rig bids for,

REDACTED

and to fix, stabilize, and maintain the prices of, automotive wire harnesses and related products sold to automobile manufacturers in the United States and elsewhere from at least as early as January 2000 and continuing until at least February 2010 in violation of the Sherman Act, 15 U.S.C. § 1; (2) participating in a combination and conspiracy to suppress and eliminate competition in the automotive parts industry by agreeing to rig bids for, and to fix, stabilize, and maintain the prices of, instrument panel clusters sold to automobile manufacturers in the United States and elsewhere, from at least as early as December 2002 until at least February 2010, in violation of the Sherman Act, 15 U.S.C. § 1; and (3) participating in a combination and conspiracy with its co-conspirators to suppress and eliminate competition in the automotive parts industry by agreeing to rig bids for, and to fix, stabilize, and maintain the prices of fuel senders sold to automobile manufacturers in the United States and elsewhere from at least as early as March 2004 and continuing until at least February 2010 in violation of the Sherman Act, 15 U.S.C. § 1.

189.    In addition to Yazaki, five executives from Yazaki (all Japanese nationals) – Tsuneaki Hanamura, Ryoji Kawai, Shigeru Ogawa, Kazuhiko Kashimoto and Hisamitsu Takada – pleaded guilty to their participation in a conspiracy to suppress and eliminate competition in the automotive parts industry by agreeing to rig bids for, and to fix, stabilize, and maintain the prices of automotive wire harnesses sold to certain automobile manufacturers in the United States and elsewhere in violation of the Sherman Act, 15 U.S.C. § 1.  These five Yazaki executives will each pay a $20,000 criminal fine and serve prison time ranging from 15 months to two years.  The two-year sentences would be the longest term of imprisonment imposed on a foreign national voluntarily submitting to U.S. jurisdiction for a Sherman Act antitrust violation.

REDACTED

190.    On September 29, 2011, the DOJ announced that Furukawa Electric Co. Ltd. ("Furukawa") had agreed to plead guilty and to pay a $200 million fine for its role in a criminal price-fixing and bid-rigging conspiracy involving the sale of automotive wire harnesses to automobile manufacturers.

191.    Three of Furukawa's executives also pleaded guilty to the same conspiracy.  The court sentenced two of the executives to 15 and 18 month prison sentences, to be served in the United States.

192.    On January 30, 2012, DENSO agreed to plead guilty to a two-count felony charge against DENSO for engaging in conspiracies to rig bids for and to fix, stabilize and maintain the prices of electronic control units (ECUs) and heater control panels (HCPs) sold to automobile manufacturers in the United States and elsewhere.

193.    On March 26, 2012 a DENSO executive agreed to plead guilty in a criminal price-fixing and bid-rigging conspiracy involving the sale of heater control panels to automobile manufacturer.

194.    On April 26, 2012, another DENSO executive agreed to plead guilty to the same conspiracy.

195.    A number of additional companies have pleaded guilty to fixing the prices of other automotive parts, including:  automotive wire harnesses;  instrument panel clusters; fuel senders; heater control panels; occupant safety restraint systems; automotive bearings; windshield wipers; starters; radiators; alternators; ignition coils; anti-vibration rubber parts, air conditioning systems; automatic transmission fluid warmers; fan motors; switches; steering angle sensors; HID ballasts; and automotive lamps.  These companies include:  Fujikura Ltd.; GS Electech, Inc.; TRW Deutschland Holding GmbH; Autoliv, Inc.; Nippon Seiki Co., Ltd.; JTEKT

REDACTED

Corporation; Mitsuba Corporation; Mitsubishi Electric Corporation; Mitsubishi Heavy Industries, Ltd.; NSK Ltd.; Panasonic Corporation; T. RAD Co., Ltd.; Tokai Rika Co.; Valeo Japan Co., Ltd.; and Yamashita Rubber Co., Ltd.  The majority of these violators pleaded guilty to engaging in bid-rigging, price-fixing, and market allocation during the same time period as the Defendants with multiple OEMs as their targets, including Suzuki, Mazda, Mitsubishi, Subaru, Chrysler, German manufacturers and unnamed automobile manufacturers.

196.    The U.S. government has said its automotive parts cartel criminal investigation will continue and other suppliers could be charged.

197.    "This criminal activity has a significant impact on the automotive manufacturers in the United States, Canada, Japan and Europe and has been occurring for at least a decade. The conduct had also affected commerce on a global scale in almost every market where automobiles are manufactured and/or sold," said FBI's Special Agent in Charge Andrew G. Arena.

198.    "When companies partner to control and price fix bids or contracts, it undermines the foundation of the United States' economic system," Arena also said.  "The FBI is committed to aggressively pursuing any company involved in antitrust crimes."

199.    On February 15, 2013, Scott Hammond, the Deputy Assistant Attorney General in the Antitrust Division, discussed DOJ's ongoing automotive parts investigation in a Thomson Reuters article.  He said "[t]he investigation is broader than what we've announced so far . . . . [The investigation] is still very much ongoing, but it already appears to be the biggest criminal antitrust investigation that we've ever encountered. *I say biggest with respect to the impact on U.S. businesses and consumers, and the number of companies and executives that are subject to the investigation*."  (emphasis added).

REDACTED

200.     On July 10, 2013, the European Commission fined four wire harness suppliers, Yazaki, S-Y Systems, Furukawa Electric and Leoni, a total of $182 million for taking part in cartels that affected Toyota, Nissan, Honda and Renault.

201.     On September 11, 2013, two Fujikura, Ltd. executives were indicted for conspiring to fix the price of wire harness assemblies to Fuji Heavy Industries, the maker of Subaru automobiles.

202.     On September 25, 2013, nine additional Japanese automotive suppliers and two more executives agrees to plead guilty to conspiracy charges and pay more than $740 million in fines for their roles in rigging the prices of 30 products.

203.     On September 26, 2013, Panasonic Corporation agreed to pay a $45.8 million fine and plead guilty to price-fixing allegations involving turn, wiper and other switches and steering angle sensors sold to Toyota and high intensity discharge ballasts sold to Honda, Mazda and Nissan among others.

204.     The diagram below, which was prepared by the DOJ, illustrates the recent guilty pleas and the corresponding automotive parts to which the various manufacturers have admitted to price-fixing.

REDACTED



205.    On October 9, 2013, Takata Corporation announced that it had agreed to pay $71.3 million to settle antitrust charges brought by the United States federal prosecutors for its role in a conspiracy to price-fix seatbelts.

206.    On November 26, 2013, the DOJ announced that Toyo Tire & Rubber Co. Ltd. had agreed to plead guilty and to pay a $120 million criminal fine for its role in two separate conspiracies. Toyo Tire & Rubber Co. Ltd. engaged in a conspiracy to suppress and eliminate competition in the automotive parts industry by agreeing to allocate sales of, to rig bids for, and to fix, raise, and maintain the prices of, automotive anti-vibration rubber products sold to Toyota Motor Corporation, Nissan Motor Corporation, Fuji Heavy Industries, Ltd., and certain of their subsidiaries, affiliates and suppliers in the United States and elsewhere, and by agreeing to allocate sales of, and to fix, raise, and maintain the prices of, automotive constant-velocity-joint boot products sold to GKN plc and its subsidiaries in the United States and elsewhere.

207.    On November 27, 2013, the DOJ announced that Stanley Electric Co. Ltd. had agreed to plead guilty and to pay a $1.44 million criminal fine for its participation in a

REDACTED

conspiracy to fix prices of automotive HID lamp ballasts installed in automobiles sold in the United States and elsewhere.

208.    On January 16, 2014, the DOJ announced that Koito Manufacturing Co. Ltd. had agreed to plead guilty and to pay a $56.6 million criminal fine for its roles in separate price-fixing conspiracies involving automobile lighting fixtures and automotive HID lamp ballasts installed in cars sold in the United States and elsewhere.

209.    On February 3, 2014, the DOJ announced that Defendant Aisan Industry Co. Ltd. had agreed to plead guilty and to pay a $6.86 million criminal fine for its role in a price-fixing conspiracy involving electronic throttle bodies sold to an automobile manufacturer in the United States and elsewhere.

210.    On February 13, 2014, the DOJ announced that Bridgestone Corp. had agreed to plead guilty and to pay a $425 million criminal fine for its role in a conspiracy to fix prices of automotive anti-vibration rubber parts installed in automobiles sold in the United States and elsewhere.

211.    On April 23, 2014, the DOJ announced that Showa Corp. agreed to plead guilty and to pay a $19.9 million criminal fine for its role in a conspiracy to fix prices and rig bids for pinion-assist type electric powered steering assemblies installed in cars sold in the United States and elsewhere.

212.    On August 19, 2014, the DOJ announced that NGK Sparkplug Co. Ltd. agreed to plead guilty and to pay a $52.1 million criminal fine for its role in a conspiracy to fix prices and rig bids for spark plugs, standard oxygen sensors, and air fuel ratio sensors installed in cars sold to automobile manufacturers in the United States and elsewhere.

REDACTED

213.    On September 29, 2014, the DOJ announced that Toyoda Gosei Co. Ltd. agreed to plead guilty and to pay a $26 million criminal fine for its involvement in a combination and conspiracy to suppress competition in the automotive parts industry by agreeing to allocate sales of, to rig bids for, and to fix, stabilize, and maintain the prices of certain automotive hoses sold to Toyota in the United States and by agreeing to allocate sales of, to rig bids for, and to fix, stabilize, and maintain the prices of, automotive airbags and steering wheels sold to Subaru and Toyota in the United States and elsewhere.

214.    On October 31, 2014, the DOJ announced that Hitachi Metals Ltd. agreed to plead guilty and to pay a $1.25 million criminal fine for its role in a conspiracy to allocate the sales of, to rig bids for, and to fix, raise, and maintain the prices of automotive brake hose sold to Toyota in the United States and elsewhere.

215.    On November 13, 2014, the DOJ announced that Aisin Seiki Co. Ltd. agreed to plead guilty and to pay a $35.8 million criminal fine for its role in a conspiracy to allocate customers of variable valve timing devices installed in cars sold to automobile manufacturers in the United States and elsewhere.

216.    On November 24, 2014, the DOJ announced that Continental Automotive Electronics LLC and Continental Automotive Korea Ltd. agreed to plead guilty and to pay a criminal fine of $4 million for their roles in a conspiracy to rig bids of instrument panel clusters installed in vehicles manufactured and sold in the United States.

