UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

_____

IN RE: AUTOMOTIVE PARTS
ANTITRUST LITIGATION       MASTER FILE NO. 12-md-02311

_____

In Re: Fuel Injection Systems      HON. MARIANNE O. BATTANI

_____

THIS DOCUMENT RELATES TO:

Dealership Actions         13-02202
End-Payor Actions         13-02203

_____/


**OPINION AND ORDER DENYING MOTION TO DISMISS THE
END-PAYORS' AND THE AUTO DEALERS' CONSOLIDATED
AMENDED CLASS ACTION COMPLAINTS**

Before the Court is Mitsuba Corporation and American Mitsuba Corporation's (collectively "Mitsuba Defendants") Motion to Dismiss the Dealerships' Consolidated Amended Class Action Complaint and the End-Payors' Corrected Consolidated Amended Class Action Complaint (Doc. No. 55 in 13-02202; Doc. No. 50 in 13-02203). The Court has reviewed all of the filings, and for the reasons that follow, the motion is **DENIED**.

**I. INTRODUCTION AND FACTUAL ALLEGATIONS**

Automobile Dealer Plaintiffs ("ADPs") and End-Payor Plaintiffs ("EPPs")

(collectively "Indirect Purchaser Plaintiffs" or "IPPs" ) bring class actions against Defendants under federal and state law based on Defendants' alleged conspiracy to rig bids, fix the prices, and allocate the market and customers of Fuel Injection Systems manufactured or sold in the United States. (Doc. Nos. 33 in 13-2202, hereinafter "ADPs' Complaint," at ¶ 1; Doc. No. 27 in 13-2203, hereinafter, "EPPs' Complaint," at ¶ 1). Defendants are manufacturers or sellers of Fuel Injection Systems that are manufactured or sold in the United States. (ADP's Complaint at ¶¶ 1, 4, 144, 145; EPPs' Complaint at ¶¶ 1, 4, 106).

In their complaints, IPPs include allegations about government investigations into antitrust activity involving Fuel Injection Systems, (ADPs' Complaint at ¶ 5; EPPs' Complaint at ¶ 5), the guilty pleas by Defendants and their agents flowing from the antitrust investigation, (ADPs' Complaint at ¶¶ 6-13, 16, 17; EPPs' Complaint at ¶¶ 6-14), and guilty pleas specific to Fuel Injection Systems (ADPs' Complaint at ¶¶ 14-15, 18; EPPs' Complaint at ¶¶ 14-15, 18). Manufacturers and numerous executives of those manufacturers have entered into guilty pleas involving Fuel Injection Systems. (Id.)

Indirect Purchaser Plaintiffs allege that Mitsuba Defendants supplied Fuel Injection Systems, which are defined in the complaints to include certain enumerated component parts.

> Fuel Injection Systems admit fuel or a fuel/air mixture into engine cylinders and may include fuel injectors, high pressure pumps, rail assemblies, feed lines, electronic throttle bodies, airflow meters, engine control units (or engine ECUs), fuel pumps, fuel pump modules, manifold absolute pressure sensors ("MAP Sensors"), pressure regulators, pulsation dampers, electronic throttle motors, purge control valves and other components sold as a unitary system. Fuel Injection Systems can also be

sold as part of a broader system, such as an engine management system. (ADP's Complaint at ¶ 3; EPPs' Complaint at ¶ 2).

IPPs allege that Mistusba Defendants acted as a supplier to Original Equipment Manufacturers ("OEMs") and rigged bids to OEMs with their co-conspirators. (ADPs' Complaint at ¶¶ 144, 145, 157, 160; EPPs' Complaint 1, at ¶ ¶ 1, 120, 121). On September 26, 2013, the Department of Justice ("DOJ") announced that Mitsuba Corporation agreed to plead guilty and to pay a criminal fine of $135 million for its participation in rigging bids for and fixing prices of electric throttle motors and fuel pumps, two of the enumerated component parts included in the definition of Fuel Injection Systems. (See ADPs' Complaint at ¶ 3, 178; EPPs' Complaint at ¶ 2). Mitsuba Corporation also agreed to plead guilty to obstruction of justice for its conduct during the course of the investigation. (ADPs' Complaint at ¶ 178).