217.    To date, thirty-two companies and forty-eight executives have been charged in the DOJ's ongoing investigation into price-fixing and bid-rigging in the automotive parts industry. Each of the thirty-two companies has either pleaded guilty or agreed to plead guilty and altogether, they have agreed to pay approximately $2.4 billion in criminal fines.

REDACTED

218.   "This criminal activity has a significant impact on the automotive manufacturers in the United States, Canada, Japan and Europe and has been occurring at least a decade. The conduct had also affected commerce on a global scale in almost every market where automobiles are manufactured and/or sold," said FBI's Special Agent in Charge Andrew G. Arena. "When companies partner to control and price fix bids or contracts, it undermines the foundation of the United States' economic system," Arena also said. "The FBI is committed to aggressively pursuing any company involved in antitrust crimes."

**Illustrative Examples**

219.   Illustrative examples of Defendants' conspiratorial conduct in the market for Fuel Injection Systems include, but are not limited to, the following:

220.



REDACTED

221.

222.

223.

REDACTED



224.

225.

REDACTED



226.

227.

REDACTED



228.

229.

230.

REDACTED



231.

232.

233.

REDACTED

## DAMAGE TO PLAINTIFFS AND OTHER AUTOMOBILE DEALERS CAUSED BY DEFENDANTS' ILLEGAL ACTIVITIES

234.   Defendants' conspiracy resulted in Defendants charging inflated prices to firms who directly purchased Fuel Injection Systems from them and in those purchasers raising their prices to subsequent purchasers.

235.   Having paid higher prices for components of the cars they sold to Plaintiffs and the Classes and the Fuel Injection Systems they sold to Plaintiffs and the Classes, firms who sold such Fuel Injection Systems and vehicles passed Defendants' overcharges on to Plaintiffs and the Classes.

236.   Plaintiffs and the Classes are entitled to the overcharges they paid for Fuel Injection Systems.

237.   Plaintiffs have standing and have suffered damage compensable by indirect purchaser laws and they and members of the classes they seek to represent have sustained significant damage and injury as a result of Defendants' conspiracy.

## CLASS ACTION ALLEGATIONS

238.   Plaintiffs bring this action on behalf of themselves and as a class action under Rule 23(a) and (b)(2) of the Federal Rules of Civil Procedure, seeking equitable and injunctive relief on behalf of the following class (the "Nationwide Class"):

> All automobile dealers that, during the Class Period, (a) indirectly purchased Fuel Injection Systems manufactured or sold by a Defendant or any current or former subsidiary or affiliate thereof or any co-conspirator, or (b) purchased vehicles containing Fuel Injection Systems manufactured or sold by a Defendant or any current or former subsidiary, affiliate thereof or co-conspirator.

REDACTED

239.    Plaintiffs also bring this action on behalf of themselves and as a class action under Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure seeking damages pursuant to the antitrust, unfair competition, unjust enrichment, and consumer protection laws of the states whose laws are set forth in the Second and Third Claims below, (except California as to unjust enrichment claims), as well as the unjust enrichment laws of Missouri, and Massachusetts. The states whose laws are set forth in the Second and Third Claims below, as well as Missouri and Massachusetts, are collectively referred to as the "Indirect Purchaser States." These claims are brought by Plaintiffs on behalf of themselves and entities in the Indirect Purchaser States listed in the Second, Third and Fourth Claims as follows (the "Damages Class"):

> All automobile dealers, in the Indirect Purchaser States, that, during the Class Period (a) indirectly purchased Fuel Injection Systems manufactured or sold by one of Defendants or any current or former subsidiary or affiliate thereof, or any co-conspirator or (b) purchased vehicles containing Fuel Injection Systems manufactured or sold by one of Defendants or any current or former subsidiary, affiliate or co-conspirator thereof.

240.    The Nationwide Class and the Damages Class are referred to herein as the "Classes." Excluded from the Classes are Defendants, their parent companies, subsidiaries and affiliates, any co-conspirators, federal governmental entities and instrumentalities of the federal government, states and their subdivisions, agencies and instrumentalities, any judicial officer presiding over this matter, persons who purchased Fuel Injection Systems directly, and persons in the End-Payor Class, as defined in the End-Payor complaint.

241.    While Plaintiffs do not know the exact number of the members of the Classes, Plaintiffs believe there are (at least) thousands of members in each Class.

242.    Common questions of law and fact exist as to all members of the Classes. This is particularly true given the nature of Defendants' and their co-conspirators' conspiracy, which was generally applicable to all the members of both Classes, thereby making appropriate relief

REDACTED

with respect to the Classes as a whole.  Such questions of law and fact common to the Classes

include, but are not limited to:

> (a)    Whether Defendants and their co-conspirators engaged in a combination and conspiracy among themselves to fix, raise, maintain or stabilize the prices of Fuel Injection Systems sold in the United States;
>
> (b)    The identity of the participants of the alleged conspiracy;
>
> (c)    The duration of the alleged conspiracy and the acts carried out by Defendants and their co-conspirators in furtherance of the conspiracy;
>
> (d)    Whether the alleged conspiracy violated the Sherman Act, as alleged in the First Claim for Relief;
>
> (e)    Whether the alleged conspiracy violated state antitrust and unfair competition law, and/or state consumer protection law, as alleged in the Second and Third Claims for Relief;
>
> (f)    Whether Defendants unjustly enriched themselves to the detriment of the Plaintiffs and the members of the Classes, thereby entitling Plaintiffs and the members of the Classes to disgorgement of all benefits derived by Defendants, as alleged in the Fourth Claim for Relief;
>
> (g)    Whether the conduct of Defendants and their co-conspirators, as alleged in this Complaint, caused injury to the business or property of Plaintiffs and the members of the Classes;
>
> (h)    The effect of the alleged conspiracy on the prices of Fuel Injection Systems sold in the United States during the Class Period;
>
> (i)    Whether Plaintiffs and the members of the Classes had any reason to know or suspect the conspiracy, or any means to discover the conspiracy;
>
> (j)    Whether Defendants and their co-conspirators fraudulently concealed the conspiracy's existence from Plaintiffs and the members of the Classes;
>
> (k)    The appropriate injunctive and related equitable relief for the Nationwide Class; and
>
> (l)    The appropriate class-wide measure of damages for the Damages Class.

243.    Plaintiffs' claims are typical of the claims of the members of the Classes, and

Plaintiffs will fairly and adequately protect the interests of the Classes.  Plaintiffs and all

REDACTED

members of the Classes are similarly affected by Defendants' wrongful conduct in that they paid artificially inflated prices for Fuel Injection Systems purchased indirectly from Defendants and/or their co-conspirators.

244.    Plaintiffs' claims arise out of the same common course of conduct giving rise to the claims of the other members of the Classes.  Plaintiffs' interests are coincident with, and not antagonistic to, those of the other members of the Classes.  Plaintiffs are represented by counsel who are competent and experienced in the prosecution of antitrust and class action litigation.

245.    The questions of law and fact common to the members of the Classes predominate over any questions affecting only individual members, including legal and factual issues relating to liability and damages.

246.    Class action treatment is a superior method for the fair and efficient adjudication of the controversy, in that, among other things, such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently and without the unnecessary duplication of evidence, effort and expense that numerous individual actions would engender.  The benefits of proceeding through the class mechanism, including providing injured persons or entities with a method for obtaining redress for claims that might not be practicable to pursue individually, substantially outweigh any difficulties that may arise in the management of this class action.

247.    The prosecution of separate actions by individual members of the Classes would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

**PLAINTIFFS AND THE CLASSES SUFFERED ANTITRUST INJURY**

248.    Defendants' price-fixing conspiracy had the following effects, among others:

REDACTED

      (a)     Price competition has been restrained or eliminated with respect to Fuel Injection Systems;

      (b)     The prices of Fuel Injection Systems have been fixed, raised, maintained, or stabilized at artificially inflated levels;

      (c)     Indirect purchasers of Fuel Injection Systems have been deprived of free and open competition;

      (d)     Defendants charged direct purchasers of their Fuel Injection Systems inflated prices as a result of their conspiracy;

      (e)     Having paid higher prices for components of the cars they sold to Plaintiffs and the Classes and the Fuel Injection Systems they sold to Plaintiffs and the Classes, firms who sold Defendants' Fuel Injection Systems and vehicles to Plaintiffs and the Classes passed Defendants' overcharges  on to them;

      (f)     Defendants' overcharges passed through each level of distribution as they traveled to Plaintiffs and the Classes; and

      (g)     Automobile dealers purchasing Fuel Injection Systems and vehicles containing Fuel Injection Systems have been deprived of free and open competition.

      (h)     Indirect purchasers of Fuel Injection Systems paid artificially inflated prices.

249.    During the Class Period, Plaintiffs and the members of the Classes paid supracompetitive prices for Fuel Injection Systems, as a result of Defendants' conspiracy.

250.    An increase in the prices of Fuel Injection Systems caused an increase in the price of vehicles during the Class Period.

251.    Fuel Injection Systems comprise a significant portion of the price of a vehicle.

252.    The markets for Fuel Injection Systems and vehicles are inextricably linked and intertwined because the market for Fuel Injection Systems exists to serve the vehicle market. Without the vehicles, the Fuel Injection Systems have little to no value because they have no independent utility and must be inserted into vehicles to serve any function.  Indeed, the demand

REDACTED

for vehicles creates the demand for Fuel Injection Systems.  As stated in the 2010 Annual Report of Lear Corporation, an automobile parts supplier:  "Our sales are driven by the number of vehicles produced by the automotive manufacturers, which is ultimately dependent on consumer fleet demand for automotive vehicles."

253.    Fuel Injection Systems are identifiable, discrete physical products that remain essentially unchanged when incorporated into a vehicle.  As a result, Fuel Injection Systems follow a traceable physical chain of distribution from Defendants to Plaintiffs and the members of the Classes, and any costs attributable to Fuel Injection Systems can be traced through the chain of distribution to Plaintiffs and the members of the Classes.

254.    Just as Fuel Injection Systems can be physically traced through the supply chain, so can their price be traced to show that changes in the prices paid by direct purchasers of Fuel Injection Systems affect prices paid by indirect purchasers of new motor vehicles containing Fuel Injection Systems and Fuel Injection Systems purchased for repair purposes.

255.    Fuel Injection Systems have their own part numbers, which permit them to be tracked.

256.    Fuel Injection Systems are pieces of sophisticated equipment that are necessary to operate a vehicle.

257.    Fuel Injection Systems can be removed from a finished vehicle and replaced.

258.    The Fuel Injection Systems subject to Defendants' conspiracy and at issue in this lawsuit only have one use: to be inserted into vehicles.  Whether Fuel Injection Systems are sold by themselves or in vehicles, their purpose is to be inserted into vehicles.