In their complaints, IPPs allege that market conditions conducive to an antitrust conspiracy exist. (ADPs' Complaint at ¶ 162; EPPs' Complaint at ¶ 123). Specifically, the Fuel Injection Systems market has high barriers to entry, which facilitate the formation and maintenance of a cartel. (ADPs' Complaint at ¶ 162; EPPs' Complaint at ¶ 124). Those barriers include "costly and lengthy start-up costs, including multi-million dollar costs associated with manufacturing plants and equipment, energy, transportation, distribution infrastructure, and long-standing customer relationships." (ADPs' Complaint at ¶ 164; EPPs' Complaint at ¶ 125). Defendants own patents, another factor hindering entry into the market. (ADPs' Complaint at ¶ 165; EPPs' Complaint at ¶ 126). IPPs further allege inelasticity of demand. (ADPs' Complaint at ¶¶ 167-169; EPPs' Complaint at ¶¶ 129-131).

3

## II.  STANDARD OF REVIEW

Federal Rule of Civil Procedure 12(b)(6) allows district courts to dismiss a complaint which fails "to state a claim upon which relief can be granted."  To survive a motion to dismiss for failure to state a claim under Rule 12(b)(6), the plaintiff must show that his complaint alleges facts which, if proven, would entitle him to relief.  First Am. Title Co. v. DeVaugh, 480 F.3d 438, 443 (6th Cir. 2007).  "A complaint must contain either direct or inferential allegations with respect to all material elements necessary to sustain a recovery under some viable legal theory."  Weiner v. Klais & Co., 108 F.3d 86, 88 (6th Cir. 1997).   When reviewing a motion to dismiss,  the Court "must construe the complaint in the light most favorable to the plaintiff, accept all factual allegations as true, and determine whether the complaint contains enough facts to state a claim to relief that is plausible on its face."  Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007).  Although the federal procedural rules do not require that the facts alleged in the complaint be detailed, " 'a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of a cause of action's elements will not do.' "  Twombly, 550 U.S. at 555; Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.").

## III.  ANALYSIS

Mitsuba Defendants advance two arguments in support of their request for dismissal.  First, they assert that IPPs cannot show they were harmed by Mitsuba Defendants because IPPs 0failed to allege they purchased any products manufactured

4

or marketed by Mitsuba Defendants.  Second, Mitsuba Defendants contend that inasmuch as they only manufacture some component parts of Fuel Injection Systems, they cannot be liable for a conspiracy in the Fuel Injection Systems market.

Before turning to the merits of the arguments, the Court addresses IPPs' request that the Court take Judicial Notice of Mitsuba Corporation's November 6, 2014, Plea Agreement.  Pursuant to Fed. R. Evid. 201(b), a court may take judicial notice of facts that are "not subject to reasonable dispute" because they are "generally known within the trial court's territorial jurisdiction; or can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned."  The Court is satisfied that the Plea Agreement meets the requirements of Rule 201(b).  Accordingly, it takes judicial notice of the Agreement, and in assessing the merits of Mitsuba Defendants' arguments, the Court considers not only the allegations in the complaints, but also the content of the Plea Agreement.

**A.  Standing**

The parties dispute whether Indirect Purchaser Plaintiffs have satisfied the constitutional requirement for standing; specifically, whether IPPs alleged a "personal injury fairly traceable to the defendant's allegedly unlawful conduct" that is "likely to be redressed by the requested relief."  <u>Lexmark Int'l, Inc. v. Static Control Components, Inc.</u>, __ U.S. __, 134 S. Ct. 1377 (2014).  Mitsuba Defendants assert that IPPs lack constitutional standing because the allegations that Mitsuba Defendants manufacture, market and sell Fuel Injection Systems are boilerplate and the definition of Fuel Injection Systems, as articulated in the complaints, reveals the lack of factual support for the boilerplate allegations.

5

IPPs define Fuel Injection Systems to include certain enumerated component parts.

> Fuel Injection Systems admit fuel or a fuel/air mixture into engine cylinders and **may** include fuel injectors, high pressure pumps, rail assemblies, feed lines, electronic throttle bodies, airflow meters, engine control units (or engine ECUs), fuel pumps, fuel pump modules, manifold absolute pressure sensors ("MAP Sensors"), pressure regulators, pulsation dampers, electronic throttle motors, purge control valves and other components sold as a unitary system.  Fuel Injection Systems can also be sold as part of a broader system, such as an engine management system.

(ADP's Complaint at ¶ 3; EPPs' Complaint at ¶ 2) (emphasis added).