259.    The purpose of the conspiratorial conduct of Defendants and their co- conspirators was to raise, fix, rig or stabilize the price of Fuel Injection Systems and, as a direct and

REDACTED

foreseeable result, the price of new motor vehicles containing Fuel Injection Systems and the price of Fuel Injection Systems purchased for repair purposes.  Economists have developed techniques to isolate and understand the relationship between one "explanatory" variable and a "dependent" variable in those cases when changes in the dependent variable are explained by changes in a multitude of variables, even when all such variables may be changing simultaneously.  That analysis - called regression analysis - is commonly used in the real world and in litigation to determine the impact of a price increase on one cost in a product (or service) that is an assemblage of costs.  Thus, an economist can isolate and identify only the impact of an increase in the price of Fuel Injection Systems on prices for new motor vehicles even though such products contain a number of other components whose prices may be changing over time. A regression model can explain how variation in the price of Fuel Injection Systems affects changes in the price of new motor vehicles.  In such models, the price of Fuel Injection Systems would be treated as an independent or explanatory variable.  The model can isolate how changes in the price of Fuel Injection Systems impact the price of new motor vehicles containing Fuel Injection Systems while controlling for the impact of other price-determining factors.

260.    The precise amount of the overcharge impacting the prices of new motor vehicles containing Fuel Injection Systems can be measured and quantified.  Commonly used and well-accepted economic models can be used to measure both the extent and the amount of the supracompetitive charge passed through the chain of distribution.  Thus, the economic harm to Plaintiffs and class members can be quantified.

261.    By reason of the violations of the antitrust law alleged herein, Plaintiffs and the members of the Classes have sustained injury to their businesses or property, having paid higher prices for Fuel Injection Systems than they would have paid in the absence of Defendants' and

REDACTED

their co-conspirators' illegal contract, combination, or conspiracy, and, as a result, have suffered damages in an amount presently undetermined. This is an antitrust injury of the type that the antitrust laws were meant to punish and prevent, and Plaintiffs' and Class members' damages are measurable.

## PLAINTIFFS' CLAIMS ARE NOT BARRED BY THE STATUTE OF LIMITATIONS

### A. The Statute of Limitations Did Not Begin to Run Because Plaintiffs Did Not And Could Not Discover Their Claims

262.   Plaintiffs repeat and re-allege the allegations set forth above.

263.   Plaintiffs and the members of the Classes had no knowledge of the combination or conspiracy alleged herein, or of facts sufficient to place them on inquiry notice of the claims set forth herein, until (at the earliest) September 26, 2013, the date that the DOJ publicly announced Defendant Hitachi Automotive Systems, Ltd.'s anticipated guilty plea. ███████

███████████████████████████████████████████████████████

███████████████████████████████████ Plaintiffs did not have sufficient information to place them on notice of Aisan's participation in the conspiracy until February 3, 2014, when its plea agreement was announced. Plaintiffs could not have been alerted to MELCO's and Mitsuba's participation in the conspiracy, until, at earliest, the dates when their plea agreements were issued, in November 2013.

264.   Plaintiffs and the members of the Classes are automobile dealers who purchased automobiles or purchased Fuel Injection Systems to replace or repair damaged or defective Fuel Injection Systems.

REDACTED

265.    They had no direct contact or interaction with Defendants in this case and had no means from which they could have discovered the combination and conspiracy described in this Complaint before September 26, 2013, the date that the DOJ publicly announced Defendant Hitachi Automotive Systems, Ltd.'s anticipated guilty plea. ████████████████████

████████████████████████████████████████████

████████████████████████████ Plaintiffs could also not have discovered Aisan's participation in the conspiracy until February 3, 2014, when its plea agreement was announced. Plaintiffs could not have been alerted to MELCO's and Mitsuba's participation in the conspiracy, until, at earliest, the dates when their plea agreements were issued, in November 2013.

266.    No information in the public domain was available to the Plaintiffs and the members of the Classes prior to September 26, 2013, the date that the DOJ publicly announced Defendant Hitachi Automotive Systems, Ltd.'s anticipated guilty plea, that revealed sufficient information to suggest that any one of the Defendants were involved in a criminal conspiracy to price-fix and rig bids for Fuel Injection Systems.  Plaintiffs and the members of the Classes had no means of obtaining any facts or information concerning any aspect of Defendants' dealings with OEMs or other direct purchasers, much less the fact that they and their co-conspirators had engaged in the combination and conspiracy alleged herein.

267.    For these reasons, the statute of limitations as to Plaintiffs' and the Classes' claims did not begin to run, and has been tolled with respect to the claims that Plaintiffs and the members of the Classes have alleged in this Complaint, until the dates set forth above.

        **B.      Fraudulent Concealment Tolled the Statute of Limitations**

268.    In the alternative, application of the doctrine of fraudulent concealment tolled the statute of limitations on the claims asserted herein by Plaintiffs and the Classes.  Plaintiffs and

REDACTED

the members of the Classes did not discover, and could not discover through the exercise of

reasonable diligence, the existence of the conspiracy alleged herein until before September 26,

2013, the date that the DOJ publicly announced Defendant Hitachi Automotive Systems, Ltd.'s

anticipated guilty plea. ████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████ Plaintiffs could not have

discovered their claims against Aisan until February 3, 2014, when its plea agreement was

announced.  Plaintiffs could not have been alerted to MELCO's and Mitsuba's participation in

the conspiracy, until, at earliest, the dates when their plea agreements were issued, in November

2013.

269.    Because Defendants' agreements, understandings, and conspiracies were kept

secret until September 26, 2013, Plaintiffs and members of the Classes were unaware before that

time of Defendants' unlawful conduct, and they did not know before then that they were paying

supracompetitive prices for Fuel Injection Systems throughout the United States during the Class

Period.  No information, actual or constructive, was ever made available to Plaintiffs and the

members of the Classes that indicated to Plaintiffs that they were being injured by Defendants'

unlawful conduct.

270.    The affirmative acts of Defendants alleged herein, including acts in furtherance of

the conspiracy, were wrongfully concealed and carried out in a manner that precluded detection.

271.    Defendants had secret communications to collusively fix prices, rig bids, and

allocate markets for Fuel Injection Systems.

REDACTED

272.    Defendants also concealed their conspiracy by submitting bids to OEMs, to give the appearance of competition, despite having already determined among themselves who would win each bid.

273.    By its very nature, Defendants' and their co-conspirators' anticompetitive conspiracy was inherently self-concealing.  Fuel Injection Systems are not exempt from antitrust regulation, and thus, before September 26, 2013, Plaintiffs reasonably considered it to be a competitive industry.  Accordingly, a reasonable person under the circumstances would not have been alerted to begin to investigate the legitimacy of Defendants' Fuel Injection Systems prices before September 26, 2013, ███████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████████ or against Aisan until February 3, 2014 or against MELCO and Mitsuba until November 2013.

274.    Plaintiffs and the members of the Classes could not have discovered the alleged contract, conspiracy or combination at an earlier date by the exercise of reasonable diligence because of the deceptive practices and techniques of secrecy employed by Defendants and their co-conspirators to avoid detection of, and fraudulently conceal, their contract, combination, or conspiracy.

275.    Because the alleged conspiracy was both self-concealing and affirmatively concealed by Defendants and their co-conspirators, Plaintiffs and members of the Classes had no knowledge of the alleged conspiracy, or of any facts or information that would have caused a reasonably diligent person to investigate whether a conspiracy existed until September 26, 2013, the date that the DOJ publicly announced Defendant Hitachi Automotive Systems, Ltd.'s anticipated guilty plea. ████████████████████████████████████

REDACTED

██████████████████████████████████████ Aisan's participation before

February 3, 2014, MELCO and Mitsuba's participation until November 2013 or ███████████

██████████████████████████████████████████ Before

those dates, no facts or information would have caused a reasonably diligent person to

investigate whether Keihin, Mikuni, Bosch, Maruyasu, MELCO, Mitsuba, Aisan or Denso had

participated in the conspiracy.

     276.    As a result of Defendants' fraudulent concealment of their conspiracy, the running

of any statute of limitations has been tolled with respect to the claims of Plaintiffs and the

members of the Classes.

## FIRST CLAIM FOR RELIEF
### Violation of Section 1 of the Sherman Act
### (on behalf of Plaintiffs and the Nationwide Class)

     277.    Plaintiffs incorporate by reference the allegations in the preceding paragraphs.

     278.    Defendants and unnamed co-conspirators entered into and engaged in a contract,

combination, or conspiracy in unreasonable restraint of trade in violation of Section 1 of the

Sherman Act (15 U.S.C. § 1).

     279.    The acts done by Defendants as part of, and in furtherance of, their and their co-

conspirators' contract, combination, or conspiracy were authorized, ordered, or done by their

officers, agents, employees, or representatives while actively engaged in the management of

Defendants' affairs.

     280.    At least as early as January 2000, and continuing until at least the filing of this

Complaint, the exact dates being unknown to Plaintiffs, Defendants and their co-conspirators

entered into a continuing agreement, understanding and conspiracy in restraint of trade to

artificially fix, raise, stabilize, and control prices for Fuel Injection Systems, thereby creating

anticompetitive effects.

REDACTED

281.    The anticompetitive acts were intentionally directed at the United States market for Fuel Injection Systems and had a substantial and foreseeable effect on interstate commerce by raising and fixing prices for Fuel Injection Systems throughout the United States.

282.    The conspiratorial acts and combinations have caused unreasonable restraints in the market for Fuel Injection Systems

283.    As a result of Defendants' unlawful conduct, Plaintiffs and other similarly situated indirect purchasers in the Nationwide Class who purchased Fuel Injection Systems have been harmed by being forced to pay inflated, supracompetitive prices for Fuel Injection Systems and vehicles containing Fuel Injection Systems.

284.    In formulating and carrying out the alleged agreement, understanding and conspiracy, Defendants and their co-conspirators did those things that they combined and conspired to do, including but not limited to the acts, practices and course of conduct set forth herein.

285.    Defendants' and their co-conspirators' conspiracy had the following effects, among others:

(a)    Price competition in the market for Fuel Injection Systems has been restrained, suppressed, and/or eliminated in the United States;

(b)    Prices for Fuel Injection Systems sold by Defendants and their co-conspirators have been fixed, raised, maintained, and stabilized at artificially high, non-competitive levels throughout the United States; and

(c)    Plaintiffs and members of the Nationwide Class who purchased Fuel Injection Systems indirectly from Defendants and their co-conspirators have been deprived of the benefits of free and open competition.