Mitsuba Defendants contend that the use of the word "may" in the definition means that Fuel Injection Systems may **or may not** include the parts manufactured or sold by Mitsuba Defendants, and that in some instances component parts, such as those manufactured by Mitsuba Defendants, are sourced separately.  The shortcomings inherent in the definition become more apparent by the fact that nowhere in the complaints, do IPPs identify which Defendant manufactured which part.  Mitsuba Corporation has only pleaded guilty to a conspiracy involving two of the parts: electronic throttle motors and fuel pumps.  Yet, IPPs have failed to allege that they purchased Fuel Injection Systems containing a throttle motor or fuel pump manufactured by Mitsuba Defendants.  Consequently, IPPs have failed to demonstrate they have standing to assert claims against Mitsuba Defendants.

Mitsuba Defendants build their argument on a reading of the complaints that reserves favorable inference for themselves.  The Court, however, must credit the allegations advanced by IPPs in the light most favorable to IPPs.  First and foremost is their allegation that they purchased vehicles containing Fuel Injection Systems

6

manufactured by Mitsuba Defendants. Secondly, the definition, read in the light most favorable to IPPs, suggests that Fuel Injection Systems may include the listed products sold as a unitary system or that Fuel Injection Systems may be sold as part of a larger system. This reading further comports with the other allegations in the complaints. In addition, Mitsuba Defendants' argument builds on the assumption that Mitsuba Corporation's guilty plea establishes immutable boundaries as to its conduct. Case law does not support such confinement. See e.g. In re High Fructose Corn Syrup Antitrust Litig., 295 F.3d 664-665 (7th Cir. 2002) (recognizing the factors that play into plea agreements).

### B. Plausible Conspiracy

The parties also dispute whether the allegations in the complaints allege a plausible horizontal conspiracy in the Fuel Injection Systems market. According to Mitsuba Defendants, IPPs' failure to advance a plausible allegation that they manufactured Fuel Injection Systems means they cannot have engaged in horizontal price-fixing with those defendants that did, in fact, manufacture Fuel Injection Systems. Instead, IPPs' complaints allege a vertical conspiracy, and IPPs must allege an economic rationale as to why Mitsuba Defendants would conspire with manufacturers of the finished product, conduct that would not benefit Mitsuba Defendants themselves.

To establish a claim under Section 1 of the Sherman Act, a "plaintiff must establish that the defendants contracted, combined or conspired among each other, that the combination or conspiracy produced adverse, anticompetitive effects within relevant product and geographic markets, that the objects of and conduct pursuant to that contract or conspiracy were illegal and that the plaintiff was injured as a proximate result

of that conspiracy." Crane & Shovel Sales Corp. v. Bucyrus-Erie Co., 854 F.2d 802, 805 (6th Cir. 1988) (quoting Davis-Watkins Co. v. Serv. Merch., 686 F.2d 1190, 1195 (6th Cir. 1982) (citations omitted)). The pleading requirements vary based on the type of anticompetitive conduct. Those, such as horizontal price-fixing conspiracies, which "have such a clear lack of any redeeming virtue that any restraint of that type is conclusively presumed to be unreasonable," are deemed per se illegal under the antitrust laws. Expert Masonry, Inc. v. Boone County, Ky., 440 F.3d 336, 342 (6th Cir. 2006) (quoting Bailey's, Inc. v. Windsor America, Inc., 948 F.2d 1018, 1027 (6th Cir. 1991)). In contrast, vertical price-fixing conspiracies are analyzed under the "rule of reason approach" which "permits case-by-case evaluation of their effect on competition." Id.

Mitsuba Defendants are correct that noncompetitors cannot engage in horizontal price-fixing. See Texaco v. Dhager, 547 U.S. 1, 5-6 (2006). Mitsuba Defendants also are correct that a conspiracy is implausible if it makes no economic sense. Mitsuba Defendants, however, are not correct that IPPs have alleged a vertical conspiracy between a component supplier and downstream manufacturers. Again, Mitsuba Defendants' position builds on a reading of the complaints and Mitsuba Corporation's Plea Agreement in the light most favorable to them.

In its Plea Agreement, Mitsuba Corporation admitted that from as early as January 2000 through at least February 2010, it manufactured various automotive parts including electronic throttle motors and fuel pumps. (Plea Agreement at ¶ 4(a)). The Plea Agreement demonstrates that Mitsuba Corporation, without question, sold two of the many parts included in the Fuel Injection System. According to Mitsuba

Defendants, the claims lodged against them rest entirely on the guilty plea that does not encompasses the finished component part at issue–Fuel Injection Systems. Therefore, they conclude, dismissal must be granted.