286.    Plaintiffs and members of the Nationwide Class have been injured and will continue to be injured in their business and property by paying more for Fuel Injection Systems

REDACTED

and vehicles containing Fuel Injection Systems than they would have paid and will pay in the absence of the conspiracy.

287.    Plaintiffs and members of the Nationwide Class will continue to be subject to Defendants' price-fixing, bid-rigging, and market allocations, which will deprive Plaintiffs and members of the Nationwide Class of the benefits of free competition, including competitively-priced Fuel Injection Systems and vehicles containing Fuel Injection Systems.

288.    Plaintiffs and members of the Nationwide Class will continue to lose funds due to overpayment for Fuel Injection Systems and vehicles containing Fuel Injection Systems because they are required to purchase vehicles and Fuel Injection Systems to continue to operate their businesses.

289.    Plaintiffs and members of the Nationwide Class continue to purchase vehicles and Fuel Injection Systems on a regular basis.

290.    Vehicles and Fuel Injection Systems continue to be sold at inflated and supracompetitive prices.

291.    The alleged contract, combination, or conspiracy is a *per se* violation of the federal antitrust laws.

292.    Plaintiffs and members of the Nationwide Class will be at the mercy of Defendants' unlawful conduct until the Court orders an injunction.

293.    Plaintiffs and members of the Nationwide Class are entitled to an injunction against Defendants, preventing and restraining the violations alleged herein.

**SECOND CLAIM FOR RELIEF**
**Violation of State Antitrust Statutes**
**(on behalf of Plaintiffs and the Damages Class)**

294.    Plaintiffs incorporate by reference the allegations in the preceding paragraphs.

REDACTED

295.    From as early as January 2000 until at least the filing of this Complaint, Defendants and their co-conspirators engaged in a continuing contract, combination or conspiracy with respect to the sale of Fuel Injection Systems in unreasonable restraint of trade and commerce and in violation of the various state antitrust statutes set forth below.

296.    The contract, combination, or conspiracy consisted of an agreement among Defendants and their co-conspirators to fix, raise, inflate, stabilize, and/or maintain at artificially supracompetitive prices, Fuel Injection Systems, and to allocate customers for Fuel Injection Systems in the United States.

297.    In formulating and effectuating this conspiracy, Defendants and their co-conspirators performed acts in furtherance of the combination and conspiracy, including:

(a)    participating in meetings and conversations among themselves in the United States during which they agreed to price Fuel Injection Systems at certain levels, and otherwise to fix, increase, inflate, maintain, or stabilize effective prices paid by Plaintiffs and members of the Damages Class with respect to Fuel Injection Systems sold in the United States;

(b)    allocating customers and markets for Fuel Injection Systems in the United States in furtherance of their agreements; and

(c)    participating in meetings and conversations among themselves in the United States to implement, adhere to, and police the unlawful agreements they reached.

298.    Defendants and their co-conspirators engaged in the actions described above for the purpose of carrying out their unlawful agreements to fix, maintain, increase, or stabilize prices and to allocate customers with respect to Fuel Injection Systems.

299.    Defendants' anticompetitive acts described above were knowing and willful and constitute violations or flagrant violations of the following state antitrust statutes.

300.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the Arizona Revised Statutes, §§ 44-1401, *et seq.*

93

REDACTED

(a)     Defendants' and their co-conspirators' combinations or conspiracies had the following effects:  (1) Fuel Injection Systems price competition was restrained, suppressed, and eliminated throughout Arizona; (2) Fuel Injection Systems prices were raised, fixed, maintained and stabilized at artificially high levels throughout Arizona; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Fuel Injection Systems and vehicles containing Fuel Injection Systems.

(b)     During the Class Period, Defendants' illegal conduct substantially affected Arizona commerce.

(c)     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)     By reason of the foregoing, Defendants entered into agreements in restraint of trade in violation of Ariz. Rev. Stat. §§ 44-1401, *et seq.*  Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under Ariz. Rev. Stat. §§ 44-1401, *et seq.*

301.   Defendants have entered into an unlawful agreement in restraint of trade in violation of the California Business and Professions Code, §§ 16700, *et seq.*

(a)     During the Class Period, Defendants and their co-conspirators entered into and engaged in a continuing unlawful trust in restraint of the trade and commerce described above in violation of Section 16720, California Business and Professions Code.  Defendants, each of them, have acted in violation of Section 16720 to fix, raise, stabilize, and maintain prices of, and allocate markets for, Fuel Injection Systems at supracompetitive levels.

94

REDACTED

(b)     The aforesaid violations of Section 16720, California Business and Professions Code, consisted, without limitation, of a continuing unlawful trust and concert of action among Defendants and their co-conspirators, the substantial terms of which were to fix, raise, maintain, and stabilize the prices of, and to allocate markets for, Fuel Injection Systems.

(c)     For the purpose of forming and effectuating the unlawful trust, Defendants and their co-conspirators have done those things which they combined and conspired to do, including but in no way limited to the acts, practices and course of conduct set forth above and the following:  (1) Fixing, raising, stabilizing, and pegging the price of Fuel Injection Systems; and (2) Allocating among themselves the production of Fuel Injection Systems.

(d)     The combination and conspiracy alleged herein has had, inter alia, the following effects:  (1) Price competition in the sale of Fuel Injection Systems has been restrained, suppressed, and/or eliminated in the State of California; (2) Prices for Fuel Injection Systems sold by Defendants and their co-conspirators have been fixed, raised, stabilized, and pegged at artificially high, non-competitive levels in the State of California and throughout the United States; and (3) Those who purchased Fuel Injection Systems or vehicles containing Fuel Injection Systems manufactured by Defendants and their co-conspirators have been deprived of the benefit of free and open competition.

(e)     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property in that they paid more for Fuel Injection Systems than they otherwise would have paid in the absence of Defendants' unlawful conduct.  As a result of Defendants' violation of Section 16720 of the California Business and Professions Code, Plaintiffs and members of the Damages Class

REDACTED

seek treble damages and their cost of suit, including a reasonable attorney's fee, pursuant to

Section 16750(a) of the California Business and Professions Code.

302.    Defendants have entered into an unlawful agreement in restraint of trade in

violation of the District of Columbia Code Annotated §§ 28-4501, *et seq.*

(a)    Defendants' and their co-conspirators' combinations or conspiracies had

the following effects:  (1) Fuel Injection Systems price competition was restrained, suppressed,

and eliminated throughout the District of Columbia; (2) Fuel Injection Systems prices were

raised, fixed, maintained and stabilized at artificially high levels throughout the District of

Columbia; (3) Plaintiffs and members of the Damages Class, including those who resided in the

District of Columbia and/or purchased Fuel Injection Systems or vehicles in the District of

Columbia, were deprived of free and open competition, including in the District of Columbia;

and (4) Plaintiffs and members of the Damages Class, including those who resided in the District

of Columbia and/or purchased Fuel Injection Systems or vehicles in the District of Columbia,

paid supracompetitive, artificially inflated prices for Fuel Injection Systems, including in the

District of Columbia.

(b)    During the Class Period, Defendants' illegal conduct substantially affected

District of Columbia commerce.

(c)    As a direct and proximate result of Defendants' unlawful conduct,

Plaintiffs and members of the Damages Class have been injured in their business and property

and are threatened with further injury.

(d)    By reason of the foregoing, Defendants have entered into agreements in

restraint of trade in violation of District of Columbia Code Ann. §§ 28-4501, *et seq.*

REDACTED

Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under District of Columbia Code Ann. §§ 28-4501, *et seq.*

303.   Defendants have entered into an unlawful agreement in restraint of trade in violation of the Hawaii Revised Statutes Annotated §§ 480-1, et seq.

(a)   Defendants' unlawful conduct had the following effects: (1) Fuel Injection Systems' price competition was restrained, suppressed, and eliminated throughout Hawaii; (2) Fuel Injection Systems' prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Hawaii; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices for Fuel Injection Systems and vehicles containing Fuel Injection Systems.

(b)   During the Class Period, Defendants' illegal conduct substantially affected Hawaii commerce.

(c)   As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)   By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Hawaii Revised Statutes Annotated §§ 480-4, et seq. Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under Hawaii Revised Statutes Annotated §§ 480-4, *et seq.*

304.   Defendants have entered into an unlawful agreement in restraint of trade in violation of the Illinois Antitrust Act, 740 Illinois Compiled Statutes 10/1, et seq.

REDACTED

(a)      Defendants' combinations or conspiracies had the following effects: (1) Fuel Injection Systems price competition was restrained, suppressed, and eliminated throughout Illinois; (2) Fuel Injection Systems prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Illinois; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Fuel Injection Systems and vehicles containing Fuel Injection Systems.

(b)      During the Class Period, Defendants' illegal conduct substantially affected Illinois commerce.

(c)      As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)      By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of 740 Illinois Compiled Statutes 10/1, et seq.  Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under 740 Illinois Compiled Statutes 10/1, *et seq.*[3]

305.      Defendants have entered into an unlawful agreement in restraint of trade in violation of the Iowa Code §§ 553.1, *et seq.*

(a)      Defendants' and their co-conspirators' combinations or conspiracies had the following effects:  (1) Fuel Injection Systems price competition was restrained, suppressed, and eliminated throughout Iowa; (2) Fuel Injection Systems prices were raised, fixed, maintained

---

[3] Dealership Plaintiffs recognize that their claims under the Illinois Antitrust Act were dismissed in the *Wire Harness* action.  Dealership Plaintiffs assert this claim here, individually and collectively, to preserve it for appeal.

REDACTED

and stabilized at artificially high levels throughout Iowa; (3) Plaintiffs and members of the

Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of

the Damages Class paid supracompetitive, artificially inflated prices for Fuel Injection Systems

and vehicles containing Fuel Injection Systems.

(b)     During the Class Period, Defendants' illegal conduct substantially affected

Iowa commerce.

(c)     As a direct and proximate result of Defendants' unlawful conduct,

Plaintiffs and members of the Damages Class have been injured in their business and property

and are threatened with further injury.

(d)     By reason of the foregoing, Defendants have entered into agreements in

restraint of trade in violation of Iowa Code §§ 553.1, *et seq.*  Accordingly, Plaintiffs and

members of the Damages Class seek all forms of relief available under Iowa Code §§ 553.1, *et

seq.*

306.     Defendants have entered into an unlawful agreement in restraint of trade in

violation of the Kansas Statutes Annotated, §§ 50-101, *et seq*.