In their complaints, IPPs allege that Defendants, including Mitsuba Defendants conspired to fix the prices of Fuel Injection Systems as defined in the complaints sold to OEMs by Mitsuba Defendants and its co-conspirators.  IPPs need not confine the allegations in their complaints to the contours of the plea agreements.  Defendants rarely plead guilty to all of the charges against them, and limitations on government resources may play as much a role in any plea agreement reached as the conduct giving rise to the guilty pleas.  In re High Fructose Corn Syrup Antitrust Litig., 295 F.3d 664-665 (7th Cir. 2002).

Further, the Court is mindful that Mitsuba Corporation's guilty plea is not the sole basis for the allegations against Mitsuba Defendants.  IPPs' complaints detail international government investigations that resulted in the guilty pleas of other defendants for their part in the price-fixing and bid-rigging of throttle bodies and fuel pumps as well as the market conditions that facilitated the conspiracy.  Specifically, Aisan Industry Co., Hitachi Automotive Sys., Ltd., Mitsubishi Electric corporation have pleaded guilty to antitrust conduct involving electronic throttle bodies.  (ADPs' Complaint at ¶¶ 6, 14, 18; EPPs' Complaint at ¶¶ 6, 14, 18).  The factual allegations create "a reasonable expectation that discovery will reveal evidence of illegal agreement" beyond those parties that have pleaded guilty and the conduct for which they pleaded guilty. Twombly, 550 U.S. at 556. Accord In re Polyurethane Foam Antitrust Litig., 799 F. Supp. 2d 777, 782 (N.D. Ohio 2011) (relying on "specific admissions" made during a

governmental investigation that supported the "existence of a conspiratorial agreement").

These are the type of allegations found to satisfy Twombly. At this stage in the proceedings, the Court is required to read the complaints in the light most favorable to IPPs. Here, the allegations suggest a broad industry-wide conspiracy. IPPs' complaints, read in their entirety, reflect a conspiracy directed at OEMs, and Mitsuba Defendants' reliance on the decision in In re Se. Milk Antitrust Litig., 739 F.3d 262 (6th Cir.) cert. denied sub nom. Dean Foods Co. v. Food Lion, LLC, 135 S. Ct. 676 (2014), is misplaced. The difference between the allegations here and those scrutinized under the rule of reason in In re Se. Milk Antitrust Litig., 739 F.3d at 272, is that the plaintiffs in Southeastern Milk, alleged and challenged a vertical agreement involving a Defendant that processed bottled milk and a Defendant that supplied of raw milk, wherein "the [ ] supply agreements for raw milk [we]re central to the completion of the alleged conspiracy." Id. (citation omitted). Only on appeal, did the plaintiffs insist that the conspiracy was a simple horizontal agreement. The appellate court rejected the plaintiffs' recharacterization "of the conspiracy midstream," as a strategy to gain a more favorable outcome." 739 F.3d at 273. The court observed, the " 'substantial vertical elements' were too significant for the district court to agree with Plaintiffs that the essence of the conspiracy was horizontal." Id.

In contrast, here, IPPs do not allege a vertical relationship among Defendants, and IPPs' pleading burden has been satisfied. The existence of inferences that undermine a conspiracy does not undermine the sufficiency of the complaints here, provided one such inference suggests a plausible conspiracy. See Watson Carpet &

Floor Covering, Inc. v. Mohawk Indus., Inc., 648 F.3d 452, 454-55 (6th Cir. 2011) (observing that when "a complaint specifically alleges an express agreement to restrain trade and conduct by defendants consistent with the agreement, a defendant cannot prevail at the pleading stage by offering alternative explanations for the allegedly unlawful behavior").

## IV.  CONCLUSION

For the reasons stated above, Mitsuba Defendants motion is **DENIED.**

**IT IS SO ORDERED**.

Date:  August 31, 2015                                  s/Marianne O. Battani
                                                                           MARIANNE O. BATTANI
                                                                           United States District Judge

### CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing Order was served upon counsel of record via the Court's ECF System to their respective email addresses or First Class U.S. mail to the non-ECF participants on August 31, 2015.

                                                                                                    s/ Kay Doaks
                                                                                                      Case Manager