(a)     Defendants' and their co-conspirators' combinations or conspiracies had

the following effects:  (1) Fuel Injection Systems price competition was restrained, suppressed,

and eliminated throughout Kansas; (2) Fuel Injection Systems prices were raised, fixed,

maintained and stabilized at artificially high levels throughout Kansas; (3) Plaintiffs and

members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs

and members of the Damages Class paid supracompetitive, artificially inflated prices for Fuel

Injection Systems and vehicles containing Fuel Injection Systems.

REDACTED

(b)     During the Class Period, Defendants' illegal conduct substantially affected Kansas commerce.

(c)     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Kansas Stat. Ann. §§ 50-101, *et seq.*  Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under Kansas Stat. Ann. §§ 50-101, *et seq.*

307.     Defendants have entered into an unlawful agreement in restraint of trade in violation of the Maine Revised Statutes, Maine Rev. Stat. Ann. 10, §§ 1101, *et seq.*

(a)     Defendants' and their co-conspirators' combinations or conspiracies had the following effects:  (1) Fuel Injection Systems price competition was restrained, suppressed, and eliminated throughout Maine; (2) Fuel Injection Systems prices were raised, fixed, maintained and stabilized at artificially high levels throughout Maine; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Fuel Injection Systems and vehicles containing Fuel Injection Systems.

(b)     During the Class Period, Defendants' illegal conduct substantially affected Maine commerce.

(c)     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

REDACTED

(d)     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Maine Rev. Stat. Ann. 10, §§ 1101, *et seq.*  Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Maine Rev. Stat. Ann. 10, §§ 1101, *et seq.*

308.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the Michigan Compiled Laws Annotated §§ 445.771, *et seq.*

(a)     Defendants' and their co-conspirators' combinations or conspiracies had the following effects:  (1) Fuel Injection Systems price competition was restrained, suppressed, and eliminated throughout Michigan; (2) Fuel Injection Systems prices were raised, fixed, maintained and stabilized at artificially high levels throughout Michigan; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Fuel Injection Systems and vehicles containing Fuel Injection Systems.

(b)     During the Class Period, Defendants' illegal conduct substantially affected Michigan commerce.

(c)     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Michigan Comp. Laws Ann. §§ 445.771, *et seq.*  Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Michigan Comp. Laws Ann. §§ 445.771, *et seq.*

REDACTED

309.     Defendants have entered into an unlawful agreement in restraint of trade in violation of the Minnesota Annotated Statutes §§ 325D.49, *et seq*.

(a)     Defendants' and their co-conspirators' combinations or conspiracies had the following effects:  (1) Fuel Injection Systems price competition was restrained, suppressed, and eliminated throughout Minnesota; (2) Fuel Injection Systems prices were raised, fixed, maintained and stabilized at artificially high levels throughout Minnesota; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Fuel Injection Systems and vehicles containing Fuel Injection Systems.

(b)     During the Class Period, Defendants' illegal conduct substantially affected Minnesota commerce.

(c)     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Minnesota Stat. §§ 325D.49, *et seq*.  Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Minnesota Stat. §§ 325D.49, *et seq*.

310.     Defendants have entered into an unlawful agreement in restraint of trade in violation of the Mississippi Code Annotated §§ 75-21-1, *et seq*.

(a)     Defendants' and their co-conspirators' combinations or conspiracies had the following effects:  (1) Fuel Injection Systems price competition was restrained, suppressed, and eliminated throughout Mississippi; (2) Fuel Injection Systems prices were raised, fixed,

102

REDACTED

maintained and stabilized at artificially high levels throughout Mississippi; (3) Plaintiffs and

members of the Damages Class, including those who resided in Mississippi and/or purchased

Fuel Injection Systems or vehicles in Mississippi were deprived of free and open competition,

including in Mississippi: and (4) Plaintiffs and members of the Damages Class, including those

who resided in Mississippi and/or purchased Fuel Injection Systems or vehicles in Mississippi

paid supracompetitive, artificially inflated prices for Fuel Injection Systems, including in

Mississippi.

(b)     During the Class Period, Defendants' illegal conduct substantially affected

Mississippi commerce.

(c)     As a direct and proximate result of Defendants' unlawful conduct,

Plaintiffs and members of the Damages Class have been injured in their business and property

and are threatened with further injury.

(d)     By reason of the foregoing, Defendants have entered into agreements in

restraint of trade in violation of Mississippi Code Ann. § 75-21-1, *et seq.*  Accordingly, Plaintiffs

and members of the Damages Class seek all relief available under Mississippi Code Ann. § 75-

21-1, *et seq.*

311.    Defendants have entered into an unlawful agreement in restraint of trade in

violation of the Nebraska Revised Statutes §§ 59-801, *et seq.*

(a)     Defendants' and their co-conspirators' combinations or conspiracies had

the following effects:  (1) Fuel Injection Systems price competition was restrained, suppressed,

and eliminated throughout Nebraska; (2) Fuel Injection Systems prices were raised, fixed,

maintained and stabilized at artificially high levels throughout Nebraska; (3) Plaintiffs and

members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs

REDACTED

and members of the Damages Class paid supracompetitive, artificially inflated prices for Fuel Injection Systems and vehicles containing Fuel Injection Systems.

(b)     During the Class Period, Defendants' illegal conduct substantially affected Nebraska commerce.

(c)     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Nebraska Revised Statutes §§ 59-801, *et seq.*  Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Nebraska Revised Statutes §§ 59-801, *et seq.*

312.     Defendants have entered into an unlawful agreement in restraint of trade in violation of the Nevada Revised Statutes Annotated §§ 598A.010, *et seq.*

(a)     Defendants' and their co-conspirators' combinations or conspiracies had the following effects:  (1) Fuel Injection Systems price competition was restrained, suppressed, and eliminated throughout Nevada; (2) Fuel Injection Systems prices were raised, fixed, maintained and stabilized at artificially high levels throughout Nevada; 3) Plaintiffs and members of the Damages Class, including those who resided in Nevada and/or purchased Fuel Injection Systems or vehicles in Nevada, were deprived of free and open competition including in Nevada; and (4) Plaintiffs and members of the Damages Class, including those who resided in Nevada and/or purchased Fuel Injection Systems or vehicles in Nevada, paid supracompetitive, artificially inflated prices for Fuel Injection Systems and vehicles containing Fuel Injection Systems, including in Nevada.

REDACTED

(b)     During the Class Period, Defendants' illegal conduct substantially affected Nevada commerce.

(a)     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(b)     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Nevada Rev. Stat. Ann. §§ 598A.010, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Nevada Rev. Stat. Ann. §§ 598A.010, *et seq.*

313.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the New Hampshire Revised Statutes §§ 356:1, *et seq*.

(a)     Defendants' and their co-conspirators' combinations or conspiracies had the following effects:  (1) Fuel Injection Systems price competition was restrained, suppressed, and eliminated throughout New Hampshire; (2) Fuel Injection Systems prices were raised, fixed, maintained and stabilized at artificially high levels throughout New Hampshire; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Fuel Injection Systems and vehicles containing Fuel Injection Systems.

(b)     During the Class Period, Defendants' illegal conduct substantially affected New Hampshire commerce.

(c)     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

REDACTED

(d)     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of New Hampshire Revised Statutes §§ 356:1, *et seq.*  Accordingly, Plaintiffs and members of the Damages Class seek all relief available under New Hampshire Revised Statutes §§ 356:1, *et seq.*

314.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the New Mexico Statutes Annotated §§ 57-1-1, *et seq*.

(a)     Defendants' and their co-conspirators' combinations or conspiracies had the following effects:  (1) Fuel Injection Systems price competition was restrained, suppressed, and eliminated throughout New Mexico; (2) Fuel Injection Systems prices were raised, fixed, maintained and stabilized at artificially high levels throughout New Mexico; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Fuel Injection Systems and vehicles containing Fuel Injection Systems.

(b)     During the Class Period, Defendants' illegal conduct substantially affected New Mexico commerce.

(c)     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of New Mexico Stat. Ann. §§ 57-1-1, *et seq.*  Accordingly, Plaintiffs and members of the Damages Class seek all relief available under New Mexico Stat. Ann. §§ 57-1-1, *et seq.*

REDACTED

315.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the New York General Business Laws §§ 340, *et seq*.

(a)    Defendants' and their co-conspirators' combinations or conspiracies had the following effects:  (1) Fuel Injection Systems price competition was restrained, suppressed, and eliminated throughout New York; (2) Fuel Injection Systems prices were raised, fixed, maintained and stabilized at artificially high levels throughout New York; (3) Plaintiffs and members of the Damages Class, including those who resided in New York and/or purchased Fuel Injection Systems or vehicles in New York, were deprived of free and open competition, including in New York; and (4) Plaintiffs and members of the Damages Class, including those who resided in New York and/or purchased Fuel Injection Systems or vehicles in New York, paid supracompetitive, artificially inflated prices for Fuel Injection Systems when they purchased, including in New York, Fuel Injection Systems or vehicles containing Fuel Injection Systems, or purchased vehicles and Fuel Injection Systems that were otherwise of lower quality than they would have been absent Defendants' and their co-conspirators' illegal acts, or were unable to purchase Fuel Injection Systems or vehicles that they would have otherwise have purchased absent the illegal conduct.

(b)    During the Class Period, Defendants' illegal conduct substantially affected New York commerce.

(c)    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of the New York Donnelly Act, §§ 340, *et seq*.  The conduct set

REDACTED

forth above is a *per se* violation of the Act.  Accordingly, Plaintiffs and members of the Damages

Class seek all relief available under New York Gen. Bus. Law §§ 340, *et seq*.

316.    Defendants have entered into an unlawful agreement in restraint of trade in

violation of the North Carolina General Statutes §§ 75-1, *et seq*.

(a)    Defendants' and their co-conspirators' combinations or conspiracies had

the following effects:  (1) Fuel Injection Systems price competition was restrained, suppressed,

and eliminated throughout North Carolina; (2) Fuel Injection Systems prices were raised, fixed,

maintained and stabilized at artificially high levels throughout North Carolina; (3) Plaintiffs and

members of the Damages Class, including those who resided in North Carolina and/or purchased

Fuel Injection Systems or vehicles in North Carolina, were deprived of free and open

competition, including in North Carolina; and (4) Plaintiffs and members of the Damages Class,

including those who resided in North Carolina and/or purchased Fuel Injection Systems or

vehicles in North Carolina, paid supracompetitive, artificially inflated prices for Fuel Injection

Systems or vehicles containing Fuel Injection Systems, including in North Carolina.

(b)    During the Class Period, Defendants' illegal conduct substantially affected

North Carolina commerce.  As a direct and proximate result of Defendants' unlawful conduct,

Plaintiffs and members of the Damages Class have been injured in their business and property

and are threatened with further injury.

(c)    By reason of the foregoing, Defendants have entered into agreements in

restraint of trade in violation of North Carolina Gen. Stat. §§ 75-1, *et seq*.  Accordingly,

Plaintiffs and members of the Damages Class seek all relief available under North Carolina Gen.

Stat. §§ 75-1, *et. seq*.

REDACTED

317.     Defendants have entered into an unlawful agreement in restraint of trade in violation of the North Dakota Century Code §§ 51-08.1-01, *et seq*.

(a)     Defendants' and their co-conspirators' combinations or conspiracies had the following effects:  (1) Fuel Injection Systems price competition was restrained, suppressed, and eliminated throughout North Dakota; (2) Fuel Injection Systems prices were raised, fixed, maintained and stabilized at artificially high levels throughout North Dakota; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Fuel Injection Systems and vehicles containing Fuel Injection Systems.

(b)     During the Class Period, Defendants' illegal conduct had a substantial effect on North Dakota commerce.

(c)     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of North Dakota Cent. Code §§ 51-08.1-01, *et seq*.  Accordingly, Plaintiffs and members of the Damages Class seek all relief available under North Dakota Cent. Code §§ 51-08.1-01, *et seq*.

318.     Defendants have entered into an unlawful agreement in restraint of trade in violation of the Oregon Revised Statutes §§ 646.705, *et seq*.

(a)     Defendants' and their co-conspirators' combinations or conspiracies had the following effects:  (1) Fuel Injection Systems price competition was restrained, suppressed, and eliminated throughout Oregon; (2) Fuel Injection Systems prices were raised, fixed,

REDACTED

maintained and stabilized at artificially high levels throughout Oregon; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Fuel Injection Systems and vehicles containing Fuel Injection Systems.

(b)     During the Class Period, Defendants' illegal conduct had a substantial effect on Oregon commerce.

(c)     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Oregon Revised Statutes §§ 646.705, *et seq.*  Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Oregon Revised Statutes §§ 646.705, *et seq.*

319.   Defendants have entered into an unlawful agreement in restraint of trade in violation of the South Dakota Codified Laws §§ 37-1-3.1, *et seq.*

(a)     Defendants' and their co-conspirators' combinations or conspiracies had the following effects:  (1) Fuel Injection Systems price competition was restrained, suppressed, and eliminated throughout South Dakota; (2) Fuel Injection Systems prices were raised, fixed, maintained and stabilized at artificially high levels throughout South Dakota; (3) Plaintiffs and members of the Damages Class, including those who resided in South Dakota and/or purchased Fuel Injection Systems or vehicles in South Dakota, were deprived of free and open competition, including in South Dakota; and (4) Plaintiffs and members of the Damages Class, including those who resided in South Dakota and/or purchased Fuel Injection Systems or vehicles in South

REDACTED

Dakota, paid supracompetitive, artificially inflated prices for Fuel Injection Systems and vehicles containing Fuel Injection Systems, including in South Dakota.

(b)     During the Class Period, Defendants' illegal conduct had a substantial effect on South Dakota commerce.

(c)     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of South Dakota Codified Laws Ann. §§ 37-1, *et seq*.  Accordingly, Plaintiffs and members of the Damages Class seek all relief available under South Dakota Codified Laws Ann. §§ 37-1, *et seq*.

320.     Defendants have entered into an unlawful agreement in restraint of trade in violation of the Tennessee Code Annotated §§ 47-25-101, *et seq*.

(a)     Defendants' and their co-conspirators' combinations or conspiracies had the following effects:  (1) Fuel Injection Systems price competition was restrained, suppressed, and eliminated throughout Tennessee; (2) Fuel Injection Systems prices were raised, fixed, maintained and stabilized at artificially high levels throughout Tennessee; (3) Plaintiffs and members of the Damages Class, including those who resided in Tennessee and/or purchased Fuel Injection Systems or vehicles in Tennessee, were deprived of free and open competition, including in Tennessee; and (4) Plaintiffs and members of the Damages Class, including those who resided in Tennessee and/or purchased Fuel Injection Systems or vehicles in Tennessee, paid supracompetitive, artificially inflated prices for Fuel Injection Systems and vehicles containing Fuel Injection Systems, including in Tennessee.

111

REDACTED

(b)     During the Class Period, Defendants' illegal conduct had a substantial effect on Tennessee commerce.

(c)     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Tennessee Code Ann. §§ 47-25-101, *et seq.*  Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Tennessee Code Ann. §§ 47-25-101, *et seq.*

321.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the Utah Code Annotated §§ 76-10-911, *et seq.*

(a)     Defendants' and their co-conspirators' combinations or conspiracies had the following effects:  (1) Fuel Injection Systems price competition was restrained, suppressed, and eliminated throughout Utah; (2) Fuel Injection Systems prices were raised, fixed, maintained and stabilized at artificially high levels throughout Utah; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Fuel Injection Systems and vehicles containing Fuel Injection Systems.

(b)     During the Class Period, Defendants' illegal conduct had a substantial effect on Utah commerce.

(c)     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

REDACTED

      (d)     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Utah Code Annotated §§ 76-10-911, *et seq.*  Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Utah Code Annotated §§ 76-10-911, *et seq.*

      322.    Defendants have entered into an unlawful agreement in restraint of trade in violation of 9 Vermont Stat. Ann. § 2453, *et seq.*

      (a)     Defendants' and their co-conspirators' combinations or conspiracies had the following effects:  (1) Fuel Injection Systems price competition was restrained, suppressed, and eliminated throughout Vermont; (2) Fuel Injection Systems prices were raised, fixed, maintained and stabilized at artificially high levels throughout Vermont; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Fuel Injection Systems and vehicles containing Fuel Injection Systems.

      (b)     During the Class Period, Defendants' illegal conduct had a substantial effect on Vermont commerce.

      (c)     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

      (d)     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of 9 Vermont Stat. Ann. § 2453, *et seq.*  Accordingly, Plaintiffs and members of the Damages Class seek all relief available under 9 Vermont Stat. Ann. § 2453, *et seq.*  Plaintiffs are entitled to relief pursuant to 9 Vermont Ann. Stat. § 2465 and any other applicable authority.

REDACTED

323.     Defendants have entered into an unlawful agreement in restraint of trade in violation of the West Virginia Code §§ 47-18-1, *et seq*.

(a)     Defendants' and their co-conspirators' combinations or conspiracies had the following effects:  (1) Fuel Injection Systems price competition was restrained, suppressed, and eliminated throughout West Virginia; (2) Fuel Injection Systems prices were raised, fixed, maintained and stabilized at artificially high levels throughout West Virginia; (3) Plaintiffs and members of the Damages Class, including those who resided in West Virginia and/or purchased Fuel Injection Systems or vehicles in West Virginia, were deprived of free and open competition including in West Virginia; and (4) Plaintiffs and members of the Damages Class, including those who resided in West Virginia and/or purchased Fuel Injection Systems or vehicles in West Virginia, paid supracompetitive, artificially inflated prices for Fuel Injection Systems and vehicles containing Fuel Injection Systems, including in West Virginia.

(b)     During the Class Period, Defendants' illegal conduct had a substantial effect on West Virginia commerce.

(c)     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of West Virginia §§ 47-18-1, *et seq*.  Accordingly, Plaintiffs and members of the Damages Class seek all relief available under West Virginia §§ 47-18-1, *et seq*.

324.     Defendants have entered into an unlawful agreement in restraint of trade in violation of the Wisconsin Statutes §§ 133.01*, et seq*.

114

REDACTED

      (a)      Defendants' and their co-conspirators' combinations or conspiracies had the following effects:  (1) Fuel Injection Systems price competition was restrained, suppressed, and eliminated throughout Wisconsin; (2) Fuel Injection Systems prices were raised, fixed, maintained and stabilized at artificially high levels throughout Wisconsin; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Fuel Injection Systems and vehicles containing Fuel Injection Systems.

      (b)      During the Class Period, Defendants' illegal conduct had a substantial effect on Wisconsin commerce.

      (c)      As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

      (d)      By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Wisconsin Stat. §§ 133.01, *et seq.*  Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Wisconsin Stat. §§ 133.01, *et seq*.

      325.    Plaintiffs and members of the Damages Class in each of the above states have been injured in their business and property by reason of Defendants' and their co-conspirators' unlawful combination, contract, conspiracy and agreement.  Plaintiffs and members of the Damages Class have paid more for Fuel Injection Systems than they otherwise would have paid in the absence of Defendants' unlawful conduct.  This injury is of the type the antitrust laws of the above states were designed to prevent and flows from that which makes Defendants' conduct unlawful.

REDACTED

326.     In addition, Defendants have profited significantly from the aforesaid conspiracy. Defendants' profits derived from their anticompetitive conduct come at the expense and detriment of the Plaintiffs and the members of the Damages Class.

327.     Accordingly, Plaintiffs and the members of the Damages Class in each of the above jurisdictions seek damages (including statutory damages where applicable), to be trebled or otherwise increased as permitted by a particular jurisdiction's antitrust law, and costs of suit, including reasonable attorneys' fees, to the extent permitted by the above state laws.

### THIRD CLAIM FOR RELIEF
**Violation of State Consumer Protection Statutes**
**(on behalf of Plaintiffs and the Damages Class)**

328.     Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

329.     Defendants knowingly engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of the state consumer protection and unfair competition statutes listed below.

330.     Defendants have knowingly entered into an unlawful agreement in restraint of trade in violation of the Arkansas Code Annotated, § 4-88-101.

(a)     Defendants knowingly agreed to, and did in fact act in, restraint of trade or commerce by affecting, fixing, controlling, and/or maintaining at non-competitive and artificially inflated levels, the prices at which Fuel Injection Systems were sold, distributed, or obtained in Arkansas and took efforts to conceal their agreements from Plaintiffs and members of the Damages Class.

REDACTED

      (b)     The aforementioned conduct on the part of Defendants constituted "unconscionable" and "deceptive" acts or practices in violation of Arkansas Code Annotated, § 4-88-107(a)(10).

      (c)     Defendants' unlawful conduct had the following effects: (1) Fuel Injection Systems price competition was restrained, suppressed, and eliminated throughout Arkansas; (2) Fuel Injection Systems prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Arkansas; (3) Plaintiffs and the members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and the members of the Damages Class paid supracompetitive, artificially inflated prices for Fuel Injection Systems and vehicles containing Fuel Injection Systems.

      (d)     During the Class Period, Defendants' illegal conduct substantially affected Arkansas commerce and consumers.

      (e)     As a direct and proximate result of the unlawful conduct of Defendants, Plaintiffs and the members of the Damages Class have been injured in their business and property and are threatened with further injury.

      (f)     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Arkansas Code Annotated, § 4-88-107(a)(10) and, accordingly, Plaintiffs and the members of the Damages Class seek all relief available under that statute.

     331.     Defendants have engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of California Business and Professions Code § 17200, *et seq.*

REDACTED

(a)     During the Class Period, Defendants committed and continue to commit acts of unfair competition, as defined by Sections 17200, *et seq.* of the California Business and Professions Code, by engaging in the acts and practices specified above.

(b)     During the Class Period, Defendants' illegal conduct substantially affected California commerce and consumers.

(c)     This claim is instituted pursuant to Sections 17203 and 17204 of the California Business and Professions Code, to obtain restitution from Defendants for acts, as alleged herein, that violated Section 17200 of the California Business and Professions Code, commonly known as the Unfair Competition Law.

(d)     Defendants' conduct as alleged herein violated Section 17200.  The acts, omissions, misrepresentations, practices and non-disclosures of Defendants, as alleged herein, constituted a common, continuous, and continuing course of conduct of unfair competition by means of unfair, unlawful, and/or fraudulent business acts or practices within the meaning of California Business and Professions Code, Section 17200, *et seq.*, including, but not limited to, the following:  (1) the violations of Section 1 of the Sherman Act, as set forth above; (2) the violations of Section 16720, *et seq.*, of the California Business and Professions Code, set forth above;

(e)     Defendants' acts, omissions, misrepresentations, practices, and non-disclosures, as described above, whether or not in violation of Section 16720, *et seq.*, of the California Business and Professions Code, and whether or not concerted or independent acts, are otherwise unfair, unconscionable, unlawful or fraudulent;

REDACTED

(f)     Defendants' acts or practices are unfair to purchasers of Fuel Injection Systems (or vehicles containing them) in the State of California within the meaning of Section 17200, California Business and Professions Code; and

(g)     Defendants' unlawful conduct had the following effects: (1) Fuel Injection Systems price competition was restrained, suppressed, and eliminated throughout California; (2) Fuel Injection Systems prices were raised, fixed, maintained, and stabilized at artificially high levels throughout California; (3) Plaintiffs and members of the Damages Class, including those who resided in California and/ or purchased Fuel Injection Systems or vehicles in California, were deprived of free and open competition, including in California; and (4) Plaintiffs and members of the Damages Class, including those who resided in California and/or purchased Fuel Injection Systems or vehicles in California, paid supracompetitive, artificially inflated prices for Fuel Injection Systems and vehicles containing Fuel Injection Systems, including in California.

(h)     Defendants' acts and practices are fraudulent or deceptive within the meaning of Section 17200 of the California Business and Professions Code.

(i)     Plaintiffs and members of the Damages Class are entitled to full restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits that may have been obtained by Defendants as a result of such business acts or practices.

(j)     The illegal conduct alleged herein is continuing and there is no indication that Defendants will not continue such activity into the future.

(k)     As alleged in this Complaint, Defendants and their co-conspirators have been unjustly enriched as a result of their wrongful conduct and by Defendants' unfair competition.  Plaintiffs and the members of the Damages Class are accordingly entitled to equitable relief including restitution and/or disgorgement of all revenues, earnings, profits,

REDACTED

compensation, and benefits that may have been obtained by Defendants as a result of such business practices, pursuant to the California Business and Professions Code, Sections 17203 and 17204.

332.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. §§ 501.201, *et seq*.

(a)    Defendants' unlawful conduct had the following effects:  (1) Fuel Injection Systems price competition was restrained, suppressed, and eliminated throughout Florida; (2) Fuel Injection Systems prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Florida; (3) Plaintiffs and members of the Damages Class, including those who resided in Florida and/or purchased Fuel Injection Systems or vehicles in Florida, were deprived of free and open competition, including in Florida; (4) Plaintiffs and members of the Damages Class, including those who resided in Florida and/or purchased Fuel Injection Systems or vehicles in Florida, paid supracompetitive, artificially inflated prices for Fuel Injection Systems, including in Florida.

(b)    During the Class Period, Defendants' illegal conduct substantially affected Florida commerce and purchasers of Fuel Injection Systems and vehicles in Florida.

(c)    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured and are threatened with further injury.

(d)    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Florida Stat. § 501.201, *et seq*., and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

120

REDACTED

333.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the New Mexico Stat. § 57-12-1, *et seq*.

(a)    Defendants and their co-conspirators agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining at non-competitive and artificially inflated levels, the prices at which Fuel Injection Systems were sold, distributed or obtained in New Mexico and took efforts to conceal their agreements from Plaintiffs and members of the Damages Class.

(b)    Plaintiffs were not aware of Defendants' price-fixing conspiracy and were therefore unaware that they were being unfairly and illegally overcharged.  There was a gross disparity of bargaining power between the parties with respect to the price charged by Defendants for Fuel Injection Systems.  Defendants had the sole power to set that price and Plaintiffs had no power to negotiate a lower price.  Moreover, Plaintiffs lacked any meaningful choice in purchasing Fuel Injection Systems because they were unaware of the unlawful overcharge and because they had to purchase Fuel Injection Systems in order to be able to operate their vehicles.  Defendants' conduct with regard to sales of Fuel Injection Systems, including their illegal conspiracy to secretly fix the price of Fuel Injection Systems at supracompetitive levels and overcharge consumers, was substantively unconscionable because it was one-sided and unfairly benefited Defendants at the expense of Plaintiffs and the public.  Defendants took grossly unfair advantage of Plaintiffs.

(c)    The aforementioned conduct on the part of Defendants constituted "unconscionable trade practices," in violation of N.M.S.A. Stat. § 57-12-3, in that such conduct, *inter alia*, resulted in a gross disparity between the value received by Plaintiffs and the members of the Damages Class and the prices paid by them for Fuel Injection Systems as set forth in

REDACTED

N.M.S.A., § 57-12-2E, due to the inflated prices paid by Plaintiffs and Class members for vehicles and Fuel Injection Systems.

(d)    Defendants' unlawful conduct had the following effects:  (1) Fuel Injection Systems price competition was restrained, suppressed, and eliminated throughout New Mexico; (2) Fuel Injection Systems prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New Mexico; (3) Plaintiffs and the members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and the members of the Damages Class paid supracompetitive, artificially inflated prices for Fuel Injection Systems and vehicles containing Fuel Injection Systems.

(e)    During the Class Period, Defendants' illegal conduct substantially affected New Mexico commerce and consumers.

(f)    As a direct and proximate result of the unlawful conduct of Defendants, Plaintiffs and the members of the Damages Class have been injured and are threatened with further injury.

(g)    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of New Mexico Stat. § 57-12-1, *et seq.*, and, accordingly, Plaintiffs and the members of the Damages Class seek all relief available under that statute.

334.    The Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of N.Y. Gen. Bus. Law § 349, *et seq.*

(a)    The Defendants and their co-conspirators agree to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and non-competitive levels, the prices at which Fuel Injection Systems were sold, distributed or

REDACTED

obtained in New York and took efforts to conceal their agreements from Plaintiffs and members of the Damages Class.

(b)      Defendants deceptively led purchasers, such as Plaintiffs and Class members, to believe that the Fuel Injection Systems they had purchased as replacements and inside vehicles had been sold at legal competitive prices, when they had in fact been sold at collusively obtained inflated prices, that were passed on to them.

(c)      The conduct of the Defendants described herein constitutes consumer-oriented deceptive acts or practices within the meaning of N.Y. Gen. Bus. Law § 349, which resulted in injuries to purchasers and broad adverse impact on the public at large, and harmed the public interest of New York State in an honest marketplace in which economic activity is conducted in a competitive manner.

(d)      The Defendants' unlawful conduct had the following effects:  (1) Fuel Injection Systems price competition was restrained, suppressed, and eliminated throughout New York; (2) Fuel Injection Systems prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New York; (3) Plaintiffs and members of the Damages Class including those who resided in New York and/or purchased Fuel Injection Systems or vehicles in New York were deprived of free and open competition, including in New York; and (4) Plaintiffs and members of the Damages Class including those who resided in New York and/or purchased Fuel Injection Systems or vehicles in New York paid supracompetitive, artificially inflated prices for Fuel Injection Systems, including in New York.

(e)      Because of Defendants' unlawful trade practices in the State of New York, New York purchasers who indirectly purchased Fuel Injection Systems were misled to believe that they were paying a fair price for Fuel Injection Systems or the price increases for Fuel

REDACTED

Injection Systems were for valid business reasons; and similarly situated purchasers were affected by Defendants' conspiracy.

(f)     During the Class Period, the Defendants' illegal conduct substantially affected New York commerce and New York purchasers.

(g)     During the Class Period, the Defendants directly, or indirectly and through affiliates they dominated and controlled, manufactured, sold and/or distributed Fuel Injection Systems in New York.

(h)     Defendants knew that their unlawful trade practices with respect to pricing Fuel Injection Systems would have a broad impact, causing class members who indirectly purchased Fuel Injection Systems to be injured by paying more for Fuel Injection Systems than they would have paid in the absence of Defendants' unlawful trade acts and practices.

(i)     Plaintiffs and members of the Damages Class seek all relief available pursuant to N.Y. Gen. Bus. Law § 349 (h).

335.    The Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of North Carolina Gen. Stat. § 75-1.1, *et seq*.

(a)     The Defendants and their co-conspirators agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and non-competitive levels, the prices at which Fuel Injection Systems were sold, distributed or obtained in North Carolina and took efforts to conceal their agreements from Plaintiffs and members of the Damages Class.

(b)     The conduct of the Defendants described herein constitutes consumer-oriented deceptive acts or practices within the meaning of North Carolina law, which resulted in injury to purchasers and broad adverse impact on the public at large, and harmed the public

124

REDACTED

interest of North Carolina purchasers in an honest marketplace in which economic activity is conducted in a competitive manner.

    (c)  The Defendants' unlawful conduct had the following effects:  (1) Fuel Injection Systems price competition was restrained, suppressed, and eliminated throughout North Carolina; (2) Fuel Injection Systems prices were raised, fixed, maintained, and stabilized at artificially high levels throughout North Carolina; (3) Plaintiffs and members of the Damages Class, including those who resided in North Carolina and/or purchased Fuel Injection Systems or vehicles in North Carolina were deprived of free and open competition, including in North Carolina; and (4) Plaintiffs and members of the Damages Class, including those who resided in North Carolina and/or purchased Fuel Injection Systems or vehicles in North Carolina paid supracompetitive, artificially inflated prices for Fuel Injection Systems, including in North Carolina.

    (d)  During the Class Period, the Defendants' illegal conduct substantially affected North Carolina commerce and purchasers in North Carolina.

    (e)  Defendants deceptively concealed their unlawful activities by conducting meetings and conversations in secret.

    (f)  During the Class Period, the Defendants directly, or indirectly and through affiliates they dominated and controlled, manufactured, sold and/or distributed Fuel Injection Systems in North Carolina.

    (g)  Plaintiffs and members of the Damages Class seek actual damages for their injuries caused by these violations in an amount to be determined at trial and are threatened with further injury.  The Defendants have engaged in unfair competition or unfair or deceptive

REDACTED

acts or practices in violation of North Carolina Gen. Stat. § 75-1.1, *et seq.*, and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

336.   Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of South Carolina Unfair Trade Practices Act, S.C. Code Ann. §§ 39-5-10, et seq.

(a)   Defendants' combinations or conspiracies had the following effects: (1) Fuel Injection Systems price competition was restrained, suppressed, and eliminated throughout South Carolina; (2) Fuel Injection Systems prices were raised, fixed, maintained, and stabilized at artificially high levels throughout South Carolina; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Fuel Injection Systems and vehicles containing Fuel Injection Systems.

(b)   During the Class Period, Defendants' illegal conduct had a substantial effect on South Carolina commerce.

(c)   As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)   Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of S.C. Code Ann. §§ 39-5-10, et seq., and, accordingly, Plaintiffs and the members of the Damages Class seek all relief available under that statute.

337.   Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of 9 Vermont § 2451, *et seq.*

REDACTED

(a)     Defendants and their co-conspirators agreed to, and did in fact, act in restraint of trade or commerce in a market that includes Vermont by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which Fuel Injection Systems were sold, distributed, or obtained in Vermont.

(b)     Defendants deliberately failed to disclose material facts to Plaintiffs and members of the Damages Class concerning their unlawful activities and artificially inflated prices for Fuel Injection Systems.  Defendants owed a duty to disclose such facts, and Defendants breached that duty of by their silence.  Defendants misrepresented to all purchasers during the Class Period that their Fuel Injection Systems prices were competitive and fair.

(c)     Defendants' unlawful conduct had the following effects:  (1) Fuel Injection Systems price competition was restrained, suppressed, and eliminated throughout Vermont; (2) Fuel Injection Systems prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Vermont; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Fuel Injection Systems and vehicles containing Fuel Injection Systems.

(d)     As a direct and proximate result of Defendants' violations of law, Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above.  That loss was caused by Defendants' willful and deceptive conduct, as described herein.

(e)     Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of Fuel Injection Systems, misled purchasers acting reasonably

REDACTED

under the circumstances to believe that they were purchasing Fuel Injection Systems at prices set by a free and fair market.  Defendants' misleading conduct and unconscionable activities constitutes unfair competition or unfair or deceptive acts or practices in violation of 9 Vermont § 2451, *et seq.*, and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

### FOURTH CLAIM FOR RELIEF
### Unjust Enrichment
### (on behalf of Plaintiffs and the Damages Class)

338.    Plaintiffs incorporate by reference the allegations in the preceding paragraphs.

339.    Plaintiffs bring this claim under the laws of all states listed in the Second and Third Claims, *supra*., except California. Plaintiffs also bring this claim under the laws of Missouri, and Massachusetts, on behalf of the Plaintiffs who have their primary places of business in those states and the class members in those states.

340.    As a result of their unlawful conduct described above, Defendants have been, and will continue to be, unjustly enriched.  Defendants have been unjustly enriched by the receipt of, at a minimum, unlawfully inflated prices and unlawful profits on sales of Fuel Injection Systems.

341.    Defendants have benefited from their unlawful acts and it would be inequitable for Defendants to be permitted to retain any of the ill-gotten gains resulting from the overpayments made by Plaintiffs or the members of the Damages Class for Fuel Injection Systems.

342.    Plaintiffs and the members of the Damages Class are entitled to the amount of Defendants' ill-gotten gains resulting from their unlawful, unjust, and inequitable conduct. Plaintiffs and the members of the Damages Class are entitled to the establishment of a constructive trust consisting of all ill-gotten gains from which Plaintiffs and the members of the Damages Class may make claims on a *pro rata* basis.

REDACTED

343.    Pursuit of any remedies against the firms from whom Plaintiffs and the Class members purchased Fuel Injection Systems and vehicles containing Fuel Injection Systems subject to Defendants' conspiracy would have been futile, given that those firms did not take part in Defendants' conspiracy.

## PRAYER FOR RELIEF

Accordingly, Plaintiffs respectfully request that:

A.    The Court determine that this action may be maintained as a class action under Rule 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure, and direct that reasonable notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to each and every member of the Classes;

B.    That the unlawful conduct, contract, conspiracy, or combination alleged herein be adjudged and decreed:

(a)    An unreasonable restraint of trade or commerce in violation of Section 1 of the Sherman Act;

(b)    A *per se* violation of Section 1 of the Sherman Act;

(c)    An unlawful combination, trust, agreement, understanding and/or concert of action in violation of the state antitrust and unfair competition and consumer protection laws as set forth herein; and

(d)    Acts of unjust enrichment by Defendants as set forth herein.

C.    Plaintiffs and the members of the Damages Class recover damages, to the maximum extent allowed under such laws, and that a joint and several judgment in favor of Plaintiffs and the members of the Damages Class be entered against Defendants in an amount to be trebled to the extent such laws permit;

REDACTED

D.      Plaintiffs and the members of the Damages Class recover damages, to the maximum extent allowed by such laws, in the form of restitution and/or disgorgement of profits unlawfully gained from them;

E.      Defendants, their affiliates, successors, transferees, assignees and other officers, directors, partners, agents and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, be permanently enjoined and restrained from in any manner continuing, maintaining or renewing the conduct, contract, conspiracy, or combination alleged herein, or from entering into any other contract, conspiracy, or combination having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect;

F.      Plaintiffs and the members of the Damages Class be awarded restitution, including disgorgement of profits Defendants obtained as a result of their acts of unfair competition and unjust enrichment;

G.      Plaintiffs and the members of the Classes be awarded pre- and post- judgment interest as provided by law, and that such interest be awarded at the highest legal rate from and after the date of service of this Complaint;

H.      Plaintiffs and the members of the Classes recover their costs of suit, including reasonable attorneys' fees, as provided by law; and

I.      Plaintiffs and members of the Classes have such other and further relief as the case may require and the Court may deem just and proper.

## JURY DEMAND

Plaintiffs demand a trial by jury, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, of all issues so triable.

DATED:  December 22, 2014.

REDACTED

Respectfully submitted,

/s/  *Gerard V. Mantese*

Gerard V. Mantese
(Michigan Bar No. P34424)
David Hansma
(Michigan Bar No. P71056)
Brendan Frey
(Michigan Bar No. P70893)
Mantese Honigman Rossman and
Williamson, P.C.
1361 E. Big Beaver Road
Troy, Michigan 48083
Telephone: (248) 457-9200
gmantese@manteselaw.com
dhansma@manteselaw.com
bfrey@manteselaw.com

Don Barrett
Brian Herrington
David McMullan
Barrett Law Group, P.A.
P.O. Box 927
404 Court Square
Lexington, MS 39095
Telephone: (662) 834-2488
dbarrett@barrettlawgroup.com
bherrington@barrettlawgroup.com
dmcmullan@barrettlawgroup.com

Jonathan W. Cuneo
Joel Davidow
Daniel Cohen
Victoria Romanenko
Yifei Li
Cuneo Gilbert & LaDuca, LLP
507 C Street, N.E.
Washington, DC 20002
Telephone: (202) 789-3960
jonc@cuneolaw.com
joel@cuneolaw.com
danielc@cuneolaw.com
vicky@cuneolaw.com
evelyn@cuneolaw.com

Shawn M. Raiter
Larson • King, LLP
2800 Wells Fargo Place
30 East Seventh Street
St. Paul, MN  55101
Telephone: (651) 312-6500
sraiter@larsonking.com
psand@larsonking.com

Michael J. Flannery
Cuneo Gilbert & LaDuca, LLP
300 North Tucker
Suite 801
St. Louis, MO  63101
Telephone:  (314) 226-1015
mflannery@cuneolaw.com

Phillip Duncan
Richard Quintus

Thomas P. Thrash
Thrash Law Firm, P.A.

REDACTED

Duncan Firm, P.A.
900 S. Shackleford, Suite 725
Little Rock, AR 72211
Telephone:  (501) 228-7600
phillip@duncanfirm.com
richard@duncanfirm.com

1101 Garland Street
Little Rock, AR 72201
Telephone: (501) 374-1058
tomthrash@sbcglobal.net

Dewitt Lovelace
Valerie Nettles
Lovelace & Associates, P.A.
Suite 200
12870 US Hwy 98 West
Miramar Beach, FL  32550
Telephone: (850) 837-6020
dml@lovelacelaw.com
alex@lovelacelaw.com

Charles Barrett
Charles Barrett, P.C.
6518 Highway 100
Suite 210
Nashville, Tennessee 37205
Telephone: (615) 515-3393
charles@cfbfirm.com

Gregory Johnson
G. Johnson Law, PLLC
6688 145th Street West,
Apple Valley, MN 55124
Telephone: (952) 930-2485
greg@gjohnsonlegal.com

*Attorneys for Dealership Plaintiffs*

REDACTED

## CERTIFICATE OF SERVICE

I hereby certify that on December 22, 2014 I electronically filed the foregoing papers with the Clerk of the Court using the ECF system which will send electronic notices of same to all counsel of record.

    /s/ Brendan Frey
Brendan Frey (Michigan Bar No. P70893)
Mantese Honigman Rossman
 and Williamson, P.C.
1361 E. Big Beaver Road
Troy, Michigan 48083
Phone: (248) 457-9200 ext. 203
Fax: (248) 457-9201
Email: bfrey@manteselaw.